IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WILLIAM STANFORD, individually
and on behalf of all others similarly
situated,

                    Plaintiffs,

                                                    Case No. 2:07-cv-4225

          versus

FOAMEX, L.P.; FOAMEX L.P.               SENIOR JUDGE WILLIAM H. YOHN
BENEFITS COMMITTEE; FIDELITY
MANAGEMENT TRUST COMPANY;
and UNKNOWN FIDUCIARY
DEFENDANTS 1-100,
                    Defendants.

## FIDELITY MANAGEMENT TRUST COMPANY'S
## MEMORANDUM IN OPPOSITION TO PLAINTIFF STANFORD'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Stanford's Motion for Partial Summary Judgment, Record Document ("R.D.")

114, presents a significant issue that has a substantial impact on the damages asserted by the

class.  Plaintiff moves to dismiss counterclaims by all defendants (R.D. 94 & 108) seeking

reformation of a "scrivener's error" contained in a September 2005 amendment to the retirement

plan at issue in this case, the Foamex L.P. Savings Plan ("Plan").  Plaintiff's motion asks this

Court to construe an ambiguity created by this drafting error – contrary to other terms of the

Plan, the Summary Plan Description (SPD) and the Plan's trust agreement – to lock participants

into investments in the stock of a bankrupt company.  Plaintiff's construction is also contrary to

the communications issued to participants, and to the participants' own actions. Defendant

Fidelity Management Trust Company ("Fidelity") opposes Plaintiff's motion because (1) the

ambiguity in Amendment No. 4 should be construed consistent with the other unambiguous

documents governing the Plan, as well as the relevant communications to participants; (2) the

other documents governing the Plan trump Amendment No. 4 in these circumstances, under

black-letter ERISA law; (3) the facts surrounding the scrivener's error are sufficient in this case to support reformation of Amendment No. 4 to conform to the drafter's intent; and (4) Plaintiff's proposed rule of decision would lead to absurd results, both in this case and in others. Fidelity also joins in the request for relief made in the Committee Defendants' Motion for Partial Summary Judgment, R.D. 121-125.

In his Memorandum in Support ("Pl. Memo."), R.D. 115, Plaintiff advances a single legal premise for this untenable result – namely, that this Court lacks authority to reform the Plan to eliminate an unmistakable drafting error, simply because there was (allegedly) no "mutual error" in the implementation of the erroneous amendment. Plaintiff's argument is without merit because the Third Circuit does not require mutuality as a precondition to reformation. Even if it were required, however, mutuality is present here under the criteria employed by courts that have considered the issue.

Ultimately, Plaintiff's position cannot be squared with the facts, with the precedent of this Circuit, nor with common sense. For these reasons, the Court should deny Plaintiff's motion, and grant summary judgment in Fidelity's favor on the counterclaim.[1]

## I.      BACKGROUND & UNDISPUTED FACTS

This class-action lawsuit seeks to recover for alleged losses resulting from actions taken by Defendants in response to the extreme financial distress facing Foamex. In the instant motion, Plaintiff asks the Court to accept and enforce an implausible construction of an ambiguous amendment to the Plan – specifically, that this amendment (known as "Amendment

---

[1]      Summary judgment in Fidelity's favor is warranted on the grounds set forth in this memorandum in opposition. As noted above, Fidelity also joins in the request for relief set forth in the Committee Defendants' Motion for Partial Summary Judgment (R.D. 121-125). This Court has the discretion to grant summary judgment *sua sponte* to Fidelity on its counterclaim (R.D. 94), as well. *See, e.g., DL Res., Inc. v. FirstEnergy Solutions Corp.*, 506 F.3d 209, 223-24 (3d Cir. 2008).

No. 4") was intended to prevent Plan participants, against their will, from selling stock holdings of a bankrupt company, just as the stock was by all appearances about to become worthless.

Plaintiff's strained reading of Amendment No. 4 conflicts directly with the controlling provisions of the plan documents, including the Plan itself, the SPD, and the Trust Agreement. Remarkably, Plaintiff does not, and cannot, claim that his proposed interpretation reflects the intent of its drafters. On the contrary, Plaintiff's self-serving and highly selective view of Amendment No. 4 stands in stark conflict with the drafters' intent, as demonstrated below. For these reasons, the Court should deny Plaintiff's motion.

### A.    Overview.

Defendant Foamex, L.P. is the Plan's Sponsor. *See* Fidelity's Statement of Facts ("S.F.") ¶1. The Foamex L.P. Benefits Committee ("Committee") is the Plan's named fiduciary, as well as the Plan Administrator. *See* S.F. ¶2. The individual defendants ("Committee Defendants") were members of Foamex's senior management and served on the Committee during the relevant time period. *See* S.F. ¶3. The Foamex Committee has "complete authority to control and manage the operation and administration of the Plan." *See* S.F. ¶4. Fidelity Trust served as the Plan's directed trustee,[2] pursuant to a Trust Agreement between Fidelity and Foamex. *See* S.F. ¶5.

