## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| WILLIAM STANFORD, JR., individually and on behalf | : | |
| of all other similarly situated persons and on behalf of | : | CIVIL ACTION |
| the Foamex L.P. Savings Plan, | : | |
|     Plaintiff, | : | No. 2:07-cv-4225 |
| | : | |
|     v. | : | |
| | : | |
| FOAMEX L.P., *et al.*, | : | |
|     Defendants. | : | |

_____:

**Memorandum**

YOHN, J.                                                                  August 31, 2010

Plaintiff, William Stanford, Jr., filed this class action individually and on behalf of all

other similarly situated persons and on behalf of the Foamex L.P. Savings Plan (the "Plan")

pursuant to Section 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1132(a)(2).[1]  Plaintiffs seek to recover alleged losses to their investments in the Foamex

Stock Fund (the "Fund") that occurred when Fidelity Management Trust Company ("Fidelity")

and the Foamex L.P. Benefits Committee (the "Committee") began selling the Fund's stock

holdings in Foamex International, Inc., out of concern that Foamex International was financially

distressed, and eventually closed down the Fund, even though the stock's value had increased.

_____

[1]  On September 24, 2009, the court certified a class based on the following definition:

All individuals invested in the Foamex Stock Fund on September 22, 2005, except
individuals who were members of the Foamex Benefits Committee at any time
between September 22, 2005 and December 31, 2006, the members of their
immediate families, and their heirs, successors or assigns.

Stanford v. Foamex L.P., 263 F.R.D. 156, 175 (E.D. Pa. 2009).

Presently before the court are cross-motions for partial summary judgment on defendants' counterclaims.[2]  In those counterclaims, defendants seek to reform a September 8, 2005, amendment to the Plan ("Amendment No. 4"), based on an alleged "scrivener's error."  They seek this reformation in response to plaintiffs' allegation that defendants' sale of Foamex International stock from the Fund—ostensibly to increase the percentage of cash held in the Fund to satisfy increased daily exchanges or withdrawals by Plan participants—was unnecessary because Amendment No. 4 precluded transfers "out of" as well as into the Fund.  Defendants argue that the language precluding transfers out of the Fund was a drafting error inconsistent with the intent of Amendment No. 4, which was only meant to preclude new investments in the Fund in order to protect Plan participants.  They argue that the language is also inconsistent with other language in Amendment No. 4, other Plan documents, communications to the Plan participants, and the course of dealing under the Plan.  Plaintiffs argue that defendants are not entitled to reformation of an unambiguous term that was defendants' unilateral drafting error.

Plaintiffs do not dispute that the language in question was an unintended drafting error.  In addition, there is no evidence in the record that during the relevant time period any Plan participants received, viewed, or relied on the drafting error.  In fact, Plan participants were informed that they would be allowed to transfer investments out of the Fund, and they did so.  The evidence in the record is clear and convincing—and undisputed—that a drafting error occurred, that it did not reflect the intent of Amendment No. 4, and that no Plan participants were likely to have relied on it.  The court concludes that no rational juror could find against defendants on this issue.  Thus, the court will deny plaintiffs' motion, grant defendants' motions,

---

[2]  For consistency, brevity, and clarity the counterclaim-plaintiffs will be referred to as "defendants" and the counterclaim-defendants as "plaintiffs" throughout this opinion.

reform Amendment No. 4 to eliminate the drafting error, and enter summary judgment in favor of defendants and against plaintiffs on defendants' counterclaims.

## I. Factual and Procedural Background[3]

### A. The Plan

Foamex L.P. ("Foamex") is the Plan's Sponsor.[4] (Fidelity's Statement of Facts ¶ 1.) The Committee is the Plan's named fiduciary and also the Plan Administrator. (Id. ¶ 2.) The Committee Defendants—K. Douglas Ralph, Stephen Drap, Gregory J. Christian, and George L. Karpinski—were members of Foamex's senior management and served on the Committee during the relevant time period. (Id. ¶ 3.) The Committee has "complete authority to control and

---

[3] The parties do not dispute the facts pertinent to the cross-motions for summary judgment. Indeed, plaintiffs have not submitted counter-statements of facts in opposition to the statements of facts that defendants submitted with their motions. The court's Scheduling Order required plaintiffs to submit counter-statements of facts or to have the factual assertions in defendants' statements deemed admitted:

> The opposing party shall file a separate, short and concise statement, responding to the numbered paragraphs in the moving party's statement, of the material facts as to which the opposing party contends there is a genuine issue to be tried and shall conform to the record citation requirements listed above. All factual assertions set forth in the statement required to be served by the moving party shall be deemed admitted unless controverted by the statement required to be served by the opposing party.

Oct. 15, 2009, Scheduling Order ¶ 8 (Docket No. 103); see also J&J Sports Productions, Inc. v. Kurz, Ltd., No. 07-3850, 2009 WL 1886124, *1 n.1 (E.D. Pa. 2009) (deeming facts admitted where party did not controvert opposing party's factual assertions). The court therefore deems defendants' statements of facts admitted. In addition, where necessary to provide further background, the court will refer to the findings of fact from its decision certifying the class, which were found by a preponderance of the evidence. Stanford, 263 F.R.D. at 160 n.1.

[4] Foamex is one of many wholly-owned subsidiaries of Foamex International, which operates its business through Foamex and its other subsidiaries. Stanford, 263 F.R.D. at 160 n.2. On April 15, 2009, the court ordered that this case be stayed against Foamex while Foamex was in bankruptcy. (Docket No. 81.) On March 3, 2010, the court lifted this stay. (Docket No. 132.) Accordingly, the court's ruling applies equally to Foamex as to the other defendants.

manage the operation and administration of the Plan."  (Id. ¶ 4.)  Fidelity served as the Plan's

Trustee, pursuant to a Trust Agreement between Fidelity and Foamex.  (Id. ¶ 5.)

The Plan permits either Foamex (as the Plan Sponsor) or the Committee (as the Plan

Administrator) to amend its terms.  (Plan §§ 1.47-1.48, 13.2 (McGinley Decl. Ex. A[5]); see also

Pls.' Statement of Facts ¶ 1.)  The Plan also allows the Committee (as the Plan Administrator) to

"change or add Investment Funds from time to time."  (Plan § 4.4.)  The Foamex L.P. Savings

Plan for Salaried Employees Summary Plan Description (the "SPD") provides Plan participants

with the right to allocate their investments among the various investment options in the Plan and

to "reallocate savings already in your account daily[.]"  (SPD 8.)[6]  The SPD further states that

"you can divide your contributions among the funds" (id. at 6) and that participants can

"[e]xchange between investment options" (SPD 12 (Foamex Mot. Dismiss Ex. B (Docket No.

9)); Fidelity Statement of Facts ¶ 9.)[7]  The Trust Agreement provides that "each Plan participant

shall direct the Trustee in which investment option(s) to invest the assets in the participant's

individual accounts."  (Trust Agreement § 4(c) (Foamex Mot. Dismiss Ex. C (Docket No. 9)).)

### B.     The Fund

One of the investment options the Plan offered was the Fund.  (Plan § 1.32.)  The SPD

describes the Fund as "a non-diversified stock investment that invests in the common stock of

---

[5] The Committee Defendants attached to their statement of facts a declaration and accompanying exhibits from Thomas A. McGinley, secretary to the Committee.

[6] Except where otherwise indicated, references to the SPD will be to the portions of the SPD attached as Exhibit C to McGinley's declaration.

[7] The SPD was available for review through the Foamex intranet page.  (Stanford Dep. 23:2-15 (Comm. Defs.' Statement of Facts Ex. A).)

Foamex International Inc. and therefore is considered to have a high level of risk." (SPD 7.)[8]

The SPD explains that "[t]he investment performance of the fund is directly tied to the financial

performance of Foamex International Inc. and its subsidiaries, along with general market

conditions." (SPD 7.) The SPD further explains that "[y]our ownership is measured in units of

the fund instead of shares of stock." (Id. (emphasis deleted).) The SPD also explains that "[a]

percentage of assets will be held as cash (short-term investments)." (Id. (emphasis deleted).)

> The Trust Agreement's description of the Fund is consistent with that of the SPD:
>
> Investments in the Stock Fund shall consist primarily of shares of Sponsor Stock
> [i.e., Foamex International stock]. In order to satisfy daily participant exchange or
> withdrawal requests for transfers and payments, the Stock Fund shall also include
> cash or short-term liquid investments . . . .

(Trust Agreement § 4(e) (Foamex Mot. Dismiss Ex. C).) The Trust Agreement requires that the

Committee "shall continually monitor the suitability under the fiduciary rules of section

404(a)(1) of ERISA . . . of acquiring and holding Sponsor Stock." (Trust Agreement § 4(e)(ii)

(McGinley Decl. Ex. B).) Prior to the fall of 2005, the Fund maintained a target cash balance of

approximately 5%, meaning the Fund invested approximately 95% of its assets in Foamex

International stock. Stanford, 263 F.R.D. at 161.

### C.    The Closing of the Fund to New Investments

From March through August 2005, Foamex International and Foamex disclosed their

growing financial distress in public filings with the Securities & Exchange Commission,

including the prospect of a bankruptcy filing. Id. (see also Fidelity Statement of Facts ¶ 10). At

a July 13, 2005, meeting, the Committee decided to close the Fund to new investments but not to

change the ability of Plan participants to move their investments out of the Fund:

---

[8] The Plan similarly defines the Fund as a "non-diversified stock fund that invests solely
in Employer Stock [i.e., the common stock of Foamex International]." (Plan §§ 1.26, 1.32.)

> Due to the recent volatility in the price of Foamex stock, the Committee
> determined that the Foamex Stock Fund may no longer be an appropriate
> investment for the 401(k) Plan and agreed to close the Fund to new investments as
> soon as administratively possible . . . . Money currently in the Foamex Stock Fund
> will not be affected, and *participants will be permitted [to] move those assets at
> their discretion*.

(Mins. of Comm., July 13, 2005 (McGinley Decl. Ex. E) (emphasis added).)

Defendants began communicating to Plan participants concerning the decision to close

the Fund to new investments. On July 15, 2005, defendant Christian issued a memorandum to

Plan participants stating that the Fund would be closed to new investments but that Plan

participants would be able to move their investments into other investment options in the Plan:

> [D]ue to the recent volatility in the price of Foamex stock, the Benefits Committee
> has determined that the Foamex Stock Fund may not be an appropriate investment
> for a retirement plan such as the 401K Savings Plan at this time. Therefore, a
> decision has been made to close the Foamex Stock Fund to new investments
> effective July 15, 2005.
>
>       *     *     *
>
> This action applies only to new contributions. Money that is currently in the
> Foamex Stock Fund may remain in the Fund *or can be moved into other
> investments within the Savings Plan at the participant's discretion*.

(Mem. from Christian to 401(k) Participants Contributing to the Foamex Stock Fund, July 15,

2005 (McGinley Decl. Ex. F) (emphasis added).) On July 20, 2005, Fidelity mailed a letter to

Plan participants, providing similar information:

> Due to the recent volatility in the price of Foamex stock, the Benefits Committee
> has determined that the Foamex Stock Fund may no longer be an appropriate
> investment for the Savings Plan at this time.
>
> Therefore, as of . . . July 20, 2005, no additional employee contributions or
> Company Matching contributions will be directed into the Foamex Stock Fund,
> and no exchanges into the Foamex Stock Fund will be permitted.
>
>       *     *     *
>
> Money that is currently in the Foamex Stock Fund may remain in the fund *or can
> be moved into other investment option[s] within the Savings Plan*.

(Letter from Fidelity to Participants, July 20, 2005 (McGinley Decl. Ex. G) (emphasis added).)

Stanford acknowledged in his deposition that he received and understood the communications to

Plan participants. (Stanford Dep. 55:18-22, 56:18-57:21).)

On July 22, 2005, effective July 20, 2005, Fidelity executed Trust Agreement No. 5[9] to

close the Fund to "new investments and exchanges in," but did not amend the Trust Agreement

to preclude transfers or exchanges of investments out of the Fund:

> WHEREAS, the Sponsor has informed the Trustee that *effective July 20, 2005*, the assets of the Foamex Stock Fund are frozen to new investments and exchanges in . . . .
>
> *        *        *
>
> [T]he Trustee and the Sponsor hereby amend the Trust Agreement by:
>
> (1) *Effective . . . on July 20, 2005*, amending the "investment options" section of Schedules "A" and "C" to reflect that the Foamex Stock Fund is frozen to new contributions and exchanges in.

(Fifth Amendment to Trust Agreement (McGinley Decl. Ex. B) (emphasis in original).) Between

July 15, 2005, and September 8, 2005, approximately one-third of the Fund investment units

were transferred out of the Fund. (Comm. Defs.' Statement of Facts ¶ 27.)

## D.     Amendment No. 4

On September 8, 2005, the Committee executed Amendment No. 4 to the Plan, as well as

an accompanying Resolution. (Fidelity Statement of Facts ¶ 16.) Amendment No. 4 amended

and restated Section 4.3.1 of the Plan:

> Effective July 20, 2005, Section 4.3.1 is hereby amended and restated in its entirety to read as follows:
>
> ". . . . Effective July 20, 2005, a Member may no longer direct new investments into, or transfer existing investments into *or out of*, the Foamex Stock Fund. All investments in the Foamex Stock Fund as of July 19, 2005 shall remain in the

---

[9]  Foamex executed Trust Amendment No. 5 on July 19, 2006. (Comm. Defs.' Statement of Facts ¶ 23.)

Foamex Stock Fund *until moved into an alternative investment fund or distributed according to the terms of the Plan*."

(Amendment No. 4 ¶ 10 (Spoonemore Decl. Ex. A[10])) (emphasis added); see also Written

Consent of Committee (Spoonemore Decl. Ex. B) ("RESOLVED, that the Company hereby

amends the Foamex L.P. Savings Plan to . . . (iv) prohibit direction of investments into or *out of*

the Foamex Stock Fund.") (emphasis added).)[11]  Amendment No. 4 also restated other pre-

existing language in Section 4.3.1, which provided that Plan participant accounts "shall be

invested as directed by each Member in one or more of the investment funds made available from

time to time by the Plan Administrator."  (Amendment No. 4 ¶ 10.)

In their motion for partial summary judgment, plaintiffs state that, "for purposes of this

motion only," they assume that "the language preventing participants from withdrawing existing

investments 'out of' the Fund was a drafting error and that the Benefits Committee only intended

to prohibit new investments into the Fund."  (Pls.' Br. 4 n.1.)[12]  They submit no evidence that any

---

[10]  Plaintiffs attached to their statement of facts a declaration and accompanying exhibits from their counsel, Richard E. Spoonemore.

[11]  Defendants' counterclaims do not explicitly seek to reform the Resolution that accompanied Amendment No. 4, although the Resolution contains the same undisputed drafting error.  Plaintiffs, however, do not claim in their Third Amended Complaint or in their answers to defendants' counterclaims—or argue here—that the drafting error in the Resolution would alone have had any binding effect.  In addition, there is no evidence in the record that any Plan participant received, viewed, or relied on the drafting error as contained in the Resolution. Accordingly, the court will treat reformation of the drafting error as contained in Amendment No. 4 to eliminate any binding effect the drafting error may have had.

[12]  Plaintiffs do not otherwise assert in their opposition to defendants' motions (which plaintiffs combined with their reply in support of their motion) that the language in question was anything other than a drafting error.  (See Pls.' Reply, *passim* (referring to language in question as a "mistake").)  In any event, the Committee Defendants submitted with their motion a declaration from the "scrivener," David F. Jones, Esq., in which Jones states that (1) he understood that McGinley, Christian, and the Committee only intended to prohibit new investments in the Fund; (2) they never asked him to include in any amended plan documents language precluding transfers out of the Fund; (3) he never advised that such a preclusion should

Plan participant ever received, viewed, or relied on the drafting error during the relevant time period. Only Foamex, the Committee, their attorneys, and Fidelity ever possessed Amendment No. 4, and it was never circulated to Plan participants. (Comm. Defs.' Statement of Facts ¶¶ 31, 33, 34.) During the relevant time period, no Plan participant asked to review the Plan and McGinley never provided any Plan participant with any document that contained the drafting error. (Id. ¶ 34.)[13]

### E. The Final Closing of the Fund

On September 19, 2005, Foamex International and certain of its subsidiaries, including Foamex, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Stanford, 263 F.R.D. at 161 (see also Fidelity Statement of Facts ¶ 15). Under the terms of Foamex International's proposed bankruptcy plan, "there would be no recovery for holders of equity securities in [Foamex International]." Stanford, 263 F.R.D. at 161. On September 22, 2005,

---

be implemented; (4) the language in the version of Amendment No. 4 that he forwarded to McGinley on August 5, 2005, that "incorrectly states that participants are precluded from transferring existing investments 'out of, the Foamex Stock Fund'" was "simply a drafting error"; (5) the inclusion of the drafting error in the Resolution and Amendment No. 4 that he caused to be sent to McGinley went "unnoticed"; and (6) the only document he ever reviewed and edited that was sent to Plan participants was the July 15, 2005, memorandum from Christian, which did not contain the drafting error and which "accurately reflects the true intent and purpose of Amendment No. 4." (Jones Decl. ¶¶ 3-10 (Attach. to Comm. Defs.' Statement of Facts).) Plaintiffs have not disputed any of the factual assertions contained in Jones's declaration.

[13] Defendants claim that this "uncontested evidence" is also confirmed by a declaration they submitted with their reply brief from Robert Barnes, the Fidelity Managing Director who oversaw services related to the Plan during the relevant time period, who states that Fidelity has no records of any Plan participant being precluded from withdrawing investments from the Fund. (Defs.' Reply Ex. A ¶ 13.) Because, however, defendants did not submit this declaration until they filed a reply brief, rather than when they filed their motions, the court will not consider the factual assertions contained in the declaration to be uncontroverted. See Oct. 15, 2009, Scheduling Order ¶ 8 (Docket No. 103) (requiring party filing motion for summary judgment to support each material fact with specific citations to the underlying record and to "attach a copy of the relevant portions of that record, if practicable and not already of record").)

allegedly envisioning an increase in the number of transfer requests in light of the proposed bankruptcy plan, the Committee directed Fidelity to increase the cash balance in the Fund to a target of 20%, "to provide liquidity to satisfy daily participant requests." Id. On December 23, 2005, Foamex International and its bankrupt subsidiaries filed a joint reorganization plan calling for the cancellation of Foamex stock, providing for no recovery by shareholders. Id. (see also Fidelity Statement of Facts ¶ 19).

Between September 8, 2005, and December 31, 2005, approximately one-fourth of the Fund investment units were transferred out of the Fund. (Comm. Defs.' Statement of Facts ¶ 35.) On January 6, 2006, Foamex directed Fidelity to increase the target cash balance in the Fund to 50%. Stanford, 263 F.R.D. at 162. On January 27, 2006, Fidelity mailed a letter to Plan participants explaining the plan to liquidate the remaining shares of Foamex International stock held in the Fund and advising Plan participants how to exit the Fund prior to its liquidation. (Fidelity Statement of Facts Ex. 1.) Between January 23, 2006, and January 30, 2006, all Foamex International stock holdings in the Fund were liquidated. Stanford, 263 F.R.D. at 162.

The automatic cancellation of Foamex International stock, however, which would have occurred after the bankruptcy court approved the terms of the bankruptcy plan, was placed on hold due to delays in the bankruptcy proceeding. Id. On February 7, 2006, Foamex contacted Fidelity to discuss the possibility of reversing the January 2006 voluntary liquidation of the Fund. Id. On February 8, 2006, Fidelity began to repurchase Foamex International stock to establish a target stock position of 50% for the Fund. Id. On February 24, 2006, Fidelity mailed a letter to Plan participants advising that the Committee had halted the planned liquidation of the Fund and stating that "**[t]he Foamex Stock Fund is still closed** to additional contributions or exchanges into the fund" but that "you may make exchanges out of the Foamex Stock Fund at any time."

(Fidelity Statement of Facts Ex. 1 (emphasis in original).)  As the target stock position of the

Fund in Foamex International stock increased, so did the market value of the stock.  Stanford,

263 F.R.D. at 162.  The Fund did not fully realize the gains attendant to the stock price increases,

however, because the Fund invested only 50% of its assets in the stock, retaining a 50% target

cash balance.  Id.  The Fund was finally closed down on December 22, 2006.  Id.

**F.     Plaintiffs' Claim Regarding Amendment No. 4 and Defendants' Counterclaims**

On June 29, 2009, Stanford filed a Third Amended Complaint in this action.  (Docket No.

89.)  In the Third Amended Complaint, Stanford alleged, among other things, as follows:

> From July 20, 2005 through the elimination of the fund on December 22, 2006,
> there was no need to hold any cash or short-term liquid investments.  This is
> because all transfers "into or out of" the Foamex Stock Fund had been frozen by
> an amendment to the Plan.

(Id. ¶ 32.)  Stanford claimed that defendants violated their fiduciary duty to follow Plan

documents because "according to Foamex International Inc.'s Form 11-K, filed with the SEC on

June 29, 2006, participants and beneficiaries were, in fact, allowed to transfer investments out of

the Foamex Stock Fund prior to its liquidation on December 22, 2006."  (Id. ¶ 50.)  Stanford

claimed that, as a direct and proximate result, "plaintiff, the Plan and the Plan's participants and

beneficiaries have suffered losses and are entitled to relief under ERISA" and that defendants

should be compelled to restore to the Plan "the loss of value in the Fund, including opportunity

losses and interest[.]"  (Id. ¶¶ 51-52.)

On August 13, 2009, Fidelity answered the Third Amended Complaint and filed a

counterclaim seeking reformation of a "scrivener's error" in order to "comply [Amendment No.

4] with its intended purpose – namely, to foreclose new or additional investment in the Fund,

while permitting participants to re-direct their existing investments from the Fund to another

investment option, or to withdraw from the Fund altogether." (Docket No. 94 ¶¶ 2, 6.) Stanford answered Fidelity's counterclaim on October 6, 2009. (Docket No. 101.) On December 14, 2009, the Committee Defendants filed an amended answer to the Third Amended Complaint and a counterclaim that, like Fidelity's, sought reformation of the alleged "scrivener's error." (Docket No. 108 ¶¶ 13-24.) Stanford answered the Committee Defendants' counterclaim on March 29, 2009. (Docket No. 138.)

### G. The Court's Class Certification Decision

In its September 24, 2009, decision granting class certification, the court noted that "[w]hether the court should reform the Plan amendment is not at issue in a motion for class certification" but that "the relevant question is whether plaintiff can counter defendants' scrivener's error defense with proof common to the entire class." <u>Stanford</u>, F.R.D. at 163 n.10. The court then stated the standard it must follow under controlling Third Circuit precedent to reform Amendment No. 4:

> As defendants point out, the court can reform the Plan to reflect the intended language of Amendment No. 4 only if defendants establish that "*no plan participants were likely to have relied upon the scrivener's error in question . . . .*" <u>See</u> <u>Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.</u>, 85 F.3d 1098, 1105 n.2 (3d Cir. 1996) (discussing the Third Circuit's holding in <u>Int'l Union v. Murata Erie North America, Inc.</u>, 980 F.2d 889 (3d Cir. 1992)).

<u>Id.</u> (emphasis added). The court concluded that "[b]ecause the court must find that no plan participants were likely to follow the erroneous Plan amendment, the evidence presented by the parties necessarily will be class-wide in nature," and that therefore the counterclaims did not preclude class certification. <u>Id.</u> The court stated that it would, however, "consider the merits of the scrivener's error defense later if raised in a proper motion." <u>Id.</u>

### H. The Motions for Partial Summary Judgment

On February 3, 2010, plaintiffs filed a motion for partial summary judgment on defendants' counterclaims. (Docket No. 114.) On February 23, 2010, the Committee Defendants filed an opposition to plaintiffs' motion and a cross-motion seeking partial summary judgment in the Committee Defendants' favor on their counterclaim. (Docket No. 121.) On February 24, 2010, Fidelity filed its own opposition to plaintiffs' motion as well as a cross-motion "join[ing] in the request for relief made in the Committee Defendants' Motion for Partial Summary Judgment" and seeking "summary judgment in Fidelity's favor on the counterclaim." (Docket No. 127 (Fidelity Br. 2).)

On March 15, 2010, plaintiffs submitted a reply in support of their motion combined with an opposition to defendants' motions. (Docket No. 135.) The combined reply and opposition also contained a request, pursuant to Fed. R. Civ. P. 56(f), to deny or continue defendants' motions "until after the close of discovery." (Id. at 3.) Plaintiffs also submitted an accompanying declaration from their counsel in support of the Rule 56(f) request, in which plaintiffs' counsel stated that he was "in the process of distributing a questionnaire for class members . . . designed to elicit information concerning whether any of the class members saw, read, reviewed or were told about Amendment No. 4" and that he had not been provided a date for a deposition of McGinley. (Docket No. 136 (Spoonemore Decl., March 15, 2010, ¶¶ 2-3).) On March 22, 2010, defendants submitted a joint reply in support of their motions. (Docket No. 137.)

On June 7, 2010, Fidelity filed a motion *in limine* to preclude plaintiffs from submitting responses to a questionnaire sent by plaintiffs' counsel to class members in support of plaintiffs' motion. (Docket No. 143.) On June 17, 2010, plaintiffs filed a response to Fidelity's motion *in*

*limine*, arguing that it should be denied as moot because "the class has not sought to admit the questionnaires (or any complication [sic] thereof) into the record for any reason, and has no intention of ever doing so" and that plaintiffs' counsel "has never sought admission of . . . any summary of the responses to the questionnaires."  (Docket No. 145.)  On June 29, 2010, the court dismissed Fidelity's motion *in limine* as moot because plaintiffs agreed that they "will not seek to admit the questionnaires into the record for any purpose and will not seek admission of any summary of the responses to the questionnaires."  (Docket No. 146.)  On July 8, 2010, counsel for Fidelity submitted a letter to the court reporting that plaintiffs' counsel had "confirmed that he does not intend to submit any declarations from class members in connection with the 'scrivener's error' issue presented by the motions," and that plaintiffs had effectively withdrawn their contention that defendants' motions were premature.  (Letter from Marshall Walthew to Court, July 8, 2010.)  Counsel for Fidelity stated that therefore "the issues presented in the motions are fully ripe for resolution[.]" (Id.)  Plaintiffs did not submit a response to this letter.

On August 13, 2010, defendants filed a Joint Notice of Additional Authority regarding a recent decision by the Seventh Circuit in <u>Young v. Verizon's Bell Atl. Cash Balance Plan</u>, __ F. 3d. __, Nos. 09-3872, 09-3965, 2010 WL 3122795 (7th Cir. Aug. 10, 2010), in which the court held that equitable reformation was proper, relying in part on the Third Circuit's holding in <u>Murata</u>.  (Docket No. 151.)  Plaintiffs have not submitted a response to defendants' Joint Notice.

## II.    Legal Standards

### A.    Standards for Summary Judgment

A motion for summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c)(2). Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the ultimate burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once a party moving for summary judgment has met its initial burden, the nonmoving party may not rely merely on bare assertions, conclusory allegations, or suspicions, see Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982), but instead must present "specific facts showing that there is a *genuine issue for trial*," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added in Matsushita). "If the [nonmoving] party does not so respond, summary judgment should, if appropriate, be entered against that party." Fed. R. Civ. P. 56(e)(2).

"Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir. 1996) (citation omitted). For elements on which the nonmoving party bears the burden of production, the party must show more than "[t]he mere existence of a scintilla of evidence," but instead must present concrete evidence supporting each essential element of its claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex, 477 U.S. at 322-23. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." Anderson, 477 U.S. at 255. Furthermore, "[a]ll justifiable inferences are to be drawn in [the nonmoving party's] favor." Id. "Summary judgment may not be

granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." <u>Ideal Dairy</u>, 90 F.3d at 744 (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (citation omitted). In addition, the mere fact that parties have filed cross-motions for summary judgment "does not mean that the case will necessarily be resolved at the summary judgment stage" because "[e]ach party must still establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." <u>Atl. Used Auto Parts v. City of Phila.</u>, 957 F. Supp. 622, 626 (E.D. Pa. 1997) (citation omitted).

### B.     Standards for the Scrivener's Error Doctrine in the Context of ERISA

Under ordinary contract law, the scrivener's error doctrine allows a court to modify language in an agreement to conform the actual intent of the parties at the time of contract formation. 27 Samuel Williston & Richard Lord, A Treatise on the Law of Contracts § 70.93 (4th ed. 2003) ("[A] scrivener's error, like a mutual mistake, occurs when the intention of the parties is identical at the time of the transaction but the written agreement does not express that intention because of that error.").

The Third Circuit has held that a court may correct a scrivener's error "based upon parol evidence, provided the evidence is 'clear, precise, convincing and of the most satisfactory character' that a mistake has occurred and that the mistake does not reflect the intent of the parties." <u>Murata</u>, 980 F.2d at 907-908 (quoting <u>In re Estate of Duncan</u>, 232 A.2d 717, 720 (Pa. 1967) (finding application of scrivener's error doctrine appropriate in ERISA case where windfall resulting from error could not have been reasonably expected by the parties)). In contrast to the scrivener's error doctrine in the context of ordinary contract law, the scrivener's

- 16 -

error doctrine in the context of ERISA does not focus on whether or not there was a strict "mutual mistake" but on whether or not "plan participants were likely to have relied upon the scrivener's error in question":

> The central holding of <u>Murata</u>'s "scrivener's error" discussion is that in circumstances where a court can establish that *no plan participants were likely to have relied upon the scrivener's error in question* in determining their rights and obligations under the plan, allowing reformation of the scrivener's error does not thwart ERISA's statutory purpose of ensuring that plan participants can rely upon the language.

<u>McCormick</u>, 85 F.3d at 1105 n.2 (3d Cir. 1996) (distinguishing <u>Murata</u> in a dispute involving multi-employer plan) (emphasis added).[14]

Plaintiffs argue, however, that the drafting error was unilateral on the part of defendants and that "[a] unilateral mistake by a plan drafter may not be equitably reformed."  (Pls.' Br. 9.) This statement is incorrect under <u>Murata</u> and <u>McCormick</u>.  The Third Circuit did not hold in <u>Murata</u> that mutuality is a precondition to reformation under the scrivener's error doctrine in the context of ERISA.  <u>Murata</u>, 980 F.2d at 907 (enunciating scrivener's error doctrine in the context of ERISA without reference to mutual mistake).[15]  As the Third Circuit stated in <u>McCormick</u>,

---

[14]  Plaintiffs do not cite <u>McCormick</u>, even though the court cited the case in its decision certifying the class as providing the standard of proof defendants must meet.  <u>Stanford</u>, 263 F.R.D. at 163 n.10.  Instead, plaintiffs rely on <u>Cross v. Bragg</u>, 329 F. App'x 443, 454 (4th Cir. 2009), where the Fourth Circuit found that reformation was unavailable because, according to plaintiffs, "defendants failed to prove the true 'intent' of all plan participants related to the erroneous plan language."  (Pls.' Br. 4; <u>see also</u> Pls.' Br. 6-7, 10).)  <u>Cross</u> conflicts with <u>Murata</u> and <u>McCormick</u> because, interpreting only the law of contracts, <u>Cross</u> would require proof of mutual mistake except in cases of fraud.  <u>Cross</u>, 329 F. App'x at 454-455.  <u>Cross</u>, however, is of only limited precedential value as it is unpublished and from another circuit.

[15]  In fact, the <u>Murata</u> court specifically relied on <u>Duncan</u>, 232 A.2d at 720, which observed that mutual error was not required to reform a trust.  <u>See Murata</u>, 980 F.2d at 907-908.  The Supreme Court recently reiterated that the law of trusts "serves as ERISA's backdrop." <u>Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan</u>, 129 S. Ct. 865, 871 (2009) (citation omitted).  Under trust law, a unilateral scrivener's error that causes the terms of the trust to be inconsistent with settlor intent is "sufficient ground for reform."  <u>See</u> Mary F. Radford & George

- 17 -

Murata was "concerned only with ensuring that employees could reasonably rely upon the language of the plan." McCormick, 85 F.3d at 1105 (emphasis deleted).[16]

Accordingly, contrary to plaintiffs' arguments, defendants need not establish that "no class members relied on Amendment No. 4" (Pls.' Reply 5) or that "all plan participants *knew* of Amendment No. 4, *knew* it was a mistake and *intended* to disregard it," (Pls.' Br. 9-10 (emphasis

---

G. Bogert, The Law of Trusts and Trustees § 991 n.3 ("Unilateral mistake on the settlor's part is sufficient ground for reform, provided there is clear and precise proof of the mistake."); see also Rea v. The Hershey Co. 2005 Enhanced Separation Plan, No. 1:CV-06-1920, 2008 WL 2782663, at *8-9 (M.D. Pa. July 15, 2008) (reforming unilateral error where plan participants received consistent communications describing the true intent and where reliance on the error was doubtful).

[16]  Plaintiffs and defendants dispute whether the decision of the district court in Young v. Verizon's Bell Atl. Cash Balance Plan, 667 F. Supp. 2d 850 (N.D. Ill. 2009), conflicts with Murata and McCormick in holding that "mutual mistake" is a necessary element of the scrivener's error doctrine in the context of ERISA. The evidence upon which the district court in Young relied, however, was evidence of "the sponsor's intent," including the drafting history of the alleged error and the parties' communications and course of dealing, and thus the standard that the district court applied was essentially the same as in Murata and McCormick. Id. at 895-897, 900-902.

In any event, in its recent decision affirming the district court in Young, the Seventh Circuit did not hold that "mutual mistake" was a necessary element of the scrivener's error doctrine in the context of ERISA. Young, 2010 WL 3122795 at *8. Instead, relying on Murata and McCormick, the Seventh Circuit approved of equitable reformation because it allows a court to avoid the unfair result of enforcing erroneous plan terms contrary to the *reasonable expectations* of plan participants, "even if doing so would increase employees' benefits." Id. The court held that "ERISA § 502(a)(3) authorizes equitable reformation of a plan that is shown, by clear and convincing evidence, to contain a scrivener's error that does not reflect participants' reasonable expectations of benefits." Id. The court then examined the parties' reasonable expectations by reviewing the drafting history of the plan and the communications and course of dealing between the parties. Id. at *10. The court found that "[t]he drafting history left little doubt" that alleged scrivener's error was a mistake. Id. The court also found that "[t]he communications and course of dealing" between the parties "further illustrate that the parties intended" that the plan's terms were not to include the scrivener's error. Id. "Based on this evidence of the intended meaning of the Plan, the district court correctly found that [the] scrivener's error [was] inconsistent with plan participants' expected benefits." Id. at *11.

in original)).[17]  The "central holding" of <u>Murata</u> is that a court may reform a drafting error if a party establishes that "no plan participants were *likely* to have relied upon the scrivener's error in question." <u>McCormick</u>, 85 F.3d at 1105 n.2 (emphasis added).

## III.    Discussion

Plaintiffs do not dispute that the language in question was a drafting error and that defendants did not intend to preclude transfers of investments out of the Fund.  In addition, there is no evidence that during the relevant time period any Plan participants received, viewed, or relied on the drafting error.  In fact, the evidence in the record is undisputed that defendants informed Plan participants that they would be allowed to transfer investments out of the Fund and that Plan participants did so throughout the relevant time period.  Thus, the evidence in the record is clear and convincing "that a mistake has occurred and that the mistake does not reflect the intent of the parties," <u>Murata</u>, 980 F.2d at 907, and that "no plan participants were likely to have relied upon the scrivener's error in question," <u>McCormick</u>, 85 F.3d at 1105 n.2.  The court concludes that no rational juror could find against defendants on this issue.  The court will therefore enter summary judgment in favor of defendants and against plaintiffs on defendants' counterclaims and will reform Amendment No. 4 to eliminate the undisputed drafting error.

---

[17]  Plaintiffs also overstate the argument that strict mutuality of mistake should be required for reformation in the context of ERISA because "many ERISA plans, like the plan at issue here, are created unilaterally by an employer" and are "not the result [of] collective bargaining."  (Pls.' Br. 2.)  Plaintiffs overlook that, even when plan participants are not involved in the negotiation of plan documents, ERISA mandates disclosure to plan participants of important plan terms through, for example, communications to plan participants or an SPD.  <u>See</u> 29 U.S.C. § 1002 (ERISA § 102).

### A. The Evidence in the Record is Clear and Convincing, and Undisputed, That the Language in Question Was an Unintended Drafting Error

The evidence in the record is clear and convincing that the language in question was a drafting error and that defendants' intent was only to prevent Plan participants from taking on additional exposure to the Fund, not to prevent Plan participants from leaving it. Plaintiffs do not dispute this evidence. In fact, as to their own motion plaintiffs state that they assume "that the language preventing participants from withdrawing existing investments 'out of' the Fund was a drafting error and that the Benefits Committee only intended to prohibit new investments into the Fund." (Pls.' Br. 4 n.1 (emphasis added).)

As a result, a rational juror could only find "that a mistake has occurred and that the mistake does not reflect the intent of the parties." Murata, 980 F.2d at 907. The minutes of the Committee's July 13, 2005, meeting establish that the Committee intended to close the Fund to new investments "[d]ue to the recent volatility in the price of Foamex stock" but that Plan participants would continue to be permitted to move their assets out of the Fund "at their discretion." (Mins. of Comm., July 13, 2005 (Comm. Defs.' Statement of Facts, McGinley Decl. Ex. E).) In addition, the communications to Plan participants assured them that they would continue to be able to transfer their assets out of the Fund, and they did so throughout the relevant time period. (Fidelity Statement of Facts ¶¶ 13-14, 20; Comm. Defs.' Statement of Facts ¶¶ 27, 35.) Furthermore, Trust Amendment No. 5 did not include any language precluding transfers out of the Fund. Consistent with defendants' evident intent merely to close the Fund to new investments, Trust Amendment No. 5 only precluded "new investments" or "new contributions" and "exchanges in"—not out—of the Fund. (Fifth Amendment to Trust Agreement (Comm. Defs.' Statement of Facts, McGinley Decl. Ex. B).) Indeed, both McGinley and Jones submitted uncontroverted declarations that they did not intend to include the drafting

error in Amendment No. 4 and that their intent and the intent of the Committee was only to close the Fund to new investments. (McGinley Decl. ¶¶ 3-10, 14; Jones Decl. ¶¶ 2-6, 10.)[18]

The minutes of the Committee's July 13, 2005, meeting, the communications to Plan participants, the amendment to the Trust Agreement, and the declarations of McGinley and Jones—all of which are uncontroverted—establish clearly and convincingly that the language in question was a drafting error and that defendants' intent was only to close the Fund to new investments, not to preclude Plan participants from transferring investments out of the Fund.

## B. The Evidence in the Record is Clear and Convincing That No Plan Participants Were Likely to Have Relied on the Drafting Error

The evidence in the record is also clear and convincing that "no plan participants were likely to have relied upon the scrivener's error in question." McCormick, 85 F.3d at 1105 n.2. Plaintiffs submit no evidence that any Plan participant ever received, viewed, or relied on the drafting error during the relevant time period.[19] Only Foamex, the Committee, their attorneys,

---

[18] In Young, the Seventh Circuit cautioned that "clear and convincing evidence" supporting equitable reformation ought not to include "self-serving testimony" of the drafter: "The evidence also must be 'objective' and not dependent 'on the credibility of testimony (oral or written) of an interested party.'" Young, 2010 WL 3122795 at *9-10 (quoting Matthews v. Sears Pension Plan, 144 F.3d 461, 467 (7th Cir. 1998)). The Seventh Circuit did not need to rely on the drafter's "arguably self-serving testimony," however, because it was clear there was an error if one compared the draft in which the error first appeared with an earlier draft. Id. at *11. It was also evident that the error was a drafting mistake because of the absence of any evidence suggesting that the company intended to revise the plan to increase benefits, as would have been the result of the error. Id. Here, in any event, it is unnecessary for the court to determine whether or not "credibility" testimony of an "interested party" might be insufficiently objective to support equitable reformation, because the declarations of McGinley and Jones are uncontroverted and the court's conclusion is further supported by other clear and convincing evidence in the record.

[19] Plaintiffs originally stated in their opposition to defendants' motions on March 15, 2010, that "discovery is ongoing" and that defendants' motions were premature because plaintiffs were "in the process of distributing a questionnaire to those class members who remained invested in the Fund." (Pls.' Reply 3.) Plaintiffs also stated that they had requested but had not yet taken the deposition of McGinley. (Id.) Plaintiffs therefore requested, pursuant to Rule 56(f) and with support by an affidavit from their counsel, that the court deny or continue defendants'

and Fidelity ever possessed Amendment No. 4, and it was never circulated to Plan participants. (Comm. Defs.' Statement of Facts ¶¶ 31, 33, 34.) No Plan participant asked to review the Plan during the relevant time period, and McGinley never provided any Plan participant with any document that contained the drafting error. (Id. ¶ 34.)

The parties' course of dealing also establishes by clear and convincing evidence that no Plan participants were likely to have relied on the drafting error.[20] The communications by the Committee and Fidelity to the Plan participants regarding the closing of the Fund to new

---

motions until after the close of discovery. (Id.) Rule 56(f) provides that the court may order a continuance if the "party opposing the motion shows by affidavit, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(f). Plaintiffs, however, submitted no "specified reason" why a deposition of McGinley would be material to defendants' motions as to this issue. Furthermore, after Fidelity filed a motion *in limine* to exclude plaintiffs' questionnaires and any responses thereto, plaintiffs advised the court that they would not attempt to introduce the questionnaires and responses into evidence. Counsel for Fidelity subsequently informed the court, in a July 8, 2010, letter, that "class counsel has confirmed that he does not intend to submit any declarations from class members in connection with the 'scrivener's error' issue presented by the motions." (Letter from Marshall Walthew to Court, July 8, 2010.) Counsel for Fidelity stated that plaintiffs had "effectively withdrawn [their] contention that defendants' pending motions . . . are premature" and that therefore "the issues presented in the motions are fully ripe for resolution." (Id.) Plaintiffs submitted no response. Accordingly, the court concludes that plaintiffs have withdrawn their request under Rule 56(f).

[20] Plaintiffs state that "the parties' course of dealing may be a factor in some reformation suits." (Pls.' Reply 5.) Indeed, the Seventh Circuit in Young based its findings specifically on "[t]he communications and course of dealing" between the parties and referred to the evidence of course of dealing in that case as "convincing." Young, 2010 WL 3122795 at *4, 10. Plaintiffs attempt to distinguish the facts of Young on the ground that the parties' course of dealing took place over a course of years, whereas "in our case the class members had no opportunity to demonstrate the lack of a mutually understood agreement" and "[t]hose who remained invested may have done so in reliance on Amendment No. 4." (Pls.' Reply at 6.) As in Young, however, the parties' course of dealing here took place over a considerable period of time—from July 15, 2005 (when the Committee first informed Plan participants of its intention to close the Fund to new investments) to December 22, 2006 (when the Fund was finally closed). Furthermore, plaintiffs' speculation that those who remained invested in the Fund may have relied on Amendment No. 4 is contradicted by the clear and convincing—and undisputed—evidence in the record that, during the relevant time period, no Plan participant received, viewed, or relied on the drafting error.

investments each assured Plan participants that they would still be able to transfer their investments out of the Fund. (Fidelity Statement of Facts ¶¶ 13-14, 20.) Stanford acknowledged in his deposition that he received and understood the communications to Plan participants. (Id. ¶ 21.) Furthermore, it is undisputed that Plan participants were permitted to transfer their investments out of the Fund throughout the relevant time period. (Comm. Defs.' Statement of Facts ¶¶ 27, 35.)[21]

As a result, no rational juror could find against defendants on their counterclaims. The communications to Plan participants, the transfer of investments by Plan participants out of the Fund throughout the relevant time period, and the evidence in the record that no Plan participants ever received or viewed the drafting error establish clearly and convincingly, and without contrary evidence, that no Plan participants were likely to have relied upon the drafting error.

**C.    Reformation of the Drafting Error Does Not Conflict With the Plan Documents Rule**

Plaintiffs also argue that reformation of the drafting error would conflict with ERISA's "plan documents rule." (Pls.' Br. 2, 7-9; Pls.' Reply 2, 4-5.) The plan documents rule, also referred to as ERISA's "writing requirement," mandates that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). The rule aims to ensure that "'every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan.'" Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 83 (1995) (quoting H.R. Rep. No. 93-1280, at 297 (1974) U.S. Code Cong. & Admin. News 4639, 5077, 5078) (emphasis deleted).

---

[21]    Because the evidence is clear and convincing that no Plan participants were likely to have relied on the unintended drafting error, it is not necessary for the court to address defendants' additional arguments that plaintiffs' position would lead to harsh or absurd results. (Fidelity Br. 16-17; Comm. Defs.' Br. 13-14.)

In <u>Murata</u>, the Third Circuit recognized the tension between the scrivener's error doctrine

and the plan documents rule:

> Allowing the doctrine of scrivener's error to apply in ERISA cases would seem at
> odds with [the plan documents rule]. A plan document containing a scrivener's
> error might mislead an employee into believing he had rights or obligations that
> he did not, in fact, have. If, on the other hand, the employer were bound by the
> plan documents, whether or not they contained errors, the employee would know
> precisely his obligations and rights upon reading the plans.

<u>Murata</u>, 980 F.2d at 907. Despite this potential tension, the Third Circuit allowed application of

the scrivener's error doctrine in the context of ERISA when, as here, there is no evidence that

Plan participants were likely to have relied on a drafting error. <u>Id.</u>[22] The Third Circuit stated

that, in such circumstances, "ERISA's goal of providing clear Plan documents is . . . less

---

[22] The Seventh Circuit in <u>Young</u> also recognized the tension between the plan documents
rule and the scrivener's error doctrine. <u>Young</u>, 2010 WL 3122795 at *9. The court in <u>Young</u>
nevertheless rejected the plaintiff's argument that "allowing equitable reformation of ERISA
plans will undermine the efficient, easily enforceable plan documents rule." <u>Id.</u> The court
concluded that it could not "simply reject such a claim based on the added litigation burden that
it might represent." <u>Id.</u> In addition, the court found that allowing equitable reformation would
ensure consistency between cases interpreting ambiguous language of an ERISA plan and cases
interpreting language of an ERISA plan that, although "not intrinsically ambiguous," "still
misstates participants' benefits":

> [W]e see little difference between the intent-based inquiry that took place in this
> reformation case and what must occur in the related case of an ambiguous ERISA
> plan. In each case, the court must look beyond the plan document to extrinsic
> evidence to determine the parties' understanding of the plan. We do not think that
> the availability or scope of this judicial inquiry should turn on whether the error in
> an ERISA plan is deemed an "ambiguity" or a "scrivener's error." Drafting
> mistakes in ERISA plans may take many forms; some involve language that is
> ambiguous on its face while others, like the mistake here, involve language that is
> not intrinsically ambiguous but still misstates participants' benefits. It would not
> further the purposes of ERISA to allow courts to correct one type of mistake but
> not the other.

<u>Id.</u> (citation omitted). The court also found that the high standard of proof of clear and
convincing evidence necessary for equitable reformation "should deter an employer from seeking
to reform plan language simply because it has proven unfavorable." <u>Id.</u>

pertinent."  Id.; see also McCormick, 85 F.3d at 1105 (reading Murata as "only concerned with

ensuring that employees could reasonably rely" on plan terms) (emphasis deleted).[23]

Furthermore, the drafting error conflicts with the SPD, which was not amended, which

was available to employees over the Foamex intranet, and which expressly grants Plan

participants the right to allocate their investments among the various investment options in the

Plan and to "reallocate savings already in your account daily." (SPD 8.)  The SPD further states

that "you can divide your contributions among the funds" (id. at 6) and that Plan participants can

"[e]xchange between investment options" (SPD 12 (Foamex Mot. Dismiss Ex. B (Docket No.

9)); Fidelity Statement of Facts ¶ 9.)  The language of the SPD trumps the conflicting language of

the drafting error, even if there were evidence in the record that Plan participants had the

opportunity to view the drafting error (and there is none).  Burstein v. Ret. Account Plan for

Employees of Allegheny Health Educ. & Research Found., 334 F.3d 365, 378 (3d Cir. 2003)

---

[23] Thus, plaintiffs overstate their argument that because "Amendment No. 4 is not
ambiguous" and is "a unilateral mistake," the plan documents rule unequivocally precludes
reformation.  (Pls.' Br. 8-9, see also id. at 4, 6-7.)  In fact, because the Third Circuit has held that
application of the scrivener's error doctrine may be appropriate if no plan participants were likely
to have relied on an unintended drafting error, it is not necessary for the court to consider
whether or not Amendment No. 4 is ambiguous.  See Murata, 980 F.2d at 907; McCormick, 85
F.3d at 1105 n.2; see also Rea, 2008 WL 2782663 at *8 ("reformation of a plan document does
not contravene [the plan documents rule] if a court can determine that it is unlikely that plan
participants relied upon the scrivener's error").

In any event, Amendment No. 4 is only unambiguous if the drafting error is read in
isolation.  In fact, unless the drafting error is reformed, Amendment No. 4 is completely
unintelligible because the drafting error directly conflicts with the other terms of Amendment No.
4.  Plaintiffs do not offer any explanation of how transfers of investments "out of" the Fund
could be precluded if the investments and accounts of Plan participants could still be "moved to
an alternative investment fund" or "distributed according to the terms of the Plan" or "invested as
directed by each Member in one or more of the investment funds."  (Amendment No. 4 ¶ 10.)
Furthermore, plaintiffs acknowledge that when plan language is completely unintelligible,
reformation is appropriate even if a contract is unilateral.  (See Pls.' Br. 9 (stating that
reformation of a "unilateral contract" is appropriate when plan language is "completely
unintelligible") (citing Rea, 2008 WL 2782663 at *8-9)).

("Where a summary plan description conflicts with the plan language, it is the summary plan description that will control.").[24]

## IV.    Conclusion

The evidence in the record is clear and convincing—and undisputed—that a drafting error occurred, that the drafting error did not reflect the intent of Amendment No. 4, and that no Plan participants were likely to have relied upon the drafting error. The court concludes that no rational juror could find against defendants on this issue. The court will therefore deny plaintiffs' motion, grant defendants' motions, reform Amendment No. 4 to eliminate the drafting error, and enter summary judgment in favor of defendants and against plaintiffs on defendants' counterclaims. An appropriate order follows.

---

[24] The drafting error is also trumped by the Trust Agreement, which provides that "each Plan participant shall direct the Trustee in which investment option(s) to invest the assets in the participant's individual accounts." (Trust Agreement § 4(c) (Foamex Mot. Dismiss Ex. C).) The Trust Agreement provides that "in the event of conflict between the provisions of the Plan and the provisions of this Agreement, the provisions of this Agreement shall control." (Trust Agreement § 16(b) (McGinley Decl. Ex. B).)