**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

WILLIAM STANFORD, Individually
and on Behalf of All Other Similarly
Situated Persons and on Behalf of the
Foamex L.P. Savings Plan,

        Plaintiff,

v.

FOAMEX L.P., FIDELITY
MANAGEMENT TRUST CO., K.
DOUGLAS RALPH, STEPHEN DRAP,
GREGORY J. CHRISTIAN, and
GEORGE L. KARPINSKI,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION

NO. 2:07-cv-4225

WILLIAM H. YOHN, JR.

---

**MEMORANDUM IN SUPPORT OF DEFENDANT FIDELITY MANAGEMENT TRUST
COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff William Stanford ("Stanford") is a former participant in the Foamex L.P.
Savings Plan ("Plan"), a 401(k) retirement plan sponsored by Foamex L.P. ("Foamex") for its
employees.   Stanford asserts class-action claims under the Employee Retirement Income
Security Act ("ERISA"), 29 U.S.C. §1001, *et seq.*, arising from a decision to liquidate company-
stock holdings in the Plan at a time when Foamex had announced its stock would soon become
worthless.   Stanford asserts these claims against Foamex L.P., the Plan's sponsor; the Foamex
L.P. Benefits Committee (the "Committee"); the Plan's named fiduciary; and individual Foamex
Committee members Gregory J. Christian, George L. Karpinski, K. Douglas Ralph, and Stephen
Drap (collectively "the Foamex Defendants").   Stanford also raises ERISA claims against

Fidelity Management Trust Company ("Fidelity"), which served as the directed trustee[1] and record keeper for the Plan, pursuant to the terms of a Trust Agreement ("Trust") between Fidelity and Foamex.

Stanford's claims relate to the Foamex Stock Fund ("Fund"), a Plan investment option designed to hold Foamex stock.  The Third Amended Complaint ("3rd A.C."), Record Doc. ("Rec. Doc.") 89, alleges that Fidelity violated ERISA by following directions to sell Foamex stock in the Fund in late 2005 and early 2006, when Foamex was bankrupt and had publicly announced its stock would be cancelled.  Stanford concedes these directions were signed by the Committee's designated representative and an authorized signatory, but nevertheless contends Fidelity should not have followed them, because (1) the directions allegedly violated Plan terms that, Stanford claims, required that the Fund stay invested exclusively in Foamex stock, and/or (2) the signer of the directions was allegedly acting on behalf of the Plan's sponsor, Foamex, not the Committee (i.e., the named fiduciary).  See Fidelity's accompanying Statement of Undisputed Material Facts ("S.F.") ¶33.

Neither the letter nor the spirit of ERISA requires such an absurd result.  First, there was no reason for Fidelity – which was an "outsider" to Foamex and had no special insight into the Committee's decision-making process – to disregard directions that were signed by an authorized signatory.  Second, even assuming these directions were issued by Foamex (the Plan sponsor), it was still proper for Fidelity to follow them, since Foamex had authority both to eliminate the Fund altogether and to direct Fidelity to take steps in anticipation of the Fund's elimination.  Third, these directions were *substantively* prudent, and were therefore consistent with ERISA – *i.e.*, where a plan's company-stock holdings may lose all value, ERISA arguably requires

---

[1]     Unlike discretionary trustees, "directed" trustees have significantly limited duties under ERISA because they are obligated to implement directions from named fiduciaries.  *See* Exh. 1, Department of Labor, Field Assistance Bulletin ("FAB") 2004-03 (Dec. 17, 2004) at 4 & 7.

fiduciaries to take action, including selling off the stock, to protect the participants from further loss.

Given Fidelity's limited role, the directions issued by the Foamex fiduciaries, and the precarious financial condition of the company, Fidelity's actions were consistent with its obligations under the Plan, the Trust and ERISA – not to mention the specific guidance issued by the Department of Labor ("DOL").   In short, Fidelity acted *precisely* how directed trustees *should* act when providing such services to a bankrupt company.  Accordingly, the Court should grant summary judgment in Fidelity's favor and dismiss with prejudice all claims against Fidelity.

## I.     INTRODUCTION

**A.     The Plan and Its Administration.**  As the Plan's sponsor, Foamex appointed individual defendants Christian, Ralph, Drap and Karpinski – all members of Foamex's senior management – to serve on the Committee.  S.F. ¶3.  At all material times, defendant Christian served as Chair of the Committee.[2]  S.F. ¶4.

The Committee served as the Plan Administrator and named fiduciary, and had "complete authority to control and manage the operation and administration of the Plan."  S.F. ¶¶12-13.  The Committee's authority included "all powers and duties necessary or appropriate to operate and administer the plan," including "discretionary authority to interpret the Plan and to resolve ambiguities, inconsistencies and omissions, which findings shall be binding, final and conclusive."  S.F. ¶14.

---

[2]      In 2005-06, defendant Christian was Foamex's General Counsel and Executive Vice President of Human Resources.  S.F. ¶5.  In the summer of 2005, Christian was also named the company's Chief Restructuring Officer, with duties including oversight of the company's restructuring of debt; supervision of the company's advisors and consultants, including legal counsel; management of corporate communications; and if appropriate, overseeing the preparation of the company's petition for bankruptcy relief.  S.F. ¶6.  Christian, like Stanford, held an interest in the Fund.  S.F. ¶7.

At all relevant times, Thomas McGinley ("McGinley"), the company's long-time Director of Compensation & Benefits, served as Secretary to the Committee. S.F. ¶15. As Secretary, McGinley's role was to implement directives from the Committee, and to execute the Committee's decisions. S.F. ¶¶15-17. Pursuant to the Plan and to corresponding Committee action, McGinley was also authorized "to sign directives and communications and to execute documents on behalf of the Committee." S.F. ¶17.[3] Accordingly, McGinley was one of the persons authorized to sign letters of direction to Fidelity on the Committee's behalf, whether as the Plan's named fiduciary or the Plan Administrator. S.F. ¶18. By virtue of his corporate position, McGinley was also authorized to act on behalf of Foamex, the Plan Sponsor. S.F. ¶19. For example, he executed the Trust on behalf of Foamex. *Id*.

The Plan (restated effective January 1, 2001) establishes individual accounts for each participant, which are funded by both participant contributions and employer contributions. S.F. ¶ 9. Participants may generally direct investment of these amounts among investment funds specified by the Plan documents. S.F. ¶11.

**B.     The Trust and Fidelity's Role**.     As required by ERISA §403(a), 29 U.S.C. §1103(a), the Plan's assets were "committed in trust to the Trustee [*i.e.*, Fidelity] ... subject to the terms of the Trust to be held, managed, and disposed of by the Trustee in accordance with the terms of the Trust and this Plan." S.F. ¶20. Fidelity served as the Plan's recordkeeper and directed trustee, under the terms set forth in the Trust. S.F. ¶8[4] In this capacity, Fidelity

---

[3]     The Committee appointed McGinley as Committee Secretary and as the Committee's "Appointed Representative" in November 2001. S.F. ¶¶15-16.

[4]     Since the Trust implements ERISA's statutory trust requirement, it is by definition one of the "documents and instruments governing the plan," as that term is used in ERISA. *See also* ERISA §§104(a)(6), 104(b)(2) and 104(b)(4), 29 U.S.C. §§1024(a)(6), 1024(b)(2) and 1024(b)(4) (including "trust agreement" among "instruments under which a plan was established or is operated").

performs primarily ministerial functions,[5] and is subject to direction in virtually every aspect of Plan management, operation or administration.   S.F. ¶23.[6]   For instance, Fidelity has no responsibility for selection of plan investment options, and in fact, is expressly prohibited from providing investment advice to any person in connection with the selection of investments. S.F. ¶28.   Rather, the Committee directs Fidelity to maintain a specified menu of investment options available to participants.  S.F. ¶26.  Plan participants direct Fidelity on their individual investment choices from among the options selected by the Foamex Committee.  S.F. ¶27. The Trust further provides that Fidelity is not liable for any loss, or for any breach, arising from the exercise or non-exercise of the Committee's or participants' rights of direction.  S.F. ¶29.

Notably, in the event of any conflict between the Plan and the Trust, *the provisions of the Trust control*.  S.F. ¶31.

**C.    The Foamex Stock Fund.**    The Fund, one of 15-20 investment options in the Plan, was a unitized fund which held shares of Foamex common stock and cash.[7]   The Plan's "Definitions" section described the "Foamex Stock Fund" ("Fund") as "a non-diversified stock fund that invests solely in Employer Stock."  S.F. ¶37.  The Trust provided that the Fund will be

---

[5]        Pursuant to the Trust, Fidelity performs recordkeeping and administrative functions within a framework established at the direction of the Committee.  S.F. ¶24.  These functions include processing of payroll contributions to the Plan; maintenance of employee data necessary to support plan administration; mailing of standard participant notifications, such as transaction confirmations; preparation of reports concerning participants' benefits, such as account statements; preparation of reports required by government agencies; and preparation of employee communications materials.  *Id.*

[6]        The Trust is replete with provisions requiring Fidelity to execute directions issued by various parties.  Fidelity is also subject to direction in such administrative matters as disbursements for Plan expenses or participant withdrawals.  S.F. ¶25.

[7]        (Trust, §4(e))  *See also* (Plan, §4.3.1 & Appendix C; Trust, §4(b) & Schedule C)  In a unitized fund, participant holdings are reflected in units, which are valued at the end of each trading day using trust accounting principles that, in essence, add the total market price of the stock held in the fund to the value of the cash, then divide the fund's total value by the number of participant units.  By establishing a ready cash component, unitization allows participants to reinvest their money on the same day they redeem units, instead of waiting 2-3 business days for stock trades to settle.  Unitization also saves substantial transaction costs by netting out intra-plan buying and selling by the participants.  *Cf. DiFelice v. US Airways, Inc.*, 397 F. Supp. 2d 735, 739 (E.D. Va. 2005) (discussing operation of unitized stock funds); *Kurzweil v. Philip Morris Cos.*, 2001 WL 25700, *1 (S.D.N.Y. Jan. 10, 2001) (same).  Approximately 60-80 percent of 401(k) plans with company-stock funds use unitized funds with a cash component.  S.F. ¶104.

invested "primarily" in shares of Foamex stock, expressly contemplated that the Fund would hold "cash or short-term liquid investments," and obligated Fidelity to maintain these cash holdings at the level directed by the Foamex defendants.  S.F. ¶¶39-40.  The Plan's Summary Plan Description ("SPD")[8] described the Fund as a "non-diversified stock investment," but specifically informed participants that "[a] percentage of assets will be held as cash (short-term investments)."  Over the relevant period, the Fund held approximately 60 percent of its assets in Foamex stock.  S.F. ¶42.

**D.   The Underlying Transactions.**   By early 2005, Foamex's viability was in question, as expressed in public filings with the Securities & Exchange Commission ("SEC").  For example, in a March 15, 2005 filing, Foamex announced that it had contacted some of its lenders to obtain waivers of lending covenants.  S.F. ¶44.[9]  In April 2005, Foamex reported in another SEC filing that it might be unable to service its debt, and that any default "*could impair [Foamex's] ability to continue as a going concern*."  S.F. ¶48.  In July 2005, the company's Board appointed Christian as Chief Restructuring Officer with broad powers to manage the company during this restructuring.  *See* note 2, *supra*.  Against this backdrop, the Committee began to take action as to the Plan.

1.   The Committee Closes the Fund to New Money.   On or about July 11, 2005, a cash shortage in the Fund resulted in an unanticipated suspension of participant trading –

---

[8]      Like the Trust, the SPD is an integral part of the plan documents.  *See, e.g., In re Lucent Death Benefits ERISA Litig.*, 541 F. 3d 250, 254 (3d Cir. 2008) (noting that plans are "governed by written documents and summary plan descriptions").  Because the SPD is typically participants' primary source of information, the SPD controls in the event of conflicts with the plan itself.  *See Burstein v. Retirement Account Plan for Employees of Allegheny Health Educ. & Research Found.*, 334 F.3d 365, 378 (3d Cir. 2003).

[9]      Around this time, the Committee also began to review company-stock holdings of the Foamex L.P. Pension Plan, a defined-benefit plan that is not at issue in this litigation.  S.F. ¶45.  In connection with the Committee's review of the defined-benefit plan's holdings in Foamex stock, the Committee sought advice from various sources, including the Dechert firm, the Committee's legal counsel; Aon Consulting, the Committee's investment consultant; Miller Buckfire, the company's restructuring consultant; and Russell Investments, the Committee's investment advisor.  According to Greg Christian, the information and advice the Committee received from these sources informed later decisions regarding Foamex stock held by the Fund.  S.F. ¶¶46-47.

participant redemptions exceeded available cash in the Fund, which in turn forced suspension of participant transactions in the Fund. S.F. ¶49. Within a few days, the Committee met and decided to remove the Fund as an investment option in the Plan, and took preliminary steps to achieve this objective by closing the Fund to new contributions. S.F. ¶50. For instance, on July 13, 2005 McGinley issued a letter of direction instructing Fidelity to raise the Fund's cash target from 5% to 7%. S.F. ¶51. Additionally, Foamex and Fidelity amended the Trust on July 19, 2005 to reflect the Committee's decision to prohibit participants from directing future payroll contributions into the Fund or from exchanging assets from other investment options into the Fund; participants could (and did) continue to transfer their assets out of the Fund to other investments throughout the relevant period. S.F. ¶52. Foamex also executed an amendment to the Plan in early September 2005 intended to formalize these decisions. S.F. ¶53.[10]

Plan participants were also informed of these developments. For example, Christian issued a memorandum to "401(k) Participants Contributing to the Foamex Stock Fund" on July 14, 2005, which stated in part:

> The Benefits Committee regularly reviews the performance of the investments within the Foamex 401(k) Saving Plan to ensure the appropriateness of the options provided to participants. Due to the increasing volatility of the price of Foamex Stock, the Benefits Committee has determined that the Foamex Stock Fund may no longer be an appropriate investment for a retirement plan such as the Savings Plan. Therefore effective immediately, no additional employee contributions or Company Matching contributions will be directed into the Foamex Stock Fund ….
>
> *       *       *
>
> The Benefits Committee and its advisors will continue to monitor all investments for their appropriateness.

---

[10] Plaintiff previously relied on errant language in this Plan amendment to support class claims that Defendants' actions in July-September 2005 were improper. However, this Court has already granted summary judgment to Defendants on these issues, holding that the actual intent of the amendment and/or a proper reading of the Plan and Trust precluded Plaintiff's claims in this regard. Rec. Doc. 152.

S.F. ¶54.  A similar letter was also mailed to participants on or about July 20, 2005.  S.F. ¶55.  In mid-July 2005, Foamex announced a significant reduction in its earnings expectations for the second quarter of 2005, and noted that it was evaluating its strategic alternatives with outside advisors.  S.F. ¶56.

       2.  <u>Foamex is De-Listed and Declares Bankruptcy.</u>    Foamex's financial struggles continued thereafter.  In mid-August, Foamex stated in another SEC filing that a "pre-arranged" bankruptcy was under discussion with Foamex creditors.  S.F. ¶57.  Then on September 19, 2005, Foamex filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  *In re Foamex International, Inc*., No. 05-12685 (Bankr. D. Del.).

The bankruptcy filing was preceded by a September 18, 2005 notice that Foamex stock was being de-listed from the NASDAQ stock exchange within ten (10) days.  S.F. ¶59.  The de-listing created significant risks for the Fund:  potential effects of the de-listing included decreased liquidity for trading, fewer "market makers" for Foamex stock,[11] and the imposition of trading restrictions by the bankruptcy court.  S.F. ¶60.  In addition, the Committee's July 2005 decision to prohibit new participant contributions had already reduced the Fund's in-flows of cash to nearly zero; in fact, as of September 19, 2005 the Fund held only $12,683.97 in cash.  S.F. ¶62.[12]  By the time of the de-listing, the Committee was "sensitive" to the Fund's liquidity issues.  S.F. ¶64.  Accordingly, on September 22, 2005 McGinley issued a letter of direction instructing Fidelity to raise the Fund's cash-target percentage to 20 percent.  S.F. ¶65.

---

[11]     A "market maker" is an entity that "accepts the risk associated with holding shares [of a given stock] in inventory in order to facilitate the trading of that security; selling shares to investors looking to purchase or buying shares from those looking to sell."  Large institutional market makers typically do not serve as market makers for de-listed stocks.  S.F. ¶61.

[12]     This critically low cash reserve put the Fund at risk of being unable to process participant requests to sell their interests in the Fund.  S.F. ¶63.

The same day, the company announced that its reorganization could leave Foamex shareholders, including the Fund, with nothing:   "[h]olders of equity interests in Foamex International Inc. will receive no distributions or retain any property on account of their equity interests, and such equity interests shall be cancelled on the effective date of the [reorganization] Plan."  S.F. ¶66.  Because Foamex's declining share price might have required additional stock *purchases* to maintain the cash target at 20 percent, McGinley issued a letter of direction instructing Fidelity to "omit buys" on September 29, 2005.  S.F. ¶69.[13]

3.   Foamex Files its Proposed Reorganization Plan.   In its November 2005 SEC filings, Foamex reiterated earlier warnings that holders of Foamex stock might receive no value for their shares.  S.F. ¶70.  Around this time, Committee representatives and Fidelity held a conference call to discuss this development.  S.F. ¶71.  During this call, Christian informed Fidelity that Board approval of the restructuring plan was needed before moving forward on the Committee's earlier decision to liquidate the Fund and reallocate the proceeds to other vehicles. S.F. ¶72.

On December 23, 2005, Foamex filed its proposed Plan of Reorganization ("POR") in the bankruptcy proceeding.  S.F. ¶73.  The POR expressly provided for the cancellation of Foamex stock, and made no provision for any distribution or other relief for shareholders.  S.F. ¶74.  At the time, the unsecured debt of Foamex (which had priority over shareholders) was trading for 10 cents on the dollar.  S.F. ¶75.  According to the POR, Foamex shareholders were roughly $400 million "out of the money."  S.F. ¶76.  At this time, Foamex had an enterprise value of $460

---

[13]    "Omit buys" instructions are customary in situations involving a stock fund holding distressed stock.  S.F. ¶68.  As the share price falls, the cash proportion of the Fund grows relative to the stock portion.  Once the percentage of cash exceeds the existing cash target, a directed trustee ordinarily must re-purchase the distressed stock to restore the designated cash/stock allocation of the Fund.  An "omit buys" instruction thus prevents potentially undesirable purchases of a plummeting stock.  S.F. ¶67.

million, versus senior debt claims of approximately $867 million – nearly double the enterprise value required for holders of common stock, such as the Fund, to receive any value.  S.F. ¶77.  .

    4.  <u>Reaction to the Reorganization Plan</u>.  Committee representatives had another conference call with Fidelity on January 4, 2006 to discuss the POR and the announcement that shareholders would receive nothing.  S.F. ¶78.  During that call, Christian informed Fidelity of the decision to close the Fund, and to reallocate its assets to other funds.  S.F. ¶79.  McGinley issued a letter of direction on January 6, 2006 to Fidelity, instructing Fidelity to raise the cash component of the Fund to 50%,  S.F. ¶80.  This direction was a step towards liquidating the Fund.  S.F. ¶81.

    5.  <u>The Liquidation of the Fund</u>.  McGinley executed a detailed letter of direction instructing Fidelity to close the Fund on January 20, 2006.  S.F. ¶82.  This letter advised Fidelity that the Fund was being removed as a Plan investment option in light of Foamex's reorganization, S.F. ¶83, and indicated that Fund's liquidation should be completed "in 10 to 20 business days." *Id*.  The letter also committed Foamex to amend the Trust to reflect the Fund's elimination.  S.F. ¶84.  Significantly, McGinley issued the letter "[a]s an authorized signatory for the named fiduciary and Plan Administrator," and Christian confirmed that McGinley was acting within the scope of his authority.  S.F. ¶¶85-86.

The decision to liquidate the Fund was communicated to participants by letter dated January 27, 2006.  S.F. ¶87.  The Fund's liquidation was completed within the time frame indicated in the written direction issued by McGinley.  S.F. ¶88.

    6.  <u>The Stock Re-Purchase and the Fund's Closure</u>.  In early February 2006, Foamex advised Fidelity that changes to Foamex's financial condition had led to a decision to re-purchase Foamex stock in the Fund, until the Fund held 50% stock and 50% cash.  S.F. ¶89.

After the call, Fidelity provided McGinley a draft letter of direction, including specific representations addressing questions Fidelity raised on learning of the contemplated re-purchase. S.F. ¶90.[14]

On February 9, 2006, Fidelity received the authorized direction letter, signed by McGinley,[15] and undertook the directed purchases of Foamex stock in the Fund. S.F. ¶93. At the time of the repurchase, Foamex stock was still trading at pennies per share and its unsecured debt was trading at around 10 cents on the dollar. S.F. ¶94. The prices of Foamex securities did not significantly improve until mid-April 2006. S.F. ¶95. Foamex stock remained highly risky and uncertain throughout the bankruptcy, and there was no public indication of any recovery for equity until September 2006, after the price had already risen to $3.65 a share. S.F. ¶96.

The Fund was finally liquidated and closed on December 22, 2006. S.F. ¶97. However, Stanford does not take issue with the decision to close the Fund in December 2006, nor the way in which it was implemented. S.F. ¶99. Foamex emerged from bankruptcy in 2007, but once again entered bankruptcy in February 2009. *In re Foamex Int'l, Inc.*, No. 09-10560 (Bankr. D. Del.). Foamex stock no longer trades publicly.

7. <u>The Complaint and The Class Claims</u>.    Stanford is a former Foamex employee and participant in the Plan. S.F. ¶2. In 2005 and 2006, Stanford had invested a portion of his individual Plan account assets in the Fund. S.F. ¶35. In his operative complaint, Stanford raises six separate "claims for relief," both individually and on behalf of the Plan,

---

[14]    Consistent with the FAB, when it received direction to move the Fund back to 50% stock in February 2006, Fidelity required the following representations before acting:  (1) that Foamex considered the direction in light of its fiduciary duties under ERISA; (2) that Fidelity had questioned the direction, and Foamex confirmed that it had undertaken additional consideration of applicable ERISA duties; and (3) that Foamex consulted with legal counsel to confirm that the directions complied with applicable laws. S.F. ¶91; see also Exh 1, FAB. The template for this letter specified it should be signed by an "Authorized Signatory for Named Fiduciary." S.F. ¶92.

[15]    Fidelity rejected a virtually identical letter dated February 8, 2006, because it was signed by Greg Christian, who – despite his position as Committee Chair – was not an authorized signatory for the Committee under the terms of the Trust. S.F. p. 14, n.2.

pursuant to ERISA §502(a)(2).  Of these claims, only three are directed at Fidelity.  These include claims for failure to follow plan terms (First Claim), which applies to all defendants; following directions from an unauthorized source (Fourth Claim), in violation of ERISA section 403(a)(1); and co-fiduciary liability (Sixth Claim).[16]  In general terms, Stanford alleges the Plan suffered losses when defendants gradually raised the Fund's cash target (Sept. 2005 to Jan. 2006), then liquidated the Fund in January 2006.  3rd A.C. ¶¶37-42.  Stanford also complains the Fund's re-purchase of Foamex stock was "at a price much higher" than the price at which the stock was liquidated in January 2006.  3rd A.C. ¶¶42, 44.  Fidelity, Stanford asserts, violated ERISA when it implemented directions to undertake these transactions.

On September 24, 2009, the Court certified a class defined as "All individuals invested in the Foamex Stock Fund on September 22, 2005, except individuals who were members of the Foamex Benefits Committee at any time between September 22, 2005 and December 31, 2006, the members of their immediate families, and their heirs, successors or assigns."  Rec. Doc. 100.  The Court's certification opinion suggested a significant limitation, however:  "Plan participants must have been invested in the Fund at the time of the Challenged Transactions to be part of the class."  Rec. Doc. 99 at 33.

## II.    LAW AND ARGUMENT

A.    **Summary of the Argument.**    The undisputed evidence establishes that (1) Foamex was in dire financial condition by September 2005; (2) the Committee had decided to eliminate the Fund as an investment option, (3) Fidelity had received directions gradually reducing the participants' exposure to Foamex stock, all signed by the appropriate signatory; and (4) all publicly available information in early 2006 showed that participants with an interest in

---

[16]     The Committee defendants are cited for breach of Plan terms (First Claim) and co-fiduciary liability (Sixth Claim).  Foamex itself is cited for failure to monitor the Committee and/or Fidelity (Second & Fifth Claims), and for a respondeat superior claim based upon alleged Committee misconduct (Third Claim).

the Fund would receive virtually nothing for their Foamex stock.   Faced with these circumstances, Fidelity did exactly what a responsible directed trustee would do:  it complied with its duties under ERISA, and executed substantively prudent directions received from an authorized signatory.   Nevertheless, Stanford asks this Court to apply ERISA in such a way as to hold Fidelity liable for faithful compliance with its statutory duties, as interpreted by DOL.   As shown below, Stanford's view of the case is at odds with the evidence, the law and common sense.

**B.      Summary Judgment Standard.**   A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *See* FED. R. CIV. P. 56(c).  Significantly, a factual inference "based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  *Robertson v. Allied Signal, Inc.*, 914 F .2d 360, 382 n. 12 (3d Cir. 1990).  Significantly, "where the record *taken as a whole* could not lead a rational factfinder to find for the non-moving party, there is no genuine issue for trial."  *Leonard v. Educators Mut. Life Ins. Co.*, 620 F. Supp. 2d 654, 667 (E.D. Pa. 2007) (Yohn, J.) (emphasis added) (internal citations and quotations omitted).

**C.      Directed Trustees and ERISA Fiduciary Duties.**   It is well-established that ERISA fiduciary status is not an all-or-nothing proposition; rather, to be held liable in this case, Stanford must show that Fidelity was acting as a fiduciary "with respect to the particular activity in question."   *Moench v. Robertson*, 62 F.3d 553, 561 (3d Cir. 1995) (quoting *Maniace v. Commerce Bank of Kansas City, N.A.*, 40 F.3d 264, 267 (8th Cir. 1994)).  A directed trustee like Fidelity, however, is not a fiduciary for all purposes; rather, where a directed trustee is subject to

direction, that trustee has no discretionary responsibility, and is not subject to fiduciary scrutiny under ERISA. *See generally, e.g.,* ERISA §403(a)(1), 29 U.S.C. §1103(a)(1); *Srein v. Frankford Trust*, 323 F.3d 214, 221-22 (3d Cir. 2003) (limiting ERISA claims against directed trustee to those involving undirected control over plan assets).[17]

In 2004, the DOL issued interpretive guidance in the context of publicly traded employer securities held in an ERISA plan, and determined that a directed trustee's duties under ERISA are "significantly limited." *See* Exh. 1, FAB at 4 & 7.[18]  As explained in the FAB, ERISA's limitations on a directed trustee's duty are based upon several considerations, including the stringent fiduciary duties ERISA imposes on directing fiduciaries. *Id.* at 4-5.  Consequently, a directed trustee "does not have an obligation to duplicate or second-guess the work of plan fiduciaries that have discretionary authority over the management of plan assets and does not have a direct obligation to determine the prudence of a transaction," *Id.* at 4, except where a bankrupt company has indicated there may be no recovery for equity holders. *Id.* at 5-6.

### D.      Fidelity Did Not Breach Any Duty Imposed by ERISA.

A directed trustee's liability is "limited to instances in which it fails to follow such proper directions or it complies with directions that are improper, or contrary to the Plan or ERISA."

---

[17]         *Accord:  Maniace v. Commerce Bank*, 40 F.3d 264, 267-68 (8th Cir. 1994) (holding directed trustee "was not required to weigh the merits of any investment in [company] stock … every time it was directed to purchase said stock"); *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090, 1103 (9th Cir. 2004) ("If the underlying fiduciary direction itself if not in violation of ERISA, the directed trustee's compliance with that direction cannot serve as a basis for liability"); *Ershick v. United Missouri Bank*, 948 F.2d 660, 665-69 (10th Cir. 1991) (rejecting imprudent-investment claim against directed trustee because it followed valid directions); *Herman v. NationsBank Trust Co.*, 126 F.3d 1354, 1362 & 1370-71 (11th Cir. 1997) (holding trustee executing facially valid direction "was not required to exercise its independent judgment").

[18]         Courts evaluating ERISA claims against directed trustees in ERISA actions have found FAB 2004-03 "especially worthy of deference." *See DiFelice v. US Airways, Inc.*, 397 F. Supp. 2d 735, 751 n. 25 (E.D. Va. 2005). *See also In re WorldCom, Inc. ERISA Litig.*, 354 F. Supp. 2d 423, 446 ("[T]he opinions expressed in the Bulletin are well-reasoned and flow from a careful analysis of complex issues.").

*DiFelice,* 397 F. Supp. 2d at 746.[19]   Stanford acknowledges that all of the complained-of transactions were directed, but posits that the directions were somehow defective – either because the directions violated the terms of the Plan, or because the direction was issued by someone who lacked authority.  3rd A.C. ¶¶39-41.  Here, the evidence clearly shows that the directions Fidelity followed were properly issued and consistent with ERISA and the plan documents.

       1.  <u>The Challenged Directions were Substantively Prudent</u>.  Ultimately, Stanford predicates his claims on the untenable notion that Fidelity should have refused to implement directions to sell Foamex stock, when the company itself was in bankruptcy and warning the investing public that its stock would be cancelled without any value for shareholders.  Under such circumstances, the directions were substantively prudent, and therefore consistent with ERISA, even assuming Stanford's dubious claim of procedural imperfections has any merit.  *See* Exh. 1, FAB at 5-6 & n. 4; *Fink v. Na'l Sav. & Trust Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring and dissenting in part) (noting fiduciaries are not liable for objectively prudent decisions, even if made "through prayer, astrology or just blind luck"); *Roth v. Sawyer-Cleator Lumber* Co., 16 F.3d 915, 919 (8th Cir. 1994) (noting fiduciary not liable if the "hypothetical prudent fiduciary would have made the same decision anyway").  Additionally, Fidelity – as an "outsider" to Foamex's business operation and the Committee's activities – had no basis on which to question the direction, especially since those directions were arguably *required* by ERISA because of Foamex's dire financial straits.  *See, e.g., Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7-8 (1st Cir. 2009) (holding ERISA fiduciaries acted prudently by liquidating company stock fund after company entered bankruptcy; plaintiffs' claims that the stock should

---

[19]  *See also WorldCom*, 354 F. Supp. 2d at 441-46.  However, where plan documents are in conflict with ERISA, ERISA controls.  *See* note 22, *infra*, and accompanying text.

not have been sold were improperly based on hindsight); *Noa v. Keyser*, 519 F. Supp. 2d 481, 491-492 & n. 18 (D.N.J. 2007) (granting summary judgment for defendants because the fiduciaries fulfilled their ERISA duties by forcing the sale of company stock, after the company publicly announced a pre-packaged bankruptcy and its stock was de-listed).

    2. <u>Fidelity Did Not Violate Plan Terms</u>.   Stanford posits that the Foamex Defendants could not direct Fidelity to sell Foamex stock, because the Plan's "Definitions" section described the Fund as "a non-diversified stock fund that invests *solely* in Employer Stock." S.F. ¶37.  *Cf.* 3rd A.C. ¶¶30, 41 & 64.  This claim fails as a matter of law, because the plan documents, construed as a whole and consistent with ERISA, did not require the Fund to invest exclusively in Foamex stock without regard to the surrounding circumstances.

    First, the Fund's sale of stock to raise liquidity was clearly consistent with the terms of the Trust, which is incorporated by reference into the Plan.  S.F. ¶30.  Section 4(e) of the Trust expressly contemplates that the Fund will hold "cash or short-term liquid investments." S.F. ¶40.  Thus, the Plan documents taken as a whole defeat Stanford's contention that the Fund must hold company stock *exclusively*.[20]

    In addition, the Trust expressly provides that the Fund invest "primarily" in Foamex stock.[21]  To be invested "primarily" in employer stock, the Fund must invest 51% of its assets in stock over the life of the Fund, as acknowledged by Stanford's fiduciary expert in this case and others.  S.F. ¶41.  The evidence unequivocally demonstrates that the Fund maintained an average

---

[20] Plaintiff argues that the Fund could only hold cash to satisfy its immediate liquidity needs, and that the Fund had no need for liquidity after it was allegedly "frozen" by a Plan amendment in September 2005.  3rd A.C. ¶50.  However, the Court has rejected this contention (Rec. Doc. 152)  Since participants could still exit the Fund, liquidity concerns were still present throughout the relevant period.  In addition, the SPD advised participants that an undefined percentage of Fund assets were to be invested in cash, without any connection to Fund liquidity requirements.  As noted, the SPD controls where it conflicts with the Plan.  *See* note 8, *supra*.

[21] To the extent that the Trust's "primarily" language is in conflict with the "solely invested" language of Plan §1.32, this Court has already held that the Trust terms control.  *See* Rec. Doc. 152 at 26 & n. 24

composition of 60 percent stock between September 22, 2005 (the reference date for the class) and December 22, 2006 (when the Fund was finally closed).  S.F. ¶42.  There is thus no material fact dispute as to whether the Fund was "primarily" invested in Foamex stock during the relevant period.

Fidelity's position is consistent with other provisions of the Trust, which requires the Committee, as named fiduciary, to monitor the suitability of Foamex stock under ERISA's fiduciary duty rules.  S.F. ¶22.  For this provision to have any meaning, there must be certain circumstances in which the Committee may determine Foamex stock is an unsuitable investment. In fact, the undisputed evidence demonstrates this is exactly what happened:  the Committee reached that conclusion in July 2005, decided to remove the Fund as an investment option, and gradually worked towards the implementation of that decision.  *See, e.g.*, S.F. ¶¶50 & 79-81. This is the only reading of the Plan and Trust permitted in light of the evidence.

Plan documents must be construed to be lawful, however.  *See*, *e.g., Guthart v. White*, 263 F. 3d 1099, 1104 (9th Cir. 2001) (explaining any ambiguity in ERISA trust agreement should be construed to render trust lawful).  Similarly, where plan or trust documents conflict with ERISA, fiduciaries must conform their conduct to ERISA.  *See, e.g., Central States Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 568, (1985) ("[T]rust documents cannot excuse trustees from their duties under ERISA.").  Under the facts of this case, Stanford's proposed interpretation of the plan documents is itself inconsistent with ERISA, since it precludes any latitude for prudent divestiture:  the Third Circuit has held that a Plan provision forbidding diversification of employer securities – *precisely* the interpretation Stanford urges here – improperly "constrain[s] the [fiduciaries'] ability to act in the best interest of the beneficiaries." *Moench*, *supra*, 62 F.3d at 567 (rejecting interpretation of employee stock ownership plan as

requiring exclusive investment in company stock).[22]  Stanford suggests that Fidelity should have disregarded authorized directions to divest the Fund of dying shares of a dying company, simply because the word "solely" appears in the Plan's description of the Fund.  As shown above, Foamex was publicly considering bankruptcy by August 2005, and there was already a substantial question whether participants would receive any value for their Foamex stock.  Given these public indicators, a decision to move to a larger cash position, at least temporarily, was not only a justifiable exercise of fiduciary prudence, but also arguably required to avoid an assertion of fiduciary imprudence or loss of participant investment control (*i.e.*, inadequate liquidity in the Fund).  *See, e.g., Moench*, 62 F.3d at 569-71 (holding ERISA might require fiduciaries to diversify employer-stock in spite of plan terms).  Similarly, to the extent that a divestiture might have been necessary to avoid imprudent retention of Foamex stock,[23] the directions to raise cash and ultimately, to liquidate, are also justifiable exercises of the Foamex Defendants' discretionary judgment.  *Noa*, 519 F. Supp. 2d at 490-92 (dismissing claims against fiduciaries who liquidated employer securities to avoid ERISA violation).  Indeed, Stanford's expert testified that such a sale is permitted by ERISA, even if it were inconsistent with the Plan itself, under the circumstances of this case.  S.F. ¶101.

Stanford's claims fail for an additional reason:  the Plan granted Foamex, as Sponsor, the authority to amend the Plan.  S.F. ¶10.  The Trust, in turn, granted Foamex, as Sponsor, the authority to direct Fidelity.  S.F. ¶21.  The gradual liquidation of the Fund is simply the process followed here to amend the Plan to eliminate the Fund as an investment option.  S.F. ¶98.  The

---

[22]      *See also Kuper v. Iovenko*, 66 F.3d 1447, 1457 (6th Cir. 1995) ("[A] plan provision that completely prohibits diversification of ESOP assets necessarily violates the purposes of ERISA.").

[23]      A bankrupt company with no expectation of shareholder recovery is *precisely* the situation in which DOL indicates an investment is unsuitable.  *See* Exh. 1, FAB at 5-6 & n. 4.  Stanford's expert agreed with this view, claiming he would have sold the Fund's holdings in September 2005, or earlier.  S.F. ¶102.  Fidelity's expert calculated that the Plan would have had greater damages under this alternative course of action (*i.e.*, liquidating the Fund in September 2005).  S.F. ¶103.  Therefore, the actions taken by the Committee and the other defendants were demonstrably superior to those which plaintiff's expert would have taken.

January 20, 2006 direction letter specifically confirms that Foamex and Fidelity would amend the Trust to eliminate the Fund.  S.F. ¶84.

Each of the foregoing points constitutes an independent and adequate basis for dismissing Stanford's claims.  Consequently, Stanford's claim that Fidelity violated the Plan's provisions by implementing directions to liquidate Foamex stock is without merit, and must be dismissed.

  3. <u>Fidelity Followed Directions From An Authorized Source</u>.  Stanford argues in the alternative that Fidelity should not have implemented directions to liquidate the stock, because those directions emanated from Foamex, rather than the Committee.  Nevertheless, Stanford concedes – as he must – that McGinley had authority to issue every, single one of the complained-of directions on the Committee's behalf.  S.F. ¶¶15-19.  Rather, Stanford argues that McGinley was not acting for the Committee, even though he was Secretary of the Committee, its Appointed Representative, and an authorized signatory designated under the Trust.  Stanford's complaint seems to be that Fidelity had a duty to determine the capacity in which McGinley was acting when he issued the directions.  S.F. ¶33.

This claim has no basis in law or policy.  Nothing in ERISA imposes any such duty on a directed trustee.  *See* Section II(C), *supra*.  On the contrary, the industry practice of naming an "authorized signatory" evolved to obviate the need to verify authority for transactions such as those here.  Imposing such a duty to second-guess the authority of authorized signatories is unworkable, since no directed trustee has adequate access to Foamex's internal processes and deliberations to verify every signature for every transaction.  S.F. ¶32.

Even if Fidelity were required to second-guess instructions issued by McGinley, there still would be no viable claim against Fidelity.  Foamex, the Plan sponsor, had authority to eliminate the Fund as an investment option – an indisputable fact conceded by Stanford.

S.F. ¶43.  It is likewise undisputed that Foamex had authority under the Trust to issue Fidelity directions implementing these decisions.  S.F. ¶21.  Thus, the gradual sale of Foamex stock in the Fund is merely part of the process of amending the Plan and Trust to eliminate the Fund as an investment option.  S.F. ¶98.

   4. <u>Fidelity Has No Greater Fiduciary Duties Than That Of Directed Trustee</u>.  In the 3rd A.C. and during discovery, Stanford has attempted to imply that Fidelity's conduct in calling the Foamex Defendants' attention to liquidity and other operational concerns of the Fund conferred discretionary authority on Fidelity.  3rd A.C. ¶38.  Such activities do nothing to support a claim against Fidelity.  On the contrary, questioning whether continued investment in Foamex stock was warranted is precisely what ERISA encourages directed trustees to do.  It does not confer discretionary fiduciary status on Fidelity, as the DOL has made clear.  First, a directed trustee may have a duty to question directions in certain limited instances, one of which is when a company has filed for bankruptcy and has indicated there may be no recovery for equity.  *See* Exh. 1, FAB at 6 & n. 6.  In addition, a directed trustee's questioning of directions in such instances does not constitute investment advice; likewise, a trustee remains directed even if the fiduciary's direction changes based on the trustee's inquiries.  *Id.* at 7.  Courts have also embraced this rule, by making clear that calling attention to potential problems (or otherwise acting as a "Good Samaritan") does not confer discretionary fiduciary status on an entity like Fidelity.  *See, e.g., CSA 401(k) Plan v. Pension Professionals Inc*., 195 F.3d 1135, 1138-40 (9th Cir. 1999) (not a fiduciary because not exercising discretionary authority); *Beddall v. State Street Bank and Trust Co*., 137 F.3d 12, 21 (1st Cir. 1998); *Webb Co. v. State Street Bank & Trust Co*., No. 09 Civ. 1241, 2010 WL 3219284, at *9 (S.D.N.Y. Aug. 12, 2010); *In Re: Delphi Corp. Sec., Derivative & ERISA Litig*., 602 F. Supp. 2d 810, 827-29 (E.D. Mich. 2009).

### E.     Fidelity Is Not Liable As A Co-Fiduciary.

There are no specific allegations as to Fidelity's co-fiduciary breaches, other than the conclusory recitation of language from ERISA §405, 29 U.S.C. §1105.  However, responding to Fidelity's motion to dismiss the original complaint, Stanford's Opposition ("Opp."), Rec. Doc. 35, describes the co-fiduciary theory further.   Specifically, Fidelity is alleged to have co-fiduciary liability by (1) knowingly following directions from Foamex, instead of the Committee; and (2) implementing directions to liquidate stock in the Fund, when plan documents stated that the Fund would invest "solely" in Foamex stock.  Stanford's Opp., Rec. Doc. 35, pp. 16-17 of 48.

The plain language of the ERISA provision regarding co-fiduciary liability requires, as an element of the claim, a pre-existing breach of fiduciary duty.  *See* ERISA §405(a), 29 U.S.C. §1105(a) (imposing co-fiduciary liability for "a breach of fiduciary responsibility of another fiduciary").   As demonstrated above (and in the Foamex Defendants' moving papers), the requisite breach of fiduciary duty (*i.e.*, failure to comply with the documents and instruments governing the plan) is absent.  *See, e.g., Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir. 1982) (dismissing co-fiduciary claims where there was no underlying ERISA violation).

Even assuming there is an underlying breach by the Foamex defendants, no co-fiduciary liability attaches to Fidelity.   Put simply, a directed trustee does not have co-fiduciary responsibility for complying with directions in accordance with the Trust and ERISA §403(a), 29 U.S.C. §1103(a).  *See, e.g., DiFelice, supra*, 397 F. Supp. 2d at 757-58 & n. 6 (noting a directed trustee's liability as a co-fiduciary is "essentially co-extensive" with its primary duties as a directed trustee).  *See also, e.g., In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002,

1040-41 & 1051 (S.D. Ohio 2006) (dismissing co-fiduciary claim against a directed trustee where plaintiffs failed to allege violation of ERISA §403 duties).

## III.   CONCLUSION

Stanford's lawsuit depends entirely on the untenable principle that Fidelity, a directed trustee, should have refused to implement directions to sell stock in a bankrupt company.  *Cf. Noa*, 519 F. Supp. 2d at 491-92 ("At its core, Plaintiffs' assertion that Defendants breached their fiduciary duties amounts to nothing more than a claim based on perfect hindsight.").  This Court should decline Stanford's invitation to pervert the letter and intent of ERISA in this way.  These directions were signed by an authorized signatory (McGinley), and were consistent both with the Committee's announced plan to reduce the Fund's Foamex stock holdings and the directing fiduciaries' duty to monitor Foamex stock for suitability under ERISA.  Since the evidence discloses no basis for Fidelity to disregard those directions, Fidelity was obligated to comply.  For the same reasons, Stanford's attributions of co-fiduciary liability also fail.  Accordingly, the Court should grant this motion and enter summary judgment in Fidelity's favor on all claims.

DATED: January 24, 2011          Respectfully submitted,

   */s/ Charles F. Seemann III*
Howard Shapiro
Robert W. Rachal
Charles F. Seemann III
PROSKAUER ROSE LLP
650 Poydras Street, Suite 1800
New Orleans, LA  70130
Telephone:  (504) 310-4088
Facsimile:  (504) 310-2022

—and—

Marshall J. Walthew (PA I.D. 55329)
Sara B. Richman (PA I.D. 200729)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA  19103-2799

Telephone:  (215) 981-4224
Facsimile:  (215) 981-4750

*Counsel for Fidelity Management Trust Co.*

## CERTIFICATE OF SERVICE

I certify that the foregoing Memorandum in Support of Motion for Summary Judgment

was served via the ECF filing system to the following on this 24th day of January 2011:

- **KENT CPREK**
  usdc-edpa-erisa@jslex.com

- **RICHARD E. SPOONEMORE**
  rspoonemore@sylaw.com,rspoonemore@hotmail.com,theresa@sylaw.com

- **CHARLES H. THULIN**
  c.thulin@ekmanbohrer.com

- **ROSEMARY J. BRUNO**
  rosemary.bruno@bipc.com

- **BRIAN A. CASAL**
  brian.casal@bipc.com

BY:   _/s/ Charles F. Seemann III_____
Charles F. Seemann III  (LA Bar #23933)
*Admitted Pro Hac Vice*