---

[2]    ERISA §403(a)(1), 29 U.S.C. §1103(a)(1), makes a directed trustee subject to the direction of plan fiduciaries. This "significantly limits such a trustee's responsibilities as a plan fiduciary." *See* Department of Labor Field Assistance Bulletin ("FAB") 2004-03 (Dec. 17, 2004) at 2. Thus, a directed trustee's ERISA liability is "limited to instances in which it fails to follow such proper directions or it complies with directions that are improper, or contrary to the Plan or ERISA." *See DiFelice v. US Airways, Inc.*, 397 F. Supp. 2d 735, 746 (E.D. Va. 2005). *See also, generally, In re WorldCom, Inc ERISA Litig.,* 354 F. Supp. 2d 423, 441-46 (S.D.N.Y. 2005) (discussing limited nature of directed trustee's duties).

One of the investment options offered by the Plan for investment by participants was the Foamex Stock Fund ("Fund").  The Fund was a unitized fund[3] which held shares of Foamex common stock, thus providing participants an opportunity for investment exposure to the business performance of Foamex.  *See* S.F. ¶6.

After months of publicly disclosed financial distress,[4] Foamex filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 19, 2005.  *See* S.F. ¶15. Throughout late 2005, Foamex issued public warnings that the bankruptcy would likely leave shareholders (such as the Fund) with no value for their shares of Foamex stock.  *See* S.F. ¶18. Indeed, on December 23, 2005, Foamex filed a bankruptcy reorganization plan calling for the cancellation of Foamex stock, providing for *no* recovery by shareholders.  *See* S.F. ¶19.

It is in this context that the Committee's adoption of Amendment No. 4 must be viewed.

## B.     The Foamex Benefits Committee Acts.

At a July 2005 meeting, the Benefits Committee decided to remove the Fund as an investment option in the Plan, and took preliminary steps to achieve this objective by closing the Fund to new contributions.  The minutes of this meeting make clear the Committee's intentions:

> Due to the recent volatility in the price of Foamex stock, the Committee determined that the Foamex Stock Fund may no longer be an appropriate investment for the 401(k) Plan and agreed to close the Fund to new investments as soon as administratively possible … *Money currently in the Foamex Stock Fund will not be affected, and participants will be permitted [to] move those assets at their discretion.*

---

[3]     In a unitized fund, participant holdings are reflected in units, which are valued at the end of each trading day using trust accounting principles that, in essence, add the total market price of the stock held in the Fund plus the value of the cash, then divided the fund's total value by the number of units.  Unitization allows participants to reinvest their money on the same day they redeem units, instead of waiting 2-3 days for stock trades to settle. Unitization also saves substantial transaction costs by netting out intra-plan buying and selling by the participants. *Cf. DiFelice, supra*, 397 F. Supp. 2d at 739 (discussing operation of unitized stock funds); *Kurzweil v. Philip Morris Cos.*, 2001 WL 25700, *1 (S.D.N.Y. Jan. 10, 2001) (same).

[4]     From March through August of 2005, Foamex repeatedly disclosed its growing financial distress in public filings with the Securities & Exchange Commission ("SEC").  These warnings included the prospect of a bankruptcy filing, and called into question Foamex's viability as a going concern.  *See* S.F. ¶10.  The Court may take judicial notice of these SEC filings.  *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).

*See* S.F. ¶11 (emphasis added).

A few days later, Foamex and Fidelity amended the Trust Agreement to implement the Committee's decision. The Fifth Amendment to the Trust Agreement, effective July 20, 2005, provided:

> WHEREAS, the Sponsor has informed the Trustee that effective July 20, 2005, the assets of the Foamex Stock Fund are *frozen to new investments and exchanges in*….
>
>         \*       \*      \*
>
> … the Trustee and the Sponsor hereby amend the Trust Agreement by:
>
> (1) Effective … on July 20, 2005, amending the "investment options" section of Schedules "A" and "C" to reflect that the Foamex Stock Fund is *frozen to new contributions and exchanges in*.

*See* S.F. ¶12 (emphasis added). Significantly, this amendment did not disturb, in any way, participants' ability to direct the investment of their individual accounts among the various investment options in the Plan, as provided in Section 4(c) of the Trust Agreement. Similarly, the SPD also provided participants the right to allocate their investments among the various investment options in the Plan. *See* S.F. ¶¶ 7, 8 & 9.[5]

At approximately the same time, Foamex and Fidelity began communicating these developments to participants. On July 15, 2005, defendant Gregory Christian issued a memorandum to affected participants, stating:

> [D]ue to the recent volatility in the price of Foamex stock, the Benefits Committee has determined that the Foamex Stock Fund may not be an appropriate investment for a retirement plan such as the 401K Savings Plan at this time. *Therefore, a decision has been made to close the Foamex Stock Fund to new investments* effective July 15, 2005.

---

[5]      The SPD also expressly informed participants that the Plan was intended to comply with ERISA §404(c), which guarantees participants control over investment of assets in their accounts. *See* S.F. ¶¶8-9 (SPD) at 6-7 (stating "you can divide your contributions among the funds" and listing various fund options), 8 (advising participants that the Plan is intended to be participant-directed under ERISA §404(c)), and 12 (advising participants they "can …[e]xchange between investment options" and explaining means for doing so). *Cf.* S.F. ¶17 (Plan §4.3.1).

*   *   *

> *This action applies only to new contributions.*  Money that is currently in the
> Foamex Stock Fund may remain in the Fund or *can be moved into other
> investments within the Savings Plan at the participant's discretion.*

*See* S.F. ¶13 (emphasis added).  Fidelity mailed another letter to participants on July 20, 2005,

reiterating this information in almost identical terms:

> Due to the recent volatility of the price of Foamex stock, the Benefits Committee
> has determined that the Foamex Stock Fund may no longer be an appropriate
> investment for the Savings Plan at this time.
>
> Therefore, as of ... July 20, 2005, *no additional employee contributions or
> Company Matching contributions will be directed into the Foamex Stock Fund,
> and no exchanges into the Foamex Stock Fund will be permitted.*
>
> *   *   *
>
> Money that is currently in the Foamex Stock Fund may remain in the fund or *can
> be moved into other investment option within the Savings Plan.*

*See* S.F. ¶14 (emphasis added).  Participant communications in early 2006 reaffirmed

participants' ability to re-allocate their investments out of the Fund.  *See* S.F. ¶20.  In deposition,

Plaintiff Stanford acknowledged receiving and understanding these communications.  *See* S.F.

¶21.

### C.    Plan Amendment No. 4.

In September 2005, the Committee executed Amendment No. 4 to the Plan (and an

accompanying Resolution).  Amendment No. 4 amended and restated Section 4.3.1 of the Plan to

provide, in part:

> Effective July 20, 2005, a Member may no longer direct new investments into, or
> transfer existing investments into or out of, the Foamex Stock Fund.  All
> investments in the Foamex Stock Fund as of July 19, 2005 shall remain in the
> Foamex Stock Fund *until moved into an alternative investment fund or distributed
> according to the terms of the Plan*.

*See* S.F. ¶16 (emphasis added).  Amendment No. 4 also restated pre-existing language in Section

4.3.1, which provided that participant accounts "shall be invested as directed by each Member

6

[*i.e.*, participant] in one or more of the investment funds" in the Plan. *See* S.F. ¶17. Nothing in Amendment No. 4 purported to disturb participants' right to direct their investments as established in Section 4.3.1, the SPD, the Trust Agreement or in the various participant communications.

It is undisputed that participants were forbidden from directing new investments into the Fund after July 20, 2005; it is likewise undisputed that participants were permitted to direct, and in fact did direct, their investments out of the Fund after July 20, 2005. *See* S.F. ¶¶22-23.

## II.    LAW & ARGUMENT.

Plaintiff contends that the intent of Amendment No. 4 was to preclude participants from selling their Fund holdings, despite (1) the dire financial condition of Foamex; (2) the numerous contrary provisions of the plan documents permitting participant direction of their investments; and (3) the numerous participant communications re-affirming participants' direction rights. Plaintiff asserts that Foamex, the Committee Defendants and Fidelity violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1001 *et seq*., by permitting participants to sell their individual holdings in the Fund during the Foamex bankruptcy.

Given the circumstances of this case, Defendants have sought to reform Amendment No. 4 to remove an apparent ambiguity in Amendment No. 4 and to conform it to the Committee's intentions regarding the Fund's administration. Plaintiff is not entitled to summary dismissal of the counterclaim, as shown below.

## A.    Plaintiff's Proposed Interpretation of an Ambiguous Amendment Conflicts with Other Controlling Provisions of the Plan, the SPD and the Trust Agreement.

Put simply, Plaintiff asks the Court to construe a part of a single, ambiguous plan amendment to override numerous explicit provisions found elsewhere in the plan documents. By

simply resolving this ambiguity by reference to all of the plan documents, the Court may pretermit the question of the scrivener's error altogether.[6]

        1.      <u>Amendment No. 4 is Itself Ambiguous</u>.  By its terms, one part of Amendment No. 4 (the scrivener's error part) purported to preclude "transfer[s] … out of" the Fund.  Plaintiff incorrectly argues that "there is no possible alternative interpretation" of Amendment No. 4 other than "freez[ing] participants' exit from the Fund." *See* Pl. Memo. 8.  In fact, Amendment No. 4 *also* expressly contemplates that assets in the Fund may be "moved to an alternative investment fund or distributed according to the terms of the Plan."  As noted above, Section 4.3.1 of the Plan also provides that participant accounts "shall be directed by each Member" among the investment funds in the Plan.  Amendment No. 4 itself refers to "mov[ing] to an alternative investment fund . . . according to the terms of the Plan."  The Amendment did not delete (and in fact restated) this portion of Section 4.3.1, nor did the Amendment remove alternative investment options other than the Fund.[7]

Plaintiff declares, without elaboration, that Amendment No. 4 is unambiguous.  Yet, he conspicuously fails to explain how participant holdings can be "moved … according to the terms of the Plan," if his proposed interpretation is correct.  Thus, there is an ambiguity inherent in Amendment No. 4, which is easily resolved by reading Amendment No. 4 in conjunction with the other plan documents, as shown below.

---

[6]      As noted herein, Amendment No. 4 is both internally inconsistent, and trumped by other parts of the plan documents.  Accordingly, the Court should interpret Amendment No. 4 to allow transfers out, in which case reformation is not necessary to establish that the complained-of participant withdrawals from the Fund were proper and authorized.  *See* R.D. 94, Counterclaim, ¶3.  However, to the extent Plaintiff's claims find support in Amendment No. 4, Fidelity is entitled to reformation to rectify the "scrivener's error" identified by Foamex and the Committee Defendants.  *Cf.* R.D. 86 at 8-9, R.D. 108.

[7]      The decision in *Rea v. Hershey Co. 2005 Enhanced Mut. Separation Plan*, 2008 WL 2782663 (M.D. Pa. July 15, 2008) presents problems for Plaintiff, since Plaintiff acknowledges that reformation is appropriate when plan language is "completely unintelligible, such as in *Rea*." *See* Pl. Memo. at 9.  On one hand, Plaintiff argues that Amendment No. 4 prohibits participants from moving their investments out of the Fund; on the other hand, Amendment No. 4. clearly contemplates that investments could be "moved into an alternative investment fund … according to the terms of the Plan," such as Section 4.3.1.

2.    <u>Plaintiffs' Proposed Interpretation Conflicts with the other Plan Documents, such as the SPD and the Trust Agreement, Which Unequivocally Afford Participants the Right to Control Their Investments</u>.    Plaintiff's interpretation of Amendment No. 4 is not only inconsistent with the Plan, it is also at odds with the other plan documents, the SPD and the Trust Agreement.  As with parts of Plan Section 4.3.1, the SPD and Trust Agreement conferred greater rights on participants (*i.e.*, the right to control their investments) than would have been available under Plaintiff's reading of Amendment No. 4.  These other plan documents make it clear that Defendants' actions were appropriate notwithstanding Amendment No. 4.  *Cf. Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 82-84 (1995) (observing that plan administrators have a duty to distinguish defective amendments from valid ones).

The SPD is an integral part of the plan documents.  *See, e.g., In re Lucent Death Benefits ERISA Litig.*, 541 F.3d 250, 254 (3d Cir. 2008) (noting that plans are "governed by written documents and summary plan descriptions").  In fact, the Third Circuit has already held that the SPD controls in the event of conflicts with the plan itself.  *See Burstein v. Retirement Account Plan for Employees of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 378 (3d Cir. 2003) ("[W]here a summary plan description conflicts with the plan language, it is the summary plan description that will control.").  In this case, the SPD expressly contemplates that participants have greater rights than Plaintiffs' proposed construction of Amendment No. 4 would allow, because the SPD grants participants the right to move their investments among available options.  *See* S.F. ¶¶ 7, 8 & 9 (SPD at 6-7 (stating "you can divide your contributions among the funds" and listing various fund options), 8 (advising participants that the Plan is intended to be participant-directed under ERISA §404(c)), and 12 (advising participants they "can …[e]xchange between investment options" and explaining means for doing so)).

Similarly, Plaintiff's proposed interpretation of Amendment No. 4 conflicts with the Trust Agreement. Significantly, the Plan expressly incorporates the terms of the Trust Agreement, stating that plan assets are "committed in trust to the Trustee [*i.e.*, Fidelity] . . . subject to the terms of the Trust to be held, managed, and disposed of by the Trustee in accordance with the terms of the Trust and this Plan." *See* S.F. ¶25 (Plan, §10.1). Like the SPD, ERISA also treats the Trust Agreement as an integral part of the plan documents. *See* ERISA §§ 104(a)(6), 104(b)(2) and 104(b)(4), 29 U.S.C. §§ 1024(a)(6), 1024(b)(2) and 1024(b)(4) (including "trust agreement" among "instruments under which a plan was established or is operated"). *See also* ERISA §403(a), 29 U.S.C. §1103(a) (requiring plan assets to be held in trust); *Central States S.E. & S.W. Pension Funds v. Central Transport, Inc.*, 472 U.S. 559, 568-69 (1985) (treating trust as part of plan documents).

Section 4(c) of the Trust Agreement provides that "each Plan participant shall direct the Trustee in which investment option(s) to invest the assets in the participant's individual accounts." Although the Trust Agreement was amended to reflect the Committee's decision to close the Fund to new investments in July 2005 (S.F. ¶12), the amendment did not delete Section 4(c) of the Trust Agreement. Indeed, the amendment to the Trust Agreement expressly prohibited "exchanges in" but does not prohibit "exchanges out," which are otherwise permitted by the Trust Agreement. Thus, there was no indication of any intent to restrict the participants' ability to depart the Fund. Even if Amendment No. 4 did prevent participants from exiting the Fund, however, Section 16(b) of the Trust Agreement (as incorporated by reference into the Plan) provides that "in the event of any conflict between the provisions of the Plan and the provisions of this Agreement, the provisions of this Agreement shall control." *See* S.F. ¶24.

**B.      Scrivener's Error & Reformation of ERISA Plans.**

To whatever extent part of Amendment No. 4 could be read to avoid conflicting provisions in the plan documents, and/or read to have precluded participants from exiting the Fund, Fidelity's counterclaim seeks reformation of the plan to rectify the "scrivener's error" identified by the Committee Defendants.  The Third Circuit has made clear that a "scrivener's error" in an ERISA plan may be reformed in appropriate circumstances.  *See International Union of Elec., Elec., Salaried Machine & Furniture Workers v. Murata Erie North Am., Inc.*, 980 F.2d 889, 907-08 (3rd Cir. 1992) (holding reformation proper where an intended plan provision was omitted due to a drafting error).  Under *Murata*, a court may correct drafting errors where those errors (1) are established by clear and convincing evidence and (2) were not likely to have misled participants.  *Id*. at 907.  *Accord:  Rea, supra*, 2008 WL 2782663 at *7-9 (applying scrivener's error to reform plan); *Young v. Verizon's Bell Atlantic Cash Balance Plan*, ___ F. Supp. 2d ___, 2009 WL 3677350 at **38-49 (N.D. Ill. Nov. 2, 2009) (same).   *See also Central Penn. Teamsters Pension Fund v. McCormick Dray Line, Inc*., 85 F.3d 1098, 1105 n. 2 (3rd Cir. 1996) (distinguishing *Murata* in a dispute involving a multi-employer plan):  "The central holding of *Murata*'s 'scrivener's error' discussion is that in circumstances where a court can establish that no plan participants were likely to have relied upon the scrivener's error in question in determining their rights and obligations under the plan, allowing reformation of the scrivener's error does not thwart ERISA's statutory purpose of ensuring that plan participants can rely upon the language."

1.      The Intent of Amendment No. 4 was to Preclude New Investments in the
Fund, Not to Prohibit Participants from Leaving the Fund.  As in the common law of trusts,[8] the
first step in any reformation analysis is establishing an error in drafting.  *See, e.g.*. RESTATEMENT
(THIRD) OF TRUSTS (2003), §62 & comm. a.  The "scrivener's error" rule is applied under trust
law when (i) the terms of the trust contain a drafting error and (ii) it can be shown by "clear and
convincing" evidence that the settlor's intent was not accurately reflected.  *See, e.g.,*
RESTATEMENT (3RD) OF TRUSTS (2003), §62, comm. b & illus. 1; Spencer W. Symon,
POMEROY'S EQUITY JURISPRUDENCE, §845 (5th ed. 1941) (noting exceptional relief of
reformation if, after entering an agreement, a drafting error prevents the agreement from
reflecting parties' true intent).  *Cf.* Mary F. Radford & George G. Bogert, THE LAW OF TRUSTS
AND TRUSTEES, § 991 (discussion reformation for "mistake in expression").

The evidence is clear and convincing that the Committee's intent was to prevent
participants from taking on additional exposure to the Fund, not to prevent them from leaving it.
After noting the volatility of Foamex stock, the minutes of the Committee's July 2005 meeting
(*i.e.*, the meeting that yielded Amendment No. 4) make this unmistakable:  "Money currently in
the Foamex Stock Fund will not be affected, and participants will be permitted [to] move those
assets at their discretion."  *See* S.F. ¶11.  Given their conclusion that the Fund was no longer
appropriate investment option, it is inconceivable that the Committee would have locked
participants into that Fund.

The above-described provisions from the governing plan documents confirm this.  The
Plan, the SPD and the Trust Agreement all clearly conferred on participants the right to control

---

[8]      Courts routinely look to the law of trusts in construing plan documents.  *See, e.g., Kennedy v. Plan Adm'r
for DuPont Sav. & Inv. Plan*, 129 S. Ct. 865, 871 (2009) (explaining that trust law "serves as ERISA's backdrop")
(internal quotation/citation omitted); *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 261 (4th Cir. 2009) ("[C]ourts are
to apply trust-law principles to ERISA determinations."); *Hughes v. 3M Retiree Med. Plan*, 281 F.3d 786, 790 (8th
Cir. 2002) ("We look to the law of trusts when interpreting ERISA plan documents.").

their own investments.  Amendment No. 4 did not purport to disturb that right, nor did it make any mention of the myriad of other provisions in the plan documents that established that right. But the evidence of intent does not stop there:  every single one of the relevant participant communications makes it obvious that the Committee intended to prevent new investments in the Fund, and nothing else.  *See* S.F. ¶¶ 13, 14 & 20.

Plaintiff has conceded for this motion – as, ultimately, he must – that Amendment No. 4 contains a scrivener's error.  *See* Pl. Memo. (R.D. 115) at 4 n.1.  Given the foregoing facts, the reason for Plaintiff's concession is obvious:  clear and convincing evidence has established that the Committee intended only to prevent *new* investments in the Fund after July 2005, not to prohibit any "transfer … out of" the Fund.  *See* S.F. ¶¶11-14, 17, 20 and 23.  Thus, if Plaintiff is correct that Amendment No. 4 unambiguously precluded participants from withdrawing assets from the Fund, then Amendment No. 4 contains a scrivener's error that this Court should reform.

2.     Additional Considerations Make Reformation Appropriate Here.  As noted above, the *Murata* court was "concerned only with ensuring that employees could reasonably rely upon the language of the plan."  *McCormick, supra*, 85 F.3d at 1105.  There is absolutely no basis to conclude that participants "reasonably relied" on Amendment No. 4.  This alone is sufficient basis to deny Plaintiff's motion.

However, numerous other factors relevant to a reformation analysis counsel in favor of reformation here.  These considerations include not only the reliance issue, but also the parties' course of conduct, the potential for an undeserved windfall, and general ERISA policy

considerations.  *See, e.g., Young, supra*, 2009 WL 3677350, at *45.[9]  Plaintiff's arguments regarding mutuality and participant intent are addressed in Section II(B)(3), *infra*.

        a.    <u>Participants Could Not have "Reasonably Relied" on Amendment No. 4</u>.  Plaintiff suggests that Defendants bear the burden of proving that none of the participants ever relied on Amendment No. 4.  *See* Pl. Memo. at 9-10.  This misstates the controlling law. Defendants need only establish that participants could not have *reasonably* relied on Amendment No. 4.  *Murata*, 980 F.2d at 907 (noting that "reasonable reliance" on earlier plan documents would not have misled participants).  *Cf. McCormick, supra*, 85 F.3d at 1105 (reading *Murata* as "only concerned with ensuring that employees could reasonably rely" on the plan terms). Plaintiff has produced absolutely no evidence that any participant relied on Amendment No. 4. In reality, hundreds of participants withdrew from the Fund between July 2005 and December 2006.  These participants' very actions directly contravene Plaintiff's reading of Amendment No. 4, and by definition show that *they* did not rely on any such reading of Amendment No. 4.

        Participants were also advised in the SPD that they could direct their investments. ERISA §102, 29 U.S.C. § 1002, requires that SPDs be provided to participants in order to inform them of their rights, benefits and obligations due under the plan.  Under ERISA, the SPD is intended to be the participants' "primary source of information regarding employment benefits, and employees are entitled to rely on the descriptions contained in the summary."  *Heidgerd v. Olin Corp.*, 906 F.2d 903, 907-08 (2nd Cir. 1990).  Given the SPD's central role in informing participants of their rights, their reliance on the SPD must be presumed.  *See Burstein, supra*, 334

---

[9]      The *Young* court granted summary judgment in favor of defendants, whose counterclaim sought reformation to eliminate erroneous plan terms.  As in *Murata*, the *Young* court rejected the claim – advanced by Plaintiff here (*cf.* Pl. Memo. at 7-8) – that ERISA's "plan-documents rule" categorically precludes reformation. *Young, supra*, 2009 WL 3677350 at **40-41.  *Cf. Murata*, 980 F. 2d at 907 (noting reformation is permitted in spite of "potential tension" with ERISA's plan-documents rule).  The *Young* court observed that even those courts rejecting reformation claims had not foreclosed the possibility of reformation under appropriate circumstances. *Young supra*, 2009 WL 3677350, at *41.

F.3d at 379 ("The SPD is the document to which the lay employee is likely to refer in obtaining information about the plan and in making decisions affected by the terms of the plan."); *Young, supra*, 2009 WL 3677350, at *44 (noting SPDs provide "key evidence on the reliance question").

Likewise, participant communications consistently apprised participants that they had unfettered discretion to re-allocate their accounts holdings from the Fund to another investment option.  These communications included:

- A July 15, 2005 memo from Defendant Christian to participants, stating that "[m]oney that is currently in the Foamex Stock Fund may remain in the Fund or *can be moved into other investments within the Savings Plan at the participant's discretion*."  (S.F. ¶13)

- A July 20, 2005 letter mailed by Fidelity to participants, stating:  "[m]oney that is currently in the Foamex Stock Fund may remain in the fund or *can be moved into other investment option within the Savings Plan*."  (S.F. ¶14)

- A January 27, 2006 letter mailed by Fidelity to participants, announcing the plan to liquidate stock in the Fund, and advising participants how to exit the Fund prior to its liquidation.  (S.F. ¶20)

- A February 24, 2006 letter mailed by Fidelity to participants, advising that the Committee had halted the planned liquidation of the Fund, and stating: "**[t]he Foamex Stock Fund is still closed** to additional contributions or exchanges into the fund.  However, you may make exchanges out of the Foamex Stock Fund at any time."  (S.F. ¶20 (bold type in original))

Under these circumstances, reliance on Amendment No. 4 by *any* participant was *un*reasonable as a matter of law.[10]  In addition, as set forth in the Committee Defendants' motion (*cf.* R.D. 122 at 12), there could be no reliance in fact, since Amendment No. 4 was never provided to the participants.

---

[10]     Plaintiff Stanford himself acknowledges that he received all of these communications.  *See* S.F. ¶21.  In fact, he was not even aware of Amendment No. 4 during the relevant period.  *See* S.F. ¶26; *see also* R.D. 122 at p. 3 of 17 (noting participants did not receive copies of Plan Amendment No. 4).  Perhaps recognizing this fatal flaw in his own case, Plaintiff suggests that Defendants must establish that *no* participant relied on Amendment No. 4.  *See* Pl. Memo. at 9-10.  Reliance determinations like the one posited by Plaintiff, however, are *precisely* the sort of individualized circumstances that would render this case unsuitable for class resolution.  *See generally* R.D. 86, 96.

    b. <u>The Parties' Course of Dealing Also Counsels in Favor of Reformation</u>.  In a reformation analysis, the parties' course of conduct is "particularly reliable" evidence in a case like this.  *Young, supra*, 2009 WL 3677350, at *44.  As noted above, the participants' own course of conduct – *i.e.*, hundreds of participant requests to withdraw from the Fund between July 2005 and December 2006 – clearly supports reformation here.  The above-described communications issued by the Committee and mailed by Fidelity all support reformation, as well.  Likewise, the Defendants' conduct – *i.e.,* permitting these transfers out of the Fund – supports reformation.  There is no evidence of any contrary behavior by any person or entity that would support another conclusion.

    c. <u>Withdrawing Participants Would Realize an Undeserved Windfall</u>.  Another relevant consideration is whether, absent reformation, anyone would receive an undeserved windfall.  *Young, supra*, 2009 WL 3677350, at *45.  *Cf. Murata*, 980 F.2d at 907 (characterizing decision as allocating a "windfall" among the parties).  In this case, without reformation, hundreds of participants who departed the Fund would, with the benefit of investment hindsight, be permitted to reverse the very transactions they directed.  Conversely, Defendants do not stand to gain any windfall from a reformation of Amendment No. 4.  To permit retroactive reversal of an investment decision – especially at the expense of parties acting consistent with the common understanding of all involved – would be manifestly unfair.

    d. <u>ERISA Policy Considerations Also Support Reformation</u>.  The above-described circumstances also show why Plaintiff's position is hopelessly at odds with ERISA.  Reduced to its essence, Plaintiff maintains that participants should have been locked into the stock of a bankrupt company that appeared doomed to failure.  This is an absurd result, as it seeks to deny participants the right to control their own investment decisions, and further,

quite clearly runs afoul of the Third Circuit's decision in *Moench v. Robertson*, 62 F.3d 553, 561 (3d Cir. 1995) (holding that ERISA may require liquidation of employer stock notwithstanding plan terms). As such, this view elevates Amendment No. 4 to a status higher than ERISA itself, which is likewise illogical. *See, e.g., Central States*, 472 U.S. at 568 (noting plan documents "cannot excuse [fiduciaries] from their duties under ERISA").

Plaintiff's view leads to still another unsupportable result. The Committee closed the Fund to new investments in July 2005, as set forth in the corresponding amendment to the Trust Agreement. *See* S.F. ¶12. Amendment No. 4 was executed in September 2005, but by its express terms, it was effective as of July 20, 2005. *See* S.F. ¶16. It is undisputed that many participants withdrew from the Fund in July and August 2005. Under Plaintiff's interpretation of events, these withdrawals – although valid at the time they were directed and implemented – were retroactively transformed into ERISA violations the moment Amendment No. 4 was adopted. Such unpredictability would discourage employers from establishing and maintaining ERISA plans. *Young, supra*, 2009 WL 3677350, at *46.

        3.    <u>Plaintiff Fails to Establish Entitlement to Summary Judgment</u>. At bottom, Plaintiff makes one argument in support of his motion, namely his contention that no unilaterally adopted plan term may be equitably reformed. From this premise, Plaintiff asserts that Defendants cannot establish a "mutual" error, because they cannot establish the intent of every single participant. This argument fails for multiple reasons.

        a.    <u>Mutuality is Not Required</u>. Plaintiff casually claims that "[a] unilateral mistake by a plan drafter may not be equitably reformed" (Pl. Memo. at 9), citing a single decision of the Southern District of Texas. The Third Circuit, however, has never held that mutuality is a precondition to reformation. *Murata*, 980 F.2d at 907 (enunciating

reformation rule without reference to mutual error); *McCormick*, 85 F.3d at 1105 (reading *Murata* as "only concerned with ensuring that employees could reasonably rely" on plan terms). *See also Rea, supra*, 2008 WL 2782663, at *8-9 (reforming unilaterally drafted error in plan). This approach is consistent with the common law of trusts, which allows reformation of a unilateral scrivener's error that causes the terms of the trust to be inconsistent with settlor intent. *See* Radford & Bogert, *supra*, § 991.[11]

> b.    Even if Required, Mutuality Is Nevertheless Present Here.

Plaintiff's proposed approach overlooks the fact that ERISA plans frequently are not the product of contractual bargaining.  ERISA does, however, mandate disclosure of important plan terms to participants, such as through the SPD and participant communications.  *See* ERISA §102, 29 U.S.C. § 1002.  Where a drafting error in the plan itself misstates a key term, such as the plan eligibility requirements in *Rea*, *supra*, or participants' ability to withdraw from the Fund here, the prior, ERISA-mandated communications correctly advising participants of the intended provision establish the mutual understanding that makes reformation appropriate.  Thus, in *Young*, the Court found mutuality was present where:  (1) numerous participant communications consistently described the intended plan terms; and (2) the drafting history of the erroneous term clearly indicated the drafting was in error.  *Young, supra*, 2009 WL 3677350 at **41-43.  As shown above, those factors are present here.

Plaintiff also appears to overstate the proof required to establish mutuality.  *See* Pl. Memo at 10 (suggesting Defendants must prove "all plan participants ***knew*** of Amendment No. 4, ***knew*** it was a mistake and ***intended*** to disregard it") (emphasis in original).  Plaintiff cites no authority

---

[11]      The *Murata* court relied on *In re Estate of Duncan*, 232 A.2d 717, 720 (Pa. 1967), which observed in *dicta* that mutual error was not required to reform a trust.  *Murata*, 980 F.2d at 907.  *See also, e.g., Carlson v. Sweeney, Dabagia, Donoghue, Thorne, Janes & Pagos*, 895 N.E.2d 1191, 1199 (Ind. 2008) (noting mutual error not required for reformation of trust); *Schroeder v. Gebhart*, 825 So. 2d 442, 445 (Fla. Dist. Ct. App. 2002) (same).

for the premise that participants' understanding must be uniform for there to be mutuality.  In *Young*, participant communications alone were sufficient to establish mutuality. Here, hundreds of plan participants withdrew from the Fund, demonstrating that their understanding of their rights under the plan was consistent with the Committee's intent in adopting Amendment No. 4. *A fortiori*, these participants' withdrawals from the Fund establishes sufficient mutual error to support reformation.

Likewise, Foamex and Fidelity had a mutual understanding about the Fund, reflected in the Trust Agreement.  This understanding (which permitted participants to exit the Fund) was in turn incorporated into the Plan, by virtue of the Plan provision expressly incorporating the Trust Agreement into the Plan.

## III.   CONCLUSION.

The Court should not only deny the instant motion, but should grant Fidelity summary judgment on its counterclaim.  Plaintiff cannot establish that Amendment No. 4 is, in fact, unambiguous.  Given the other terms of the Plan, SPD and Trust Agreement, the Court can simply resolve the ambiguity in Amendment No. 4 by reference to those other provisions, even without granting the remedy of reformation.   Even if Amendment No. 4 did support the incredible notion that the participants were locked into Foamex stock as it went into bankruptcy, reformation would still be appropriate, since (i) the SPD and Trust Agreement trump Amendment No. 4 under the law of the Third Circuit and (ii) as set forth here and in the Committee Defendants' motion, the elements of reformation have been met here.

Should the Court consider the scrivener's error issue, Defendants' counterclaim for reformation survives Plaintiff's summary judgment motion.  Plaintiff has already conceded a drafting error, focusing solely on the alleged lack of mutuality.  As shown above, however,

mutuality is not a requirement, but even if it were, it is easily satisfied here based on communications and the participants' own conduct.

For these reasons, the Court should deny the motion and grant Fidelity summary judgment.


DATED: February 24, 2010.


Respectfully submitted,

  _/s/ Marshall J. Walthew_____
Howard Shapiro
Charles F. Seemann III
PROSKAUER ROSE LLP
650 Poydras Street, Suite 1800
New Orleans, LA  70130
Telephone:  (504) 310-4088
Facsimile:  (504) 310-2022

—and—

Marshall J. Walthew (PA I.D. 55329)
Sara B. Richman (PA I.D. 200729)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA  19103-2799
Telephone:  (215) 981-4224
Facsimile:  (215) 981-4750

*Counsel for Fidelity Management Trust Co.*

### CERTIFICATE OF SERVICE

I certify that the foregoing Memorandum in Opposition to Motion for Partial Summary

Judgment was served via the ECF filing system to the following on this 24th day of February,

2010:

- **KENT CPREK**
  usdc-edpa-erisa@jslex.com

- **RICHARD E. SPOONEMORE**
  rspoonemore@sylaw.com,rspoonemore@hotmail.com,theresa@sylaw.com

- **CHARLES H. THULIN**
  c.thulin@ekmanbohrer.com

- **ROSEMARY J. BRUNO**
  rosemary.bruno@bipc.com

- **BRIAN A. CASAL**
  brian.casal@bipc.com

DATED: February 24, 2010.

BY:   _/s/ Marshall J. Walthew_____