IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| WILLIAM STANFORD, JR., individually and on behalf of all other similarly situated persons and on behalf of the Foamex L.P. Savings Plan, | : : : : : | |
| Plaintiff, | : : | CIVIL ACTION NO. 07-4225 |
| v. | : : | |
| FOAMEX L.P. *et al.*, | : : | |
| Defendants. | | |

**MEMORANDUM**

YOHN, J.                                                      September 29, 2011

Plaintiff William Stanford, Jr., filed this class action individually and on behalf of all

other similarly situated persons and on behalf of the Foamex L.P. Savings Plan (the "Plan")

under section 502(a)(2) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.

§ 1132(a)(2). He asserts several claims against Foamex L.P. ("Foamex"), K. Douglas Ralph,

Stephen Drap, Gregory J. Christian, and George L. Karpinski (collectively with Foamex, the

"Foamex defendants") and against Fidelity Management Trust Co. ("Fidelity"). Now pending are

cross-motions filed by plaintiff and defendants for summary judgment under Federal Rule of

Procedure 56. For the reasons that follow, I will deny plaintiff's motion, I will grant in part and

deny in part the Foamex defendants' motion, and I will deny Fidelity's motion.

I.      **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**[1]

Foamex is a wholly owned subsidiary of Foamex International, Inc. ("Foamex

International"), which is engaged in the business of manufacturing and distributing foam

products. *Stanford v. Foamex L.P.*, 263 F.R.D. 156, 160 n.2 (E.D. Pa. 2009).[2] Foamex

established the Plan to provide retirement income to eligible employees. Plaintiff Stanford is a

former employee of Foamex and was a participant in the Plan. (Foamex Defs.' Statement of

Uncontested Material Facts ("Foamex Facts") ¶ 1.)

A.      **The Plan**

The Plan was a 401(k) defined-contribution, or individual account, plan. The Plan

allowed participating employees to make pre-tax contributions, through regular payroll

deductions, to their individual accounts and to direct that their contributions be invested in one or

more of the available investment options. (Decl. of Richard E. Spoonemore (Jan. 24, 2011)

("Spoonemore Decl.") Ex. A ("Plan") §§ 3.1, 4.4.) Under the terms of the Plan, Foamex matched

the contributions of eligible employees, up to a specified level. (Plan § 3.2.1.) As the Summary

Plan Description explained, a participating employee's account balance was "made up of [his or

her] contributions, [Foamex's] matching contributions, . . . and investment earnings." (Fidelity's

Statement of Undisputed Facts ("Fidelity Facts") Ex. 7, Summary Plan Description ("SPD") at

8.) A participant could "[e]xchange between investment options" and thereby "reallocate

---

[1] Except as otherwise noted, the following facts are undisputed.

[2] Where helpful in providing additional background, I refer to the findings of fact from
the class-certification decision, which were found by a preponderance of the evidence. *Stanford*,
263 F.R.D. at 160 n.1.

savings" in his or her account daily. (*Id.* at 8, 12.) The Plan made each participant "solely

responsible" for investment decisions, and participating employees were informed that

"[f]iduciaries of the Plan may be relieved of liability for any losses which are the direct and

necessary result of investment instructions given by participants or beneficiaries." (*Id.* at 7–8.)

The Foamex L.P. Benefits Committee (the "Benefits Committee"), which was to consist

of at least three members appointed by Foamex, the Plan sponsor, was the Plan administrator and

the named fiduciary of the Plan. (Plan §§ 1.47, 12.3.) Defendants K. Douglas Ralph, Stephen

Drap, Gregory J. Christian, and George L. Karpinski were members of Foamex's senior

management and served on the Benefits Committee during the relevant period. (Foamex Facts

¶ 5.) Ralph was an executive vice president and the chief financial officer of Foamex.

(Spoonemore Decl. Ex. F, Dep. of Kenneth Douglas Ralph ("Ralph Dep.") at 9:14–23.) Drap was

the vice president of manufacturing for foam products. (*Id.* Ex. G, Dep. of Stephen Drap ("Drap

Dep.") at 7:21–8:16.) Karpinski was a senior vice president and the treasurer of Foamex.

(Spoonemore Decl. Ex. E, Dep. of George L. Karpinski ("Karpinski Dep.") at 9:11–16.)

Christian, who was an executive vice president and Foamex's general counsel and secretary

(Foamex Facts ¶ 6), was the chairman of the Benefits Committee (Fidelity Facts ¶ 4). On July 19,

2005, he was also named chief restructuring officer. (Foamex Facts ¶ 6; Fidelity Facts Ex. 1

(Minutes for the Foamex International Inc. Board of Directors Meeting (July 19, 2005)). Thomas

A. McGinley, who is not named as a defendant, was Foamex's director of compensation and

benefits (Spoonemore Decl. Ex. H, Dep. of Thomas McGinley ("McGinley Dep.") at 9:15–10:8),

and served as the Benefits Committee's secretary, although he was not a member of the

committee (Fidelity Facts ¶ 15; Pl.'s Undisputed Material Facts ("Pl.'s Facts") ¶ 19). The

Benefits Committee had the "complete authority to control and manage the operation and administration of the Plan" (Plan § 12.1), including the authority to select the investment options available to Plan participants (Plan § 4.4).

Both Foamex, as the Plan sponsor, and the Benefits Committee, as the Plan administrator, had the authority to amend the Plan at any time. (Plan § 13.1.)

Fidelity served as the Plan's trustee, pursuant to a trust agreement (the "Trust Agreement") between Foamex and Fidelity. (Foamex Facts ¶ 3.) The Trust Agreement stated that the Benefits Committee, as the named fiduciary, would direct Fidelity as to the investment options in which Plan participants could invest (Spoonemore Decl. Ex. C ("Trust Agreement") § 4(b)),[3] and provided that Fidelity would "have no responsibility for the selection of investment options under the Trust and [would] not render investment advice to any person in connection with the selection of such options" (*id.* § 4(a)). The agreement further provided that Fidelity would not be liable for following a direction of the named fiduciary if the direction was in a writing signed by an authorized signatory and if Fidelity reasonably believed the signature to be genuine, "unless it is clear on the direction's face that the actions to be taken under the direction would be prohibited under ERISA or would be contrary to the terms of this Agreement." (Trust Agreement § 7(c)). McGinley was authorized to sign letters of direction to Fidelity on behalf of the Benefits Committee, both in its capacity as named fiduciary and in its capacity as Plan administrator (Fidelity Facts ¶ 18; Spoonemore Decl. Ex. L); he was also authorized to act on

---

[3] Although the Plan provided that the Plan administrator had the authority to select the available investment options (Plan § 4.4), because the Benefits Committee was both the Plan administrator and the named fiduciary, there is no real conflict between the terms of the Plan and the terms of the Trust Agreement.

behalf of Foamex, as evidenced by the fact that he signed the Trust Agreement on behalf of Foamex (Fidelity Facts ¶ 19; Trust Agreement (signature page)).

### B.     The Foamex Stock Fund

Among the investment options available to Plan participants was the Foamex Stock Fund, a nondiversified stock fund that invested in the common stock of Foamex International. (Plan §§ 1.26, 1.32; Trust Agreement Sched. C.) The Foamex Stock Fund was a unitized fund and also included "cash or short-term liquid investments" in amounts designed "to satisfy daily participant exchange or withdrawal requests." (Trust Agreement § 4(e).) Accordingly, an investor's interest in the Foamex Stock Fund was measured in units of participation, rather than shares of common stock, and the value of each unit (the net asset value) was based on the price of the underlying Foamex International common stock as well as the value of the cash held by the fund. (*Id.*) This unitized structure enabled participants to invest in or transfer their investments out of the fund on a daily basis, rather than having to wait three days, the normal settlement period for purchases and sales of stock. It also allowed Fidelity to offset participant purchases and sales, thereby reducing the Plan's transaction costs. (Fidelity Facts Ex. 14, Decl. & Expert Report of Ellen A. Hennessy & John J. Miller ("Hennessy Report") ¶ 11.)

The Summary Plan Description explained that "[t]he investment performance of the fund is directly tied to the financial performance of Foamex International Inc. and its subsidiaries, along with general market conditions," and advised participants that "[b]ecause of the non-diversified nature of this fund, investing in this fund involves a greater element of risk than the other available funds." (SPD at 7.)

5

Under section 4(e) of the Trust Agreement, the Benefits Committee, as the named fiduciary, was charged with setting the target cash percentage and drift allowance in the Foamex Stock Fund after consulting with Fidelity.[4] And Fidelity was responsible for ensuring that the amount of cash in the Foamex Stock Fund fell within the agreed upon range. (Trust Agreement § 4(e).) Until July 2005, the Foamex Stock Fund maintained a target cash balance of 5%. (Foamex Facts ¶ 11; Spoonemore Decl. Ex. J, Dep. of Elisabeth Pathe ("Pathe Dep.") at 10:22–11:3.)

The Trust Agreement further provided that the Benefits Committee was responsible for "continually monitor[ing] the suitability under the fiduciary duty rules of section 404(a)(1) of ERISA . . . of acquiring and holding" the common stock of Foamex International, and that Fidelity would not be liable for any loss resulting from the directions of the Benefits Committee, as the named fiduciary, with respect to the acquisition or holding of Foamex International common stock, unless it was "clear on their face that the actions to be taken under those directions would be prohibited by [ERISA's] fiduciary duty rules or would be contrary to the terms of [the Trust] Agreement." (Trust Agreement § 4(e)(ii).)

---

[4] Notwithstanding this provision, as originally adopted Schedule H of the Trust Agreement provided that the Foamex Stock Fund would hold cash "in an amount that has been agreed to in writing by the *Sponsor* [Foamex] and the Trustee [Fidelity]." (Trust Agreement Sched. H (emphasis added).) Schedule H was amended in January 2001, however, and the language referring to the Plan sponsor was eliminated.

As will be discussed in more detail, there is a dispute as to whether Foamex had the authority to set the cash target.

C.     **Foamex's Financial Difficulties and Actions Taken with Respect to the Foamex Stock Fund**

Foamex International and Foamex experienced financial problems, and on March 15, 2005, Foamex International filed a Form 8-K publicly announcing that Foamex had received waivers of compliance with financial covenants from certain of its lenders. (Fidelity Facts Ex. 21.) In its annual report (Form 10-K) filed on April 4, 2005, Foamex International informed investors that it "continue[d] to be highly leveraged and [had] substantial debt service obligations." (Supplemental Decl. of Richard E. Spoonemore in Supp. of Mot. for Class Certification (July 24, 2009) Ex. E at 9.) The company explained that "[f]or the last three fiscal years we have not generated enough cash flow from operations sufficient to pay our debt service obligations and capital expenditures." (*Id.* at 10–11.) On July 11, 2005, Foamex International issued a press release announcing that it had "significantly reduced its earnings expectations for the second quarter of 2005" and that it had retained an investment banking firm "to help evaluate strategic alternatives for strengthening the Company's balance sheet and enhancing long-term value." (Fidelity Facts Ex. 39 at 4.) The stock closed at $1.056 per share that day. (Spoonemore Decl. Ex. DD.) Around that time, a liquidity shortage in the Foamex Stock Fund resulted in a suspension of trading in and out of the fund. (Fidelity Facts ¶ 49.)

On July 13, 2005, the Benefits Committee determined that the Foamex Stock Fund was no longer an appropriate investment for Plan participants and decided to close the fund to new investments, but to allow those who had already invested in the fund to maintain their investments in the fund if they so chose. (Spoonemore Decl. Ex. M.) On July 14, 2005, Christian issued a memorandum to Plan participants informing them of this change:

The Benefits Committee regularly reviews the performance of the investments within the Foamex 401(k) Savings Plan to ensure the appropriateness of the options provided to participants. Due to the increasing volatility of the price of Foamex stock, the Benefits Committee has determined that the Foamex Stock Fund may no longer be an appropriate investment for a retirement plan such as the Savings Plan. Therefore, effective immediately, no additional employee contributions or Company Matching contributions will be directed into the Foamex Stock Fund.

(Fidelity Facts Ex. 37.) The memorandum explained that "[t]his action applies only to new contributions. Money that is currently in the Foamex Stock Fund may remain in the Fund or can be moved into other investments within the Savings Plan." (*Id.*) On July 20, 2005, Fidelity mailed a letter to participants providing similar information. (Fidelity Facts Ex. 38.)

Fidelity and Foamex promptly amended the Trust Agreement to close the Foamex Stock Fund to new investments and exchanges into the fund. (Fifth Amendment to Trust Agreement.) And the Benefits Committee, acting on behalf of Foamex, amended the Plan. (Plan Amendment No. 4.)

On July 13, 2005, McGinley sent a letter to Fidelity directing the trustee to increase the cash component of the Foamex Stock Fund to 7%, subject to a minimum of 6.5% and a maximum of 7.5%. (Spoonemore Decl. Ex. O.) The letter, like the subsequent letters from McGinley to Fidelity (discussed below), bore the Foamex logo and the address of Foamex International, Inc., and identified McGinley as the director of compensation and benefits. (*See* Spoonemore Decl. Exs. O–R, T.)[5] The letter did not specify who was directing Fidelity to

---

[5] McGinley was the director of compensation and benefits for Foamex and, although it is unclear and therefore not undisputed, perhaps for Foamex International as well. In any event, McGinley was authorized to sign letters of direction to Fidelity on behalf of the Benefits Committee, both in its capacity as named fiduciary and in its capacity as Plan administrator (Fidelity Facts ¶ 18; Spoonemore Decl. Ex. L); he was also authorized to act on behalf of Foamex (Fidelity Facts ¶ 19; Trust Agreement (signature page)).

increase the cash target, but stated that Fidelity was being directed "[i]n accordance with the

Trust Agreement between Foamex International Inc. and Fidelity Management Trust Company,"

(the agreement was actually between *Foamex L.P.* and Fidelity) and that the direction "shall

apply until such time as Foamex International Inc. directs [Fidelity] in writing of any deviation to

this letter." (*Id.*) McGinley testified that Christian, who was an executive vice president and

Foamex's general counsel and secretary (Foamex Facts ¶ 6), made the decision to increase the

cash target. (McGinley Dep. at 48:4–17.) And Christian similarly testified that "as an executive

of the plan sponsor [Foamex]," he worked with McGinley and Fidelity in making the decision to

increase the cash target. (Spoonemore Decl. Ex. D, Dep. of Gregory Christian ("Christian Dep.")

at 35:12–36:5.) (The Foamex defendants explain that "Foamex entrusted Christian with ample

authority to make [such] decisions" on behalf of Foamex. (Mem. of Foamex Defs. in Opp'n to

Pl.'s Partial Summ. J. Mot. ("Foamex Opp'n Br.") at 1.) Plaintiff agrees that Christian took these

actions on behalf of Foamex. Because both parties have agreed, I will accept this as true for

purposes of these summary-judgment motions.) Although Christian was the chairman of the

Benefits Committee, there is no evidence that the committee itself was involved in the decision

to increase the target cash balance. (*See* Karpinski Dep. at 24:14–25:15 (testifying that neither he

nor the Benefits Committee was involved in the decision); Ralph Dep. at 22:7–18 (same); Drap

Dep. at 14:6–15:10 (same).)

      In an August 15, 2005, press release, Foamex International announced that it was

involved in negotiations with certain of its creditors. The company explained that "the

restructuring of [its] balance sheet [might] be implemented by means of a case under chapter 11

of the Bankruptcy Code, possibly through a pre-arranged plan of reorganization." (Fidelity Facts

Ex. 40 at 5.) The stock closed at $0.16 per share following this announcement. (Spoonemore Decl. Ex. DD.)

On September 19, 2005, Foamex International and certain of its subsidiaries, including Foamex, filed for bankruptcy. (Form 8-K (Sept. 21, 2005).[6]) According to Foamex International's press release, under the terms of the agreement in principle that it had reached with certain of its creditors, "there would be no recovery for holders of equity interests in the Company." (*Id.* (press release).) The company also announced that it had received notice that its stock would be delisted from Nasdaq on September 28, 2005. (*Id.*) The stock closed at $0.12 per share following Foamex's announcement. (Fidelity Facts Ex. 19-1, Decl. & Expert Report of M. Freddie Reiss (Oct. 29, 2010) ("Reiss Report") ¶ 26.) Following the delisting, the stock traded over the counter on the "Pink Sheets." (*Id.* ¶ 52.)

In a letter dated September 22, 2005, McGinley directed Fidelity to increase the target cash balance in the Foamex Stock Fund to 20%, ostensibly "to provide liquidity to satisfy daily participant requests." (Spoonemore Decl. Ex. P.) The letter did not specify who was directing Fidelity to increase the cash target, but stated that Fidelity was being directed "[i]n accordance with the Trust Agreement between Foamex International Inc. and Fidelity Management Trust Company," and that the direction "shall apply until such time as Foamex International Inc. directs [Fidelity] in writing of any deviation to this letter." (*Id.*) McGinley testified that Christian made the decision to increase the cash balance (McGinley Dep. at 74:11–75:5), and Christian testified that the decision was made on behalf of Foamex and that he did not recall discussing the

---

[6] This Form 8-K was not submitted by any of the parties and is therefore not part of the record. Nonetheless, I may take judicial notice of this filing. *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

matter with any of the other members of the Benefits Committee (Christian Dep. at 65:9–67:1). There is no evidence that the Benefits Committee was involved in the decision to increase the cash balance. (*See* Ralph Dep. at 26:2–12; Drap Dep. at 18:1–25.)

That same day, Foamex International released a term sheet describing the principal terms of its proposed plan of reorganization; under the terms of that plan, "[h]olders of equity interests in Foamex International Inc. [would] receive no distributions" and would not "retain any property on account of their equity interests, and such equity interests [would] be cancelled on the effective date of the [reorganization] Plan." (Fidelity Facts Ex. 49 (press release ¶ 9).)

On September 28, 2005, the closing price of Foamex International common stock was $0.045 per share, and Fidelity informed McGinley that because of the decline in the stock price, in order to keep the percentage of cash in the Foamex Stock Fund at only 20%, Fidelity would have to use cash in the fund to begin buying additional shares of Foamex International stock. (Supplemental Decl. of Richard E. Spoonemore in Supp. of Mot. for Class Certification (July 24, 2009) Ex. X.) In a letter dated September 29, 2005, McGinley directed Fidelity to "omit buys" for the Foamex Stock Fund: he instructed that "[s]hould the cash target move above its tolerance level . . . , no additional shares of Foamex Stock (FMXIQ) should be purchased." (Spoonemore Decl. Ex. Q.) The letter again did not specify who was directing Fidelity, but stated that Fidelity was being directed "[i]n accordance with the Trust Agreement between Foamex International Inc. and Fidelity Management Trust Company" and that the "direction shall apply until such time as Foamex International Inc. directs [Fidelity] in writing of any deviation to this letter." (*Id.*) McGinley testified that Christian made the decision to "omit buys." (McGinley Dep. at 85:23–86:2).

11

On December 23, 2005, Foamex International and its bankrupt subsidiaries filed a joint reorganization plan, which provided that all existing shares of Foamex International stock would be canceled without any compensation for shareholders. (Fidelity Facts Ex. 55.) The stock closed at $0.04 per share that day. (Reiss Report ¶ 31.)

Between September 8, 2005, and December 31, 2005, approximately one-fourth of the Fund investment units were transferred out of the Fund by Plan participants. (Foamex Facts ¶ 54.)

On January 4, 2006, representatives of Fidelity held a conference call with Christian and McGinley to discuss the Foamex Stock Fund. During that call, Christian informed Fidelity that he, on behalf of Foamex, had decided to close the fund and to reallocate the fund's assets to other funds. (Foamex Facts ¶¶ 47–48; Fidelity Facts ¶ 79.) (The Foamex defendants assert that Christian had the authority to make such a decision on behalf of Foamex (*see* Foamex Opp'n Br. at 1), and describe him as "the decision-maker for Foamex" (Foamex Facts ¶ 47).) In a subsequent e-mail, Fidelity informed Christian and McGinley that "[t]o begin the liquidation process," Fidelity would need a letter of direction authorizing the liquidation of the Foamex Stock Fund and that "[u]ntil the letter of direction is executed, Fidelity would also accept a letter of direction to raise the cash target in the [fund]." (Spoonemore Decl. Ex. NN.) Christian testified that during the conference call, Fidelity recommended that, as an interim step before closure, the cash balance in the fund be increased to 50%. (Christian Dep. at 96:17–97:10.)

In a letter dated January 6, 2006, McGinley directed Fidelity to maintain a target cash balance in the Foamex Stock Fund of 50%, subject to a minimum balance of 49% and a maximum balance of 51%, asserting that "[t]he purpose of this target cash balance is to provide

12

liquidity to satisfy daily participant requests." (Spoonemore Decl. Ex. R.) Christian testified,

however, that the purpose of increasing the cash target was to "phase in" the liquidation of the

fund. (Christian Dep. at 104:2–7.) McGinley's letter once again did not specify who was

directing Fidelity to increase the cash target, but stated that Fidelity was being directed "[i]n

accordance with the Trust Agreement between Foamex International Inc. and Fidelity

Management Trust Company," and that the direction "shall apply until such time as Foamex

International Inc. directs [Fidelity] in writing of any deviation to this letter." (*Id.*) Christian

testified that he made this decision to increase the cash balance and that no one else was involved

in the decision. (Christian Dep. at 98:23–99:7.) McGinley similarly testified that, to his

knowledge, members of the Benefits Committee were not informed of the decision to increase

the cash balance. (McGinley Dep. at 126:18–127:7.) The stock closed at $0.02 per share that day.

(Reiss Report ¶ 32.)

On January 20, 2006, McGinley countersigned a letter prepared by Fidelity that

authorized Fidelity to begin liquidating the Foamex Stock Fund on January 23. In the letter,

Fidelity "ask[ed] that an authorized signatory for the Named Fiduciary and Plan Administrator of

the Plan [i.e., the Benefits Committee] review this letter and sign the final page indicating

authorization and direction to take the steps outlined in this letter." The letter stated that "a

decision has been made by Foamex L.P. to eliminate the Foamex Stock Fund as an investment

option in the Plan" and that "Foamex L.P. agrees to execute an amendment to the Trust

Agreement to reflect the elimination of the Foamex Stock Fund as an investment option in the

Plan." McGinley signed the letter, stating that he was "an authorized signatory for the named

fiduciary and Plan Administrator of Foamex L.P. 401(k) Savings Plan." (Spoonemore Decl. Ex.

S.) The stock closed at $0.01 per share that day. (Reiss Report ¶ 33.)

In a notice dated January 27, 2006, Plan participants were advised by Fidelity that "[a]s a result of the filing of the proposed [reorganization plan] . . . , a decision has been made to liquidate the remaining shares of the Foamex Stock Fund." The notice explained that "[b]eginning on or about January 23, 2006, Foamex [International] shares held in the Foamex stock fund [would] begin to be liquidated" and that it was anticipated that they would "be sold in 10 to 20 business days." (Fidelity Facts Ex. 63.) Although Foamex did not amend the Trust Agreement, between January 23 and January 30, Fidelity liquidated all the Foamex International stock holdings in the fund. (Foamex Facts ¶ 61; Pl.'s Facts ¶ 74.) The stock price ranged from one cent to two cents per share during that period. (Spoonemore Decl. Ex. DD.)

As a result of delays in the bankruptcy proceeding, however, the automatic cancellation of Foamex International stock was deferred. (Foamex Facts ¶ 62.) And during this time, a shortage in the supply of raw materials for the polyurethane foam industry, caused by the hurricanes in the Gulf of Mexico in August and September 2005, led to a spike in demand for Foamex products and allowed Foamex to raise prices. (Foamex apparently had made a strategic decision before its bankruptcy filing to pre-purchase large quantities of raw materials.) (Christian Dep. at 115:12–116:6.) In light of this improvement in Foamex's financial condition, Christian decided that the liquidation of the Foamex Stock Fund should be reversed (*id.* at 116:18–117:7), and on February 7, 2006, Foamex contacted Fidelity to discuss this possibility (Foamex Facts ¶ 63).[7] In a

---

[7] In their statement of facts, the Foamex defendants do not specify who contacted Fidelity. But Elizabeth Pathe, a representative of Fidelity, testified that McGinley and Christian participated in a conference call with Fidelity at some point between January 30, 2006, and February 7, 2006, to discuss the possibility of reversing the liquidation of the Foamex Stock Fund. (Pathe Dep. at 173:3–174:24.) And McGinley testified that he called Fidelity "to set up a

letter dated February 9, 2006, McGinley advised Fidelity that "[a]cting in its capacity as named

fiduciary of the Plan, Foamex has determined that the removal of the Foamex Stock Fund should

be delayed until further written direction" and directed Fidelity to repurchase shares of Foamex

International stock and to maintain a target cash balance of 50%, subject to a minimum of 40%

and a maximum of 60% "to provide liquidity to satisfy daily participant requests." (Spoonemore

Decl. Ex. T at 1.) The letter stated that "Foamex has considered this direction in light of its

fiduciary responsibilities under [ERISA]"; that "[a]fter Fidelity, as directed trustee, questioned

the directions . . . , Foamex further considered the prudence of this direction"; and that "Foamex

has discussed the directions . . . with its own legal counsel, who has advised that no provision of

state or federal securities law or other applicable law prohibits Foamex from providing these

directions to Fidelity." (*Id.* at 2.) The stock closed at $0.02 per share that day. (Spoonemore Decl.

Ex. DD.)

Fidelity informed Plan participants of this repurchase in a notice dated February 24, 2006.

Fidelity noted that it had recently been announced that remaining shares in the Foamex Stock

Fund would be liquidated and transferred to a money-market fund on or about February 24, 2006,

and explained that because of a delay in the company's bankruptcy proceedings, "the automatic

liquidation of remaining shares in the Foamex Stock Fund has been deferred until further notice."

Fidelity informed participants that the fund remained closed to additional contributions or

exchanges into the fund but that participants could make exchanges out of the fund at any time.

Fidelity further informed participants that Foamex had "directed Fidelity to maintain a target cash

---

meeting at the request of Mr. Christian to discuss reversing the decision to liquidate the fund,"
(McGinley Dep. at 148:23–149:3), although it is not clear from his testimony when he contacted
Fidelity.

balance of 50% in the Fund, subject to a minimum balance of 40% and a maximum of 60%" and

that "[t]he Benefits Committee may review this target cash balance in the future and adjust it as

appropriate." (Supplemental Decl. of Richard E. Spoonemore in Supp. of Mot. for Class

Certification (July 24, 2009) Ex. Q.)

The price of Foamex International stock began to increase in mid-April 2006.

(Spoonemore Decl. Ex. DD.) On April 27, 2006, Foamex issued a press release asserting that it

was "revising its business plan in light of recent favorable developments in Foamex's business

performance." (Reiss Report ¶ 108 (quoting press release).) The stock closed at $2.37 per share

following this announcement; a day later, the stock closed at $3.28 per share. (Spoonemore Decl.

Ex. DD.) The Foamex Stock Fund did not fully realize the gains attendant to the stock price

increases, however, because the fund maintained a 50% target cash balance; while the stock price

increased from $0.02 per share on February 9, 2006 (when Foamex directed Fidelity to begin

repurchasing stock for the Foamex Stock Fund) to $4.15 per share on December 22, 2006 (when

the fund was ultimately closed and fully liquidated), the net asset value of the fund rose from

$0.01 per unit to just $0.15 per unit over the same period. (*See* Spoonemore Decl. Ex. II, Expert

Report of Dennis E. Logue (Aug. 9, 2010) ("Logue Report") Ex. 5.)

The Foamex Stock Fund was ultimately closed and was fully liquidated on December 22,

2006. *Stanford*, 263 F.R.D. at 162.

### D.   Procedural History

Plaintiff William Stanford, Jr., filed this class-action lawsuit on July 3, 2007, in the

Western District of Washington, against the Foamex defendants and Fidelity under section

16

502(a)(2), 29 U.S.C. § 1132(a)(2), for losses sustained by the Plan as a result of the liquidation of

the Foamex Stock Fund in January 2006 and certain adjustments to the fund's cash target. The

case was transferred to this district on September 28, 2007.

After plaintiff filed an amended complaint, defendants filed motions to dismiss, which I

denied except as to plaintiff's misrepresentation claim. *See Stanford v. Foamex L.P.*, No. 07-

4225, 2008 WL 3874823 (E.D. Pa. Aug. 20, 2008). Stanford amended his complaint twice more,

and in his third amended complaint he asserts six counts. Plaintiff's claims are based on the

following transactions: (1) the increase in the cash target for the Foamex Stock Fund to 20% on

September 22, 2005; (2) the increase in the cash target to 50% on January 6, 2006; (3) the

liquidation of the fund, as directed by the letter signed by McGinley on January 20, 2006; and

(4) the reestablishment of the 50% cash target on February 9, 2006.[8] In count I, plaintiff claims

---

[8] Although plaintiff discusses the July 13, 2005, decision to increase the cash target to 7%
and the September 29, 2005, decision to "omit buys" in his brief supporting his current motion
for summary judgment, plaintiff did not include these transactions in his third amended
complaint. Nor were these transactions included in the list of "challenged transactions" in my
September 24, 2009, memorandum and order granting class certification. *See Stanford*, 263
F.R.D. at 164. Accordingly, I will not address these two transactions here.
    Plaintiff's third amended complaint also challenged the defendants' willingness to allow
participants invested in the Foamex Stock Fund to transfer their investments out of the fund after
the adoption of Amendment No. 4 to the Plan, alleging that the amendment precluded
participants from "transferring existing investments into *or out of*, the Foamex Stock Fund." (3d
Am. Compl. ¶ 50 (quoting the amendment) (emphasis added).)
        As adopted, the Plan amendment provided, in relevant part:
        Effective July 20, 2005, a Member may no longer direct new investments into, or
        transfer existing investments into *or out of*, the Foamex Stock Fund. All investments
        in the Foamex Stock Fund as of July 19, 2005 shall remain in the Foamex Stock
        Fund until moved into an alternative investment fund or distributed according to the
        terms of the Plan.
(Plan Amendment No. 4 ¶ 10 (emphasis added).) In its answer to plaintiff's third amended
complaint, Fidelity asserted a counterclaim, alleging that the language in the amendment
precluding transfers out of the fund was a "scrivener's error." The Foamex defendants asserted a
similar counterclaim. Fidelity and the Foamex defendants asserted that the intended purpose of

that the Foamex defendants and Fidelity breached their fiduciary duty, as set forth in section

404(a)(1)(D) of ERISA, 29 U.S.C. § 1104(a)(1)(D), to act in accordance with the documents and

instruments governing the Plan. Plaintiff asserts that the Foamex defendants breached their

fiduciary duty by adjusting the cash target and by directing that the fund be liquidated in January

2006, even though they lacked the authority to do so. Plaintiff also claims that Fidelity breached

its duty by following unauthorized and improper directions from Foamex. In addition to asserting

that Foamex is directly liable under count I, plaintiff seeks, in count III, to hold Foamex liable for

the breaches of fiduciary duty by the members of the Benefits Committee under the doctrine of

*respondeat superior*. In counts II and V, plaintiff claims that Foamex failed to monitor the

Benefits Committee and Fidelity, and thereby breached its duty of prudence under section

404(a)(1)(B) of ERISA, 29 U.S.C. § 1104(a)(1)(B). In count IV, plaintiff claims that Fidelity

breached its duty, under section 403(a) of ERISA, 29 U.S.C. § 1103(a), to follow only the

"proper directions" of the named fiduciary that are made in accordance with the terms of the Plan

and are not contrary to ERISA, by following the unauthorized and improper directions of Foamex

to liquidate the Foamex Stock Fund and adjust the cash target. And finally, in count VI, plaintiff

seeks to hold each defendant liable for the breaches of fiduciary duty by the other defendants

under section 405(a) of ERISA, 29 U.S.C. § 1105(a), which provides for cofiduciary liability.

      On September 24, 2009, I granted plaintiff's motion for class certification as to the claims

---

the amendment was to prohibit new or additional investments in the Foamex Stock Fund but to
allow participants who had already invested in the fund to transfer their investments in the fund
to other investment options or to maintain their investments in the fund. In an August 31, 2010,
memorandum and order, I granted the defendants' partial motions for summary judgment as to
their counterclaims and reformed Amendment No. 4 to eliminate the drafting error. *See Stanford
v. Foamex L.P.*, No. 07-4225, 2010 WL 3488651 (E.D. Pa. Aug. 31, 2010). Accordingly,
plaintiff has abandoned any claims based on participants' transfers out of the fund.

stated in plaintiff's third amended complaint. The class is defined as follows:

> All individuals invested in the Foamex Stock Fund on September 22, 2005, except individuals who were members of the Foamex Benefits Committee at any time between September 22, 2005 and December 31, 2006, the members of their immediate families, and their heirs successors or assigns.

*Stanford*, 263 F.R.D. at 175.

After discovery, Fidelity filed a motion for summary judgment as to all claims against it. Plaintiff filed a cross-motion for partial summary judgment as to the liability of Fidelity under count IV and filed a motion for partial summary judgment as to the liability of Foamex and Christian under counts I and III. The Foamex defendants filed a cross-motion for summary judgment as to all claims against them.

## II.    STANDARD OF REVIEW

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

The moving party bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial*," *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted), offering concrete evidence supporting each essential element

of its claim, *see Celotex*, 477 U.S. at 322–23. The nonmoving party must show more than "[t]he mere existence of a scintilla of evidence" for elements on which it bears the burden of production, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986), and may not "rely merely upon bare assertions, conclusory allegations or suspicions," *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). By the same token, "it is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. SEPTA*, 479 F.3d 232, 238 (3d Cir. 2007) (footnote omitted). In addition, the mere fact that parties have filed cross-motions for summary judgment "does not mean that the case will necessarily be resolved at the summary judgment stage," because "[e]ach party must still establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Atl. Used Auto Parts v. City of Philadelphia*, 957 F. Supp. 622, 626 (E.D. Pa. 1997).

When evaluating a motion for summary judgment, the court "is not to weigh the evidence or make credibility determinations." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (internal quotation marks omitted). "[A]n inference based upon a speculation or conjecture," however, "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

20

III.    DISCUSSION

Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), allows plan participants to bring suit

against a plan fiduciary for relief under section 409, which imposes personal liability on "[a]ny

person who is a fiduciary with respect to a plan who breaches any of the responsibilities,

obligations, or duties imposed upon fiduciaries by [ERISA]," and requires such fiduciary "to

make good to such plan any losses to the plan resulting from each such breach," 29 U.S.C.

§ 1109(a).

A.    Count I: Breach of Duty to Follow Plan Documents

In count I, plaintiff alleges that the Foamex defendants and Fidelity violated their duty, as

set forth in section 404(a)(1)(D) of ERISA, 29 U.S.C. § 1104(a)(1)(D), to act in accordance with

the documents and instruments governing the Plan.[9] Plaintiff claims that the Foamex defendants

breached their fiduciary duty by making adjustments to the cash target for the Foamex Stock

Fund on September 22, 2005, January 6, 2006, and February 9, 2006, and by directing, on

January 20, 2006, that the fund be liquidated, even though they lacked the authority to do so.

Plaintiff claims that Fidelity breached its duty by following unauthorized and improper directions

from Foamex.

---

[9] ERISA provides that "a fiduciary shall discharge his duties with respect to a plan . . .
(D) in accordance with the documents and instruments governing the plan insofar as such
documents and instruments are consistent with the provisions of this subchapter and subchapter
III of this chapter." 29 U.S.C. § 1104(a)(1).

21

### 1.   The Foamex Defendants

Plaintiff asserts that the Benefits Committee had the exclusive authority to eliminate investment options under the Plan and argues that Christian, acting on behalf of Foamex, "usurped" that authority and therefore acted in contravention of the Plan when he stated that Foamex had decided to eliminate the Foamex Stock Fund and (through McGinley) directed, on January 20, 2006, that the fund be liquidated. In addition, plaintiff challenges, on two separate grounds, the decisions to adjust the cash target for the fund. First, plaintiff argues that Foamex lacked the authority to adjust the cash target. Second, plaintiff asserts that in adjusting the cash target, Christian, acting on behalf of Foamex, was attempting to hedge the risk of the fund, which was not permitted under the Plan, rather than simply attempting to provide liquidity to facilitate participants' withdrawal requests.

The Foamex defendants have moved for summary judgment as to the claims against them in this count, and plaintiff has moved for partial summary judgment as to the liability of Foamex and Christian. Although, given the undisputed evidence on the record thus far submitted, a reasonable fact-finder could not fail to find that Foamex and Christian breached their fiduciary duty to act in accordance with the Plan, there is a genuine issue of fact as to whether this breach caused the Plan's losses. Accordingly, I will deny both plaintiff's and the Foamex defendants' motions for summary judgment as to the claims against Foamex and Christian. But because no reasonable fact-finder could conclude on the basis of the undisputed facts that K. Douglas Ralph, Stephen Drap, or George L. Karpinski breached their fiduciary duty to act in accordance with the Plan, I will grant the Foamex defendants' motion for summary judgment as to the claims against these three defendants under this count.

### a.    Were the Challenged Acts Fiduciary Acts?

"In every case charging breach of ERISA fiduciary duty . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

The Foamex defendants argue that they were not acting as fiduciaries when they adjusted the cash target for the Foamex Stock Fund or when they decided to liquidate the fund. Their argument, however, lacks merit.

ERISA defines fiduciary status in functional terms of control and authority over a plan. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993). The statute provides that "a person is a fiduciary with respect to a plan to the extent . . . he . . . exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(A). Fiduciary status "is not an all or nothing concept," and a court "must ask whether a person is a fiduciary with respect to the particular activity in question." *Srein v. Frankford Trust Co.*, 323 F.3d 214, 221 (3d Cir. 2003) (internal quotation marks omitted).

At issue here are the liquidation of the Foamex Stock Fund and adjustments to the cash target, which affected the percentage of the fund's assets to be invested in Foamex International stock. These transactions clearly involved the management or disposition of the Plan's assets and are therefore fiduciary functions.

There is no merit to the Foamex defendants' argument that the decision to eliminate the Foamex Stock Fund, and the resulting liquidation of the fund in January 2006, was a "settlor"

function, not a fiduciary function (*see* Foamex Opp'n Br. at 10). The Foamex defendants are correct that, as a general matter, "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." *Lockheed Corp. v. Spink*, 517 U.S. 882, 890 (1996) (explaining that when plan sponsors adopt, modify, or terminate ERISA plans, "they do not act as fiduciaries but are analogous to the settlors of a trust" (citations omitted)). The Supreme Court has reasoned that "an employer's decision to amend a pension plan concerns the composition or design of the plan itself and does not implicate the employer's fiduciary duties which consist of such actions as the administration of the plan's assets." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 444 (1999).

Here, of course, neither Foamex nor the Benefits Committee actually amended the Plan when the decision to eliminate and liquidate the Foamex Stock Fund was made in January 2006. Moreover, contrary to the Foamex defendants' suggestion, even if the Plan had been amended, this general principle does not apply where, as here, a plan amendment affects the investment of existing plan assets. Amending the Plan to prohibit participants from directing *new* investments or transferring existing investments into the Foamex Stock Fund might arguably be a settlor function; whether to permit a company stock fund in a plan is a matter of plan design within the sponsor's discretion and not subject to ERISA's fiduciary obligations. But to the extent that the Foamex defendants decided to liquidate *existing* investments in the Foamex Stock Fund, the Foamex defendants were acting as  fiduciaries. *See King v. Nat'l Human Res. Comm., Inc.*, 218 F.3d 719, 723–24 (7th Cir. 2000) (concluding that formation of new 401(k) plan did not implicate fiduciary duties except to the extent that it involved decision about investment of funds transferred from old plan to new plan); *cf.* Department of Labor ("DOL") Information Letter to John N. Erlenborn (Mar. 13, 1986) (asserting that the decision to terminate a plan is a settlor

activity and as such is not subject to ERISA's fiduciary-duty requirements, but emphasizing that "activities undertaken to implement the termination decision are generally fiduciary in nature").

Nor is there any merit to the Foamex defendants' argument that the adjustments to the cash target on September 22, 2005, January 6, 2006, and February 9, 2006, were "ministerial" in nature because they "naturally flowed" from the Benefits Committee's July 13, 2005, decision to close the Foamex Stock Fund to new investments. (Foamex Opp'n Br. at 7.) Citing a DOL interpretive bulletin published at 29 C.F.R. § 2509.75-8, the Foamex defendants characterize the adjustments to the cash target as "ministerial," suggesting that they are similar to the non-fiduciary functions described in the DOL interpretation. But, as the Third Circuit has noted, *see Bd. of Trs. of Bricklayers & Allied Craftsmen v. Wettlin Assocs., Inc.*, 237 F.3d 270, 274 (3d Cir. 2001), the DOL's interpretation addresses administrative functions involved in the administration of benefits under a plan and does not speak to activities related to the management or disposition of plan assets.[10]

Moreover, contrary to the Foamex defendants' contention, the adjustments to the cash target cannot be said to have "naturally flowed" from the Benefits Committee's July 13, 2005, decision to close the fund to new investments; nothing in that decision required that the cash target be increased, let alone that it be increased to 20% two months later, on September 22,

---

[10] The DOL explains that

a person who performs purely ministerial functions . . . within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

29 C.F.R. § 2509.75-8 (question D-2).

2005, and then to 50% on January 6, 2006, and reestablished at 50% on February 9, 2006, after the liquidation of the fund.[11] Indeed, Foamex and Fidelity have argued that it was Foamex's bankruptcy filing and the delisting of the stock—events that had not occurred when the Benefits Committee made its decision to close the fund to new investments—that precipitated the decision to increase the cash target to 20%. (*See, e.g.*, Mem. of Foamex Defs. in Supp. of Summ. J. Mot. ("Foamex Br.") at 9 ("As a result of the delisting and bankruptcy filing, Fidelity anticipated an increased selling of stock and recommended increasing the cash component to 20% to provide liquidity to satisfy daily participant requests." (internal quotation marks omitted); Reiss Report ¶¶ 45–47.)[12] And it was not until after Foamex International announced, on December 23, 2005, that there would be no recovery to shareholders under the reorganization plan that Christian, on behalf of Foamex, decided to increase the cash target to 50%.

The Foamex defendants' argument is further undermined by their suggestion (*see* Foamex Br. at 12) that the increase in the cash target to 50% on January 6, 2006, was a step in implementing Christian's decision (made on behalf of Foamex and formally communicated to Fidelity in a letter signed by McGinley on January 20, 2006, stating that Foamex had decided to

---

[11] The Foamex defendants' expert, Mark Johnson, concluded in his report that "[t]he events following the July 13, 2005 [Benefits] Committee meeting, i.e. altering the liquidity level and omitting buys, are the logical follow up steps to the decision made by the Committee" (Foamex Defs. Resp. to Pl.'s Facts Attach. 1, Expert Report of Mark Johnson ("Johnson Report") at 19), but he provided no explanation for his conclusion. This "bare assertion[]" or "conclusory allegation[]," *Fireman's Ins. Co.*, 676 F.2d at 969, is not sufficient to establish a genuine issue of material fact.

[12] Reiss did suggest that the Benefits Committee's decision to close the fund to new investments contributed to the need to increase the cash target because there would not be any contributions into the fund to provide cash to fund participant withdrawals. (Reiss Report ¶¶ 71–73.)

eliminate the fund as an investment option and directing Fidelity to begin liquidating it)—a decision that they concede was not a "ministerial implementation" of the Benefits Committee's decision on July 13, 2005, to close the fund to new investments (*see* Foamex Opp'n Br. at 7), since the Benefits Committee expressly decided that participants who had already invested in the fund could continue to maintain their investments in the fund if they so chose.

I thus conclude as a matter of law that the challenged transactions—the increase in the cash target for the Foamex Stock Fund to 20% on September 22, 2005, the increase in the cash target to 50% on January 6, 2006, the liquidation of the fund, as directed on January 20, 2006, and the reestablishment of the 50% cash target on February 9, 2006—were fiduciary acts.

### b.      Did the Foamex Defendants Breach Their Fiduciary Duty?

Having established that the challenged transactions were fiduciary acts, I turn now to the question whether the Foamex defendants breached their fiduciary duties to the Plan.

### i.   Liquidation of the Fund

Plaintiff asserts that the Benefits Committee had the exclusive authority to eliminate investment options under the Plan and argues that Christian, acting on behalf of Foamex, "usurped" that authority and therefore acted in contravention of the Plan when he decided to liquidate the Foamex Stock Fund in January 2006 in connection with eliminating the fund as an investment option.

The Foamex defendants do not dispute that Christian was acting on behalf of Foamex or that he had the authority to do so. (*See, e.g.*, Foamex Opp'n Br. at 1 ("Foamex entrusted

27

Christian with ample authority to make the decisions in question.").).)[13] But they do dispute plaintiff's claim that Foamex lacked the authority to eliminate the fund as an investment option. They claim that Foamex had the authority, under section 13.2 of the Plan, to amend the Plan at any time, and assert that Foamex thus had the authority to eliminate any investment options offered under the Plan.

Unfortunately for the Foamex defendants, however, Foamex did not amend the Plan in connection with the liquidation of the fund in January 2006, a fact that should not be taken lightly. *Cf. Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 82 (1995) (asserting that plan amendments are "fairly serious events" and deserve "special consideration"). And under the terms of the Plan as it then existed, only the Benefits Committee had the express authority to alter the investment options available to Plan participants. (*See* Plan § 4.4.) The Foamex defendants cite no basis for their authority to liquidate the fund or eliminate the fund as an investment option other than the unexercised power to amend the Plan.

The Foamex defendants are essentially arguing that the authority to amend the Plan gave Foamex the authority to take actions not expressly authorized under the terms of the Plan. Their argument proves too much. Indeed, if accepted, their argument would render meaningless the requirement in section 404(a)(1)(D) that a fiduciary discharge his duties in accordance with the plan documents—at least to the extent that the fiduciary had the authority to amend the plan.

A fact-finder thus could not reasonably find on the basis of the evidence submitted that Foamex had the authority to eliminate the Foamex Stock Fund as an investment option and

---

[13] This is so even though McGinley signed the letter of January 20, 2006, on behalf of the named fiduciary and Plan administrator, that is, the Benefits Committee, which had taken no action.

liquidate the fund when it had not amended the Plan.

### ii. *Adjustments to the Cash Target*

Plaintiff also challenges, on two separate grounds, the adjustments to the cash target. First, plaintiff argues that Foamex lacked the authority to adjust the cash target. Second, plaintiff asserts that the Foamex Stock Fund is permitted to hold cash only to the extent necessary to facilitate transfers and exchanges. Plaintiff asserts that there is no evidence that Christian considered the fund's liquidity needs when he set the cash targets and argues that Christian instead was impermissibly attempting to hedge the risk of the fund.

Plaintiff first asserts that the Benefits Committee, as the named fiduciary, had the exclusive authority to set the cash target, and argues that Christian, acting on behalf of Foamex, "usurped" that authority and therefore acted in contravention of the Plan when he directed that Fidelity adjust the target cash balance. Plaintiff points to section 4(e) of the Trust Agreement, which provides that "[t]he Named Fiduciary shall, after consultation with the Trustee, establish and communicate to the Trustee in writing a target percentage and drift allowance for such short-term liquid investments." (Trust Agreement § 4(e).) Plaintiff notes that the original Trust Agreement, in a separate provision that seemingly conflicted with section 4(e), authorized Foamex, as the Plan sponsor, to set the target cash percentage. As originally adopted, Schedule H provided: "[I]n order to satisfy daily participant requests for exchanges, loans and withdrawals, the Stock Fund will also hold cash or other short-term liquid investments in an amount that has been agreed to in writing by the *Sponsor* and the Trustee." (Trust Agreement Sched. H (before 2001 amendment) (emphasis added).) But, as plaintiff further notes, this language in Schedule H was removed as part of a 2001 amendment to the Trust Agreement.

29

The Foamex defendants argue in response that both the Benefits Committee and Foamex had the authority to adjust the cash balance. Although they argue that there is no evidence that the purpose of the amendment to Schedule H was to eliminate Foamex's authority to set the cash target, they do not try to argue that the elimination of such authority was merely a scrivener's error or that the amendment inadvertently eliminated Foamex's authority. Rather, the Foamex defendants argue that other changes adopted as part of the same 2001 amendment make it clear that Foamex retained the authority to set the cash target.

The Foamex defendants point, for example, to section 4(e)(i), titled "Acquisition Limit," which required Foamex, as Plan sponsor, to inform Fidelity of any acquisition limits with respect to Foamex International stock under the Plan or under applicable law:

> Pursuant to the Plan, the Trust may be invested in Sponsor Stock to the extent necessary to comply with investment directions in accordance with this Agreement. The Sponsor shall be responsible for providing specific direction on any acquisition limits required by the Plan or applicable law.

(Trust Agreement § 4(e)(i).) ERISA prohibits a plan from acquiring employer securities if, as a result, the value of employer securities held by the plan would exceed 10% of the plan's assets. *See* 29 U.S.C. § 1107(a)(2). ERISA exempts eligible individual account plans such as the Foamex Plan from this acquisition limit, *see id.* § 1107(b),[14] but to the extent that ERISA was amended and such an acquisition limit did apply to the Plan, or to the extent that the Plan itself contained such a limitation (it did not at the time of the events in question), section 4(e)(i) would have required Foamex to so inform Fidelity. But this provision said nothing about the cash target for the fund, which was meant to provide liquidity to satisfy participants' exchange or

---

[14] The exemption does not apply to the extent that a plan (other than an ESOP) *requires* a participant to invest in the employer's securities. *See id.* § 1107(b)(2).

withdrawal requests.

The Foamex defendants also point to section 4(e)(iii), titled "Purchases and Sales of Sponsor Stock," which outlined how Fidelity was to purchase and sell shares of Foamex International stock for the Foamex Stock Fund:

> Unless otherwise directed by the Sponsor in writing pursuant to directions that the Trustee can administratively implement, the following provisions shall govern purchases and sales of Sponsor Stock.

(Trust Agreement § 4(e)(iii).) This subsection, for example, provided that "[p]urchases and sales of Sponsor Stock shall be made on the open market in accordance with the Trustee's standard trading guidelines" (*id.* § 4(e)(iii)(A)), and directed Fidelity to use Fidelity Capital Markets to provide brokerage services for such open-market transactions (*id.* § 4(e)(iii)(C)). It also provided that "[i]f directed by the Sponsor in writing prior to the trading date, the Trustee may purchase or sell Sponsor Stock from or to the Sponsor if the purchase or sale is for adequate consideration . . . and no commission is charged." (*Id.* § 4(e)(iii)(B).) But again, this provision said nothing about the cash target.

Finally, the Foamex defendants point to section 4(e)(iv), titled "Execution of Purchases and Sales of Units," which outlined procedures for handling purchases and sales of units in the Foamex Stock Fund:

> Unless otherwise directed in writing pursuant to directions that the Trustee can administratively implement, purchases and sales of units shall be made as follows[.]

(Trust Agreement § 4(e)(iv).) It provided, for example, that purchases and sales of units were to be made on the date on which Fidelity received the transaction request. (*Id.* § 4(e)(iv)(A).) It further provided that aggregate sales of units on any given day would be limited to the fund's

available liquidity for that day (*id.* § 4(e)(iv)(B)), and that Fidelity would "close the Stock Fund

to sales or purchases of units, as applicable, on any date on which trading in the Sponsor Stock

has been suspended or substantial purchase or sale orders are outstanding and cannot be

executed" (*id.* § 4(e)(iv)(C)). Although this provision referred to the fund's liquidity—the

amount of cash available in the fund—it said nothing about who had the authority to adjust the

fund's cash target. Moreover, unlike the other two provisions cited by the Foamex defendants,

this provision did not grant Foamex any authority not granted in some other provision of the

Trust: it provided that "[u]nless otherwise directed in writing," Fidelity was to follow certain

procedures and guidelines, but it did not specify who could "otherwise direct[]" Fidelity.

Given that section 4(e) expressly provides that the "Named Fiduciary shall . . . establish

and communicate to the Trustee in writing" the target cash percentage, these other three

provisions cannot reasonably be interpreted to mean that Foamex had the authority to set the cash

target. The fact that Foamex was granted authority with respect to certain aspects of the

administration of the Foamex Stock Fund does not mean that it had authority with respect to all

aspects of the fund.

The Foamex defendants argue that even if Foamex lacked the authority to adjust the cash

target, McGinley was acting with the authority of the Benefits Committee when he signed the

letters of direction instructing Fidelity to adjust the target cash percentage. This argument too

lacks merit.

It is true that McGinley was the secretary of the Benefits Committee and was authorized

to sign letters of direction on the committee's behalf. But as plaintiff asserts, there is no evidence

that the Benefits Committee made the decisions to adjust the cash balance in the Foamex Stock

32

Fund. Rather, the evidence demonstrates that Christian, acting on behalf of Foamex, made these decisions. McGinley testified that it was Christian who made the decision to increase the cash target to 20% on September 22, 2005, and, after the fund was liquidated, to repurchase shares of Foamex International stock and reestablish the cash target at 50% on February 9, 2006. (McGinley Dep. at 73:1–75:5, 152:2–16.) Christian similarly testified that he did not recall discussing the decision to increase the cash target to 20% with other members of the Benefits Committee and that the decision was made on behalf of Foamex. (Christian Dep. at 65:23–67:1.) He further testified that he made the January 6, 2006, decision to increase the cash balance to 50% and the February 9, 2006, decision, after the fund had been liquidated, to repurchase Foamex International stock and reestablish a cash target of 50%, and that the Benefits Committee was not involved in making those decisions. (*Id.* at 98:23–99:7, 114:14–19, 116:18–118:1.) And Christian did not have the authority to act unilaterally on behalf of the Benefits Committee, because the Plan provided that decisions of the Committee had to be approved "by the majority of the members then in office" at any meeting of the committee or "by unanimous vote in writing" if a meeting was not held. (Plan § 12.2.)

Nor is there any evidence, contrary to the Foamex defendants' suggestion, that the Benefits Committee delegated its authority with respect to the Foamex Stock Fund to either Foamex (or Christian, on behalf of Foamex) or McGinley. (*See* Plan § 12.3.6 (granting the Benefits Committee the power "to appoint other fiduciaries to carry out various specific fiduciary responsibilities").)

The undisputed evidence submitted so far thus shows that Foamex lacked the authority to

adjust the cash target.[15]

Separately, plaintiff argues that, regardless of whether Foamex had the authority to adjust the cash target, the adjustments were made for an impermissible purpose under the Plan. Specifically, plaintiff asserts that the Foamex Stock Fund is permitted to hold cash only to the extent necessary to facilitate transfers and exchanges. Plaintiff asserts that there is no evidence that Christian considered the fund's liquidity needs when he set the cash targets and argues that Christian instead was impermissibly attempting to hedge the risk of the fund. Although the fact that Foamex lacked the authority to adjust the cash target is sufficient to establish a breach of fiduciary duty on the part of Foamex and Christian, I will address this second argument.

As a preliminary matter, I note that Fidelity and Foamex characterize the January 6, 2006, decision to increase the cash target to 50% as a step in liquidating the Foamex Stock Fund (*see* Foamex Br. at 12; Fidelity Reply Mem. in Supp. of Mot. for Summ. J. ("Fidelity Reply Br.") at 8), and they thus distinguish that decision from the September 22, 2005, decision to increase the cash target to 20%. The January 6, 2006, letter from McGinley, however (like the September 22, 2005, letter) states that "[t]he purpose of [the 50%] target cash balance is to provide liquidity to satisfy daily participant requests." (Spoonemore Decl. Ex. R.) In any event, plaintiff also asserts that "[t]he purpose of the increase in cash [to 50%] was to begin or phase in the liquidation process." (Pl.'s Facts ¶ 48.)

---

[15] Fidelity has filed a motion to exclude the opinion of plaintiff's expert, Dr. Dennis Logue, regarding the issue of which persons had authority to issue directions to Fidelity regarding adjustments to the cash target and the liquidation of the Foamex Stock Fund. Because I have determined, without reference to Dr. Logue's opinion, that the undisputed evidence conclusively establishes that Foamex lacked the authority to adjust the cash target or to liquidate the fund, I will deny Fidelity's motion to exclude Dr. Logue's opinion as moot.

It is clear from the Plan documents that the cash component of the Foamex Stock Fund was not intended as an alternative investment or as a hedge against Foamex International stock but was instead meant only to satisfy participants' exchange and withdrawal requests (Trust Agreement § 4(e)). Nonetheless, where a decision to liquidate the fund has been properly made in accordance with the Plan documents, it is unreasonable to read section 4(e) of the Trust Agreement as prohibiting an increase in the cash target as a first step in liquidating the fund. As one of Fidelity's experts explained, in such a situation, increasing the cash target "allows the gradual liquidation of the employer stock in the plan, while still permitting plan participants to transfer out of the stock fund if they wish to do so." (Hennessy Report ¶ 15.) (Of course here, the decision to liquidate the fund was not properly made, because Foamex lacked the authority to make such a decision.) Thus, to the extent that the purpose of increasing the cash target to 50% on January 6, 2006, was, as Christian testified, to "phase in" the liquidation of the fund (Christian Dep. at 104:2–7), if the decision to liquidate the fund had been properly made, a fact-finder could not reasonably find that this adjustment was contrary to the terms of the Plan.

But, although the Foamex defendants similarly try to characterize the February 9, 2006, decision to reestablish the cash target at 50% as related to the liquidation of the fund, it is difficult to see how this decision could reasonably be viewed as a step in the liquidation of the fund, particularly given that the decision was made in connection with the "reversal" of the liquidation and given that the cash target remained at 50% for approximately ten months, until the fund was finally eliminated in December 2006. And although the letter of direction instructing Fidelity to set the cash target at 50% stated that "[t]he purpose of this target cash balance is to provide liquidity to satisfy daily participant requests" (Spoonemore Decl. Ex. T),

there is no other evidence that it was in fact for liquidity purposes. Indeed, when asked for his reasons for setting the cash target at 50% in connection with the "reversal" of the liquidation, Christian testified only that "[t]hat's where we were, my recollection is, or at least my take from it is, because that's where we were prior to the decision to liquidate." (Christian Dep. at 125:23–126:5.) A genuine issue of fact thus exists as to whether the adjustment was contrary to the terms of the Plan.

With respect to the September 22, 2005, decision to increase the cash target to 20%, the Foamex defendants contend that the adjustment was "in fact liquidity driven" and that "no rational fact-finder could find otherwise." (Foamex Opp'n Br. at 14.) I agree.

Although plaintiff makes much of the fact that Christian testified that he did not recall receiving any data from Fidelity regarding participant exchanges or withdrawals (Christian Dep. at 49:4–17) and that he did not know why 20% was chosen as the target as opposed to 25% or 15% or some other percentage (*id.* at 67:3–10), Elizabeth Pathe, a representative of Fidelity, testified that in discussing the decision to increase the cash target with Foamex, Fidelity explained that "due to the delisting, that liquidity may be a concern because the volume of the trading of the Foamex Stock Fund was uncertain" (Pathe Dep. at 26:25–27:4). Similarly, McGinley testified that Fidelity recommended that the cash target be increased "in anticipation of increased selling of Foamex stock as a result of, among other things, the delisting." (McGinley Dep. at 73:20–74:3.) And Fidelity's experts have explained in great detail why liquidity would have been an issue after Foamex filed for bankruptcy and Foamex International stock was delisted. (*See* Reiss Report ¶¶ 45–81.) As they explained, where, as here, there are no inflows of contributions into the stock fund because it has been closed to new investments, "the cash target

often needs to be raised to ensure that the stock fund can continue to honor participants' requests for withdrawals . . . even if there is no change in participant behavior." (Hennessy Report ¶ 13.)

The fact that actual participant withdrawals ended up constituting significantly less than 20% of the fund's assets (*see* Pl.'s Facts ¶ 64) and that a lower cash target might therefore have been sufficient to satisfy participant requests does not require a different conclusion here. As Fidelity asserts, "liquidity management is an anticipatory endeavor" (Fidelity's Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 11) and the fact that Foamex may have overestimated the demand for withdrawals does not establish a genuine issue of fact as to whether the decision to increase the cash target to 20% was liquidity driven.

Thus, given the undisputed evidence, a fact-finder could not reasonably find that either the September 22, 2005, increase in the cash target to 20% or, assuming that the decision to liquidate the fund had been properly made, the January 6, 2006, increase in the cash target to 50% was made for an impermissible purpose. But genuine issues of fact do exist as to whether the reestablishment of the cash target at 50% on February 9, 2006, in connection with the "reversal" of the liquidation, was consistent with the terms of the Plan.

And regardless of whether the adjustments to the cash target were made for a permissible purpose, the undisputed evidence shows that Foamex lacked the authority to make those adjustments or to liquidate the fund. The undisputed evidence also demonstrates that it was Christian, acting on behalf of Foamex, who made the decisions at issue here. Plaintiff has thus satisfied his burden of demonstrating that Foamex and Christian breached their duty to act in accordance with the Plan documents, and no reasonable fact-finder could disagree on the basis of the evidence submitted thus far.

37

But, as discussed above, there is no evidence that any of the other three members of the

Benefits Committee—K. Douglas Ralph, Stephen Drap, and George L. Karpinski—were

involved in the decisions to adjust the cash target. Nor is there any evidence that they were

involved in the decision to liquidate the fund. (*See* Christian Dep. at 113:15–21 (testifying that

the Benefits Committee had no role in the decision to eliminate the Foamex Stock Fund as an

investment option); Karpinski Dep. at 35:11—36:11; Drap Dep. at 21:22—22:7; Ralph Dep. at

30:12–33:8.) Accordingly, the claim against Ralph, Drap, and Karpinski must fail, and I will

grant the Foamex defendants' motion for summary judgment as to the claim in count I against

Ralph, Drap, and Karpinski.[16] The remainder of the discussion as to the claims in count I against

the Foamex defendants will thus focus on the potential liability of Foamex and Christian only,

although for convenience I will continue to refer to them as the "Foamex defendants."

c.        **Did the Breach Cause the Plan's Losses?**

ERISA requires a causal connection between the breach of fiduciary duty and the alleged

loss to the Plan. *See, e.g.*, *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 160 (3d Cir. 1999). The

Foamex defendants argue that such a causal connection does not exist here, because the

challenged transactions were objectively prudent. In support of their argument, they cite cases in

which courts have recognized that where a fiduciary fails to fully investigate an investment

decision as required under ERISA's "prudent person" standard, he is not liable for losses from

that investment if the investment is objectively prudent, because the requisite causal link does not

---

[16] I note that plaintiff does not even address the claim in count I against these three
defendants in his brief opposing the Foamex defendants' motion for summary judgment; he
addresses only the claim, under count VI, that they are liable as co-fiduciaries under section 405,
which I discuss separately in section III.E.1.

exist. *See, e.g.*, *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 919 (8th Cir. 1994) ("Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway."); *Fink v. Nat'l Savings & Trust Co.*, 772 F.2d 951, 962 (Scalia, J., concurring in part and dissenting in part) ("I know of no case in which a trustee who has happened—through prayer, astrology or just blind luck—to make (or hold) objectively prudent investments . . . has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand.").

But unlike in those cases, in this case plaintiff does not allege that defendants breached their duty of prudence by failing to investigate the challenged transactions; rather, plaintiff alleges that Foamex lacked the authority to direct such transactions. (In the cases cited by the Foamex defendants, the transactions at issue were authorized.) The fact that the challenged transactions may have been objectively prudent thus may have no bearing on whether a causal connection exists between the breach—the failure to act in accordance with the plan documents— and the alleged loss to the Plan.

The Third Circuit has not yet addressed the question of which party bears the burden of proving causation. *See In re Unisys Sav. Plan Litig.*, 173 F.3d at 160 (asserting that the court has "yet to express ourselves on this issue" and declining to address the issue because the defendant had not breached its fiduciary duties). Other circuit courts to have considered the issue are split. The Eighth Circuit, for example, has held that once a plaintiff demonstrates a breach of fiduciary duty and a prima facie case of loss to the plan, "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by the breach of duty." *Roth*, 16 F.3d at 917 (internal quotation marks and ellipses omitted); *accord McDonald v. Provident Indem. Life Ins. Co.*, 60

F.3d 234, 237 (5th Cir. 1995).[17] The Sixth Circuit, on the other hand, has suggested that the

plaintiff bears the burden of proof. *See Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)

(asserting that "a plaintiff must show a causal link between the failure to investigate and the harm

suffered by the plan"); *cf. Silverman v. Mutual Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir.

1998) (in context of claim for cofiduciary liability, asserting that plaintiff "must show some

causal link between the alleged breach of [defendant's] duties and the loss plaintiff seeks to

recover").

     Regardless of which party bears the burden of proof here, neither plaintiff nor the Foamex

defendants have addressed the question whether the loss to the Plan resulted from the Foamex

defendants' breach of their fiduciary duty. And the evidence in the record is not sufficient to

permit me to say, as a matter of law, that the requisite causal link either has been or cannot be

established. Thus, although on the basis of the current record a reasonable fact-finder could not

fail to find that Foamex and Christian breached their fiduciary duty to act in accordance with the

Plan documents, summary judgment is not appropriate here.

---

[17] This is also the approach taken under the common law of trusts. *See, e.g.*, *Estate of Stetson*, 345 A.2d 679, 690 (Pa. 1975) ("[W]hen a beneficiary has succeeded in proving that the trustee has committed a breach of duty and that a related loss has occurred, we believe that the burden of persuasion ought to shift to the trustee to prove, as a matter of defense, that the loss would have occurred in the absence of a breach of duty."); *Branch v. White*, 239 A.2d 665, 674 (N.J. Super. Ct. App. Div. 1968) ("[T]he burden of proof should be on the defaulting trustee clearly to disestablish causal connection between default and loss to the beneficiary, rather than the contrary.").

**d.      Did the Foamex Defendants Have a Duty
to Disregard Plan Terms?**

The Foamex defendants argue that even if they failed to act in accordance with the Plan

documents, such a deviation was justified here because "[u]nder certain extreme circumstances a

fiduciary may be required to act contrary to the express terms of plan documents" in order to

comply with ERISA's other requirements, including the duty of prudence. (Foamex Br. at 13.)

Their argument, however, lacks merit.

ERISA provides that a fiduciary must follow plan terms to the extent that the terms are

consistent with ERISA. *See* 29 U.S.C. § 1104(a)(1)(D) (providing that a fiduciary must act "in

accordance with the documents and instruments governing the plan insofar as such documents

and instruments are consistent with the provisions of this subchapter and subchapter III of this

chapter"). Some courts have suggested that under certain circumstances, ERISA's duty of

prudence may require that a fiduciary "override" plan terms. *See Kirschbaum v. Reliant Energy,

Inc.*, 526 F.3d 243, 253–55 (5th Cir. 2008) (acknowledging that the duty of prudence might

require a fiduciary to stop purchasing company stock for a company stock fund, but finding it

unnecessary to speculate as to the scope of such a duty to override plan terms). A hypothetical

plan requiring investment in lottery tickets, for example, would violate ERISA, and a fiduciary

would thus "be bound to deviate from the plan's requirements." *Id.* at 253.

In *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995), the Third Circuit considered

whether a fiduciary of an employee stock ownership plan ("ESOP") could be held liable for

investing solely in employer common stock when both Congress and the terms of the ESOP

provided that the primary purpose of the ESOP was to invest in the employer's securities.

Emphasizing that "ESOP fiduciaries must act in accordance with the duties of loyalty and care," *id.* at 569, the court concluded that "an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision," but that "the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities," *id.* at 571. In that case, however, the plan itself gave the fiduciaries some discretion to refrain from investing in employer stock, and the court limited its holding to cases in which "the fiduciary is not absolutely required to invest in employer securities but is more than simply permitted to make such investments." *Id.* The court declined to reach the question whether ERISA's duty of prudence could require a fiduciary to ignore plan terms where the plan directed that the fiduciary invest funds solely in employer stock. *See id.* at 567 n.4; *see also Edgar v. Avaya, Inc.*, 503 F.3d 340, 346 n.10 (3d Cir. 2007) (noting that *Moench* "explicitly left open the issue of whether there could still be a breach of fiduciary duty" where the plan "in absolute unmistakable terms requires that the fiduciary invest the assets in the employer's securities regardless of the surrounding circumstances" (internal quotation marks omitted)).[18] Thus, in the Third Circuit, the extent to which a fiduciary may be required to disregard plan terms is still unexplored in part.

But even assuming that there may be circumstances under which ERISA's duty of prudence would require the fiduciaries of the Foamex Plan to disregard the Plan's terms, the Foamex defendants' argument fails here. The Benefits Committee was charged with monitoring the suitability of the Foamex Stock Fund as an investment option and had the authority to

---

[18] Although the Third Circuit did not address this question, the Sixth Circuit has asserted that "a plan provision that completely prohibits diversification of ESOP assets necessarily violates the purposes of ERISA." *Kuper*, 66 F.3d at 1457.

eliminate investment options, including the Foamex Stock Fund. The Benefits Committee also

had the authority to set the cash target in the fund. The Foamex defendants have cited no basis in

the current record for finding that Foamex also had that authority. In determining whether

Christian, acting on behalf of Foamex, was justified in disregarding the Plan documents and

usurping the Benefits Committee's authority, one must determine not whether the challenged

transactions as undertaken by Foamex were prudent, as the Foamex defendants suggest, but

whether it would have been *imprudent* not to usurp the Benefits Committee's authority. This

determination involves two separate questions: first, whether the Benefits Committee's failure to

liquidate the Foamex Stock Fund or to adjust the cash target was imprudent; and second, to the

extent that the Benefits Committee's failure to act was imprudent, whether it was necessary for

Christian to act in the committee's stead on behalf of Foamex.

      With respect to the first question, defendants have not proffered any evidence from which

a fact-finder could reasonably conclude that the Benefits Committee's failure to liquidate the

Foamex Stock Fund was imprudent. Fidelity's experts have concluded that it was reasonable to

liquidate the fund after Foamex International filed a plan of reorganization providing that its

stock would be canceled and that there would be no recovery for shareholders. (*See* Reiss Report

¶¶ 82–83; Hennessy Report ¶ 13 (explaining that "[o]nce the employer has proposed a plan of

reorganization that provides for cancellation of existing stock, we would usually begin to

liquidate the stock fund in its entirety").) But there is nothing in their reports—nor is there any

other evidence in the record—suggesting that it would have been *unreasonable* or imprudent *not*

to liquidate the fund. Indeed, by the time Foamex filed for bankruptcy, the Benefits Committee

had already closed the Foamex Stock Fund to new investments, prohibiting participants from

directing new investments or transferring existing investments into the fund. Participants were informed, in two separate notices, that the Benefits Committee had "determined that the Foamex Stock Fund may no longer be an appropriate investment for a retirement plan such as the Savings plan." (Fidelity Facts Ex. 37; *see also id.* Ex. 38.) Participants who had already invested in the fund were permitted to maintain their investments in the fund if they so chose, but they were also informed that they could transfer their investments to other funds. (Exs. 37, 38.) A prudent fiduciary could have reasonably concluded that given the Benefits Committee's prior decision, liquidating the Foamex Stock Fund after the plan of reorganization was not necessary and indeed, might not have been in the best interests of plan participants. Liquidating the fund would have forced those who wished to remain invested in the fund to take a loss. Given that the stock closed at four cents a share on December 23, 2005, when the plan of reorganization was filed, and traded between one and two cents a share in January 2006, when Christian made the decision first to increase the cash target to 50% and then to liquidate the fund (*see* Spoonemore Decl. Ex. DD), there was little risk to those who remained in the fund—they had little left to lose.[19] On the other hand, there remained the potential to recoup at least some of their losses to the extent that Foamex's financial outlook improved and the stock price increased—however slim a possibility that seemed at the time.

And to the extent that increasing the cash target to 50% on January 6, 2006, was, as Christian testified, a step in liquidating the fund, there is similarly no evidentiary basis for

---

[19] The total market value of the stock in the Foamex Stock Fund was $20,157.30 on January 4, 2006. (Spoonemore Decl. Ex. DD.) According to Fidelity, there were 588 participants invested in the Foamex Stock Fund on that date (*id.* Ex. MM), so the average investment in the stock was just $34.28.

concluding that it would have been imprudent not to implement such an increase in the cash target.

Whether prudence required that the cash target be increased to 20% on September 22, 2005, is a closer question. Fidelity's experts explained, for example, that when a stock is delisted and traded on the "Pink Sheets," as was the case with Foamex International stock, and where, as here, there are no inflows of contributions into the stock fund because it has been closed to new investments, "the cash target often needs to be raised to ensure that the stock fund can continue to honor participants' requests for withdrawals . . . even if there is no change in participant behavior." (Hennessy Report ¶ 13; *see also* Reiss Report ¶¶ 45–81.) On the other hand, plaintiff asserts that insufficient liquidity would not have prevented participants from withdrawing, but merely would have delayed withdrawals, a risk that participants were informed of. (SPD at 7.) And if there had been a liquidity shortage, the Benefits Committee could have then decided to increase the cash target. That is, plaintiff suggests that a fiduciary could have taken a "wait and see" approach to increasing the cash target, rather than increasing it immediately.

But even to the extent that Christian reasonably thought that prudence required such an increase—or required any of the other challenged transactions—it does not necessarily follow that he was justified in usurping the Benefit Committee's authority with respect to such actions. Rather, it invites the question, Why did he not bring his concerns to the attention of the Benefits Committee and request that the committee take action? As the chairman of the committee he certainly was in a position to do so. And because there is no evidence that he did, a fact-finder could not reasonably conclude that prudence required that he disregard the Plan's terms and usurp the authority of the Benefits Committee. The evidence of record does not support a

45

conclusion that a reasonable fact-finder would be compelled to find that Foamex, through

Christian, was required to act contrary to the Plan documents.

### e.        Does Section 404(c) Provide a Defense?

Finally, the Foamex defendants contend that plaintiff's claims against them must fail

because section 404(c) of ERISA shields them from liability for their alleged breach of fiduciary

duty. Section 404(c) exempts fiduciaries of a "plan which provides for individual accounts and

permits a participant or beneficiary to exercise control over the assets in his account" from

liability "for any loss, or by reason of any breach, which results from such participant's or

beneficiary's exercise of control." 29 U.S.C. § 1104(c)(1)(A). The Department of Labor has

promulgated regulations setting forth detailed requirements that must be met in order for section

404(c) to apply. *See* 29 C.F.R. § 2550.404c-1. And a fiduciary seeking section 404(c)'s

protection bears the burden of demonstrating that these requirements have been met and that

section 404(c) applies. *See In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 446 (3d Cir. 1996); Final

Regulation Regarding Participant Directed Individual Account Plans (ERISA Section 404(c)

Plans), 57 Fed. Reg. 46,906, 46,906 (Oct. 13, 1992) ("[T]he person asserting applicability of the

exception will have the burden of proving that the conditions of section 404(c) and any

regulation thereunder have been met."). The Foamex defendants, however, have not addressed

the requirements set forth in the regulations and have therefore failed to satisfy their burden of

demonstrating that section 404(c) applies here.

There is thus no basis for granting summary judgment in favor of the Foamex defendants.

I turn next to plaintiff's claims against Fidelity under count I.

### 2.       Fidelity

Plaintiff claims that Fidelity breached its fiduciary duty by following the unauthorized

and improper directions by Foamex to make adjustments to the cash target and to liquidate the

Foamex Stock Fund.

Because there are genuine issues of fact as to whether Fidelity breached its duty and as to

whether such a breach caused the Plan's losses, I will deny both plaintiff's and Fidelity's motions

for summary judgment as to this count.[20]

### a.       Fidelity's Fiduciary Status as a Directed Trustee

As a general matter, a plan's trustee has "exclusive authority and discretion to manage

and control the assets of the plan," 29 U.S.C. § 1103(a), and thus is, by definition, a fiduciary, *see*

29 U.S.C. § 1002(21)(A) (providing that "a person is a fiduciary with respect to a plan to the

extent . . . he . . . exercises any authority or control respecting management or disposition of its

assets"). But where, as here, a plan expressly provides that a trustee is subject to the direction of

a named fiduciary, section 403(a) limits such a directed trustee's fiduciary liability to those

---

[20] Plaintiff has moved for summary judgment as to the liability of Fidelity under count IV, not under count I. But the claims in the two counts are essentially the same, and I need not address the two counts separately. In count I, plaintiff claims that Fidelity breached its duty, under section 404(a)(1)(D), to act in accordance with the Plan documents, by following unauthorized and improper directions from Foamex. Similarly, in count IV, plaintiff claims that Fidelity breached its duty, under section 403(a), to follow the "proper directions of [the named] fiduciary which are made in accordance with the terms of the plan and which are not contrary to [ERISA]." 29 U.S.C. § 403(a)(1). While section 403(a) seems to impose on directed trustees a duty to follow the proper directions of the named fiduciary, it is unclear whether a trustee breaches its duty under section 403(a) by following directions from a person other than the named fiduciary or directions that are otherwise contrary to the plan or ERISA, or whether such conduct constitutes a breach of the trustee's fiduciary duties under section 404. Regardless of whether plaintiff's claim arises under section 403 or section 404, the analysis is the same.

instances in which the trustee either fails to comply with the "proper directions" of the fiduciary or complies with directions that are contrary to the terms of the plan or ERISA. *See* 29 U.S.C. § 1103(a).[21]

### b.    Did Fidelity Breach Its Fiduciary Duty by Following Improper Directions?

Plaintiff asserts two separate grounds for his claim that Fidelity breached its fiduciary duty. First, plaintiff claims that because the Benefits Committee, as the named fiduciary, had the exclusive authority to direct Fidelity as to adjustments to the cash target and the liquidation of the fund, Fidelity breached its fiduciary duty by following directions from Foamex. Second, plaintiff claims that even if Fidelity reasonably believed that the directions were authorized by the Benefits Committee, Fidelity nonetheless breached its duty because the directions as to the cash target were contrary to the terms of the Plan. Fidelity claims that the directions it followed were both authorized and proper and thus that, as a directed trustee, it cannot be subject to liability for the liquidation of the Foamex Stock Fund or the various adjustments to the cash target.

I turn first to the question whether Fidelity breached its duty by following directions from an unauthorized source. Fidelity argues that even if Foamex was not authorized to issue such

---

[21] Section 403(a) provides, in relevant part:
Except as provided in subsection (b), all assets of an employee benefit plan shall be held in trust by one or more trustees. . . . [T]he trustee or trustees shall have exclusive authority and discretion to manage and control the assets of the plan, except to the extent that—
    (1) the plan expressly provides that he trustee or trustees are subject to the direction of a named fiduciary who is not a trustee, in which case the trustees shall be subject to proper directions of such fiduciary which are made in accordance with the terms of the plan and which are not contrary to this chapter
    . . . .
29 U.S.C. § 1103(a).

directions,[22] it was entitled to follow the directions because they were signed by McGinley, who was an authorized signatory for the Benefits Committee (as well as for Foamex). And Fidelity contends that it had no duty under ERISA to determine whether McGinley was in fact acting on behalf of the Benefits Committee or whether the Benefits Committee had in fact authorized the transactions.

Fidelity's argument is persuasive. The problem, however, is that McGinley not only was the authorized signatory for the Benefits Committee, but he was also authorized to sign on behalf of Foamex. And there is a genuine question as to whether it was reasonable for Fidelity to believe that it was following the directions of the Benefits Committee. Nowhere, for example, does either the September 22, 2005, letter or the January 6, 2006, letter directing Fidelity to increase the cash target specify that it was the Benefits Committee that was directing Fidelity. But the letters do state that "[t]his direction shall apply until such time as *Foamex International Inc.* directs [Fidelity] in writing of any deviation to this letter" (Spoonemore Decl. Exs. P, R (emphasis added)), which creates at least some ambiguity as to who was directing the increases. Contrary to plaintiff's contention, the fact that the letters are on Foamex letterhead is of little significance. There is no evidence that the Benefits Committee had its own letterhead—and indeed, there is little reason to think that such a committee, composed of Foamex employees, would have special letterhead. Nor does the fact that McGinley identified himself as the director of benefits and compensation, rather than as the secretary of the Benefits Committee, have any

---

[22] Like the Foamex defendants, Fidelity argues that Foamex had the authority to direct the challenged transactions and that the adjustments to the cash target were otherwise permitted by the Plan. But, as discussed above, although there is a genuine issue of fact as to whether the cash adjustments were made for a permissible purpose, the undisputed evidence shows that Foamex lacked the authority to adjust the cash target or liquidate the fund.

determinative significance except to the extent that there is nothing in the letters specifying that the Benefits Committee was issuing the directions.

On the other hand, as Fidelity points out, Fidelity discussed these challenged transactions with Christian and McGinley before McGinley signed the letters of direction. (*See, e.g.*, McGinley Dep. at 73:1—18; Pathe Dep. at 103:15–21, 150:23–156:6.) Given that Christian was the chairman of the Benefits Committee and McGinley was the committee's secretary, Fidelity may have had reason to believe that the Benefits Committee had authorized the increases in the cash target, notwithstanding the letters' ambiguity.

Similarly, although the letter prepared by Fidelity directing the liquidation of the fund stated that "a decision has been made *by Foamex L.P.* to eliminate the Foamex Stock Fund as an investment option in the Plan," Fidelity asked in the letter that "an authorized signatory for the Named Fiduciary and Plan Administrator of the Plan [i.e., the Benefits Committee] review this letter and sign the final page indicating authorization and direction to take the steps outlined in this letter," which McGinley did. (Spoonemore Decl. Ex. S (emphasis added).) But the February 2006 letter directing Fidelity to "reverse" the liquidation suggests that Fidelity may have been confused as to who the named fiduciary was.[23] The letter stated that *Foamex*, "[a]cting in its capacity as named fiduciary of the Plan, . . . has determined that the removal of the Foamex Stock Fund should be delayed until further written direction." (Spoonemore Decl. Ex. T at 1.) And the directions in the letter are clearly from Foamex: "*Foamex* hereby directs Fidelity to

---

[23] Although plaintiff does not challenge Fidelity as to the February 2006 direction under count IV (*see* 3d Am. Compl. ¶ 65 (alleging that Fidelity breached its fiduciary obligations when it sold stock from the Foamex Stock Fund between July 19, 2005, and January 30, 2006)), count I does not contain the same date restriction as count IV and thus encompasses plaintiff's claims as to this direction.

refrain from processing the reallocation of the proceeds of the Stock Fund which was anticipated

to occur on or about February 24, 2006"; "*Foamex* directs [Fidelity] to purchase Foamex shares

until the cash position reaches 50% of the assets in the Stock Fund"; "*Foamex* may review this

cash target direction in the future, and may adjust it as appropriate." (*Id.* (emphasis added).)[24]

There is thus a genuine question as to whether Fidelity could have reasonably believed that it was

following the directions of the Benefits Committee, the only entity authorized to issue these

directions.

     I do not suggest that, as a general matter, Fidelity had a duty to monitor the Benefits

Committee or to otherwise confirm that the committee in fact authorized directions signed by an

authorized signatory for the committee where the letter of direction clearly purports to be on

behalf of the committee. But here, there is ambiguity as to who issued the directions. As a result,

the question whether Fidelity breached its fiduciary duty by following directions from a person

other than the named fiduciary cannot be resolved on summary judgment.

     Plaintiff also claims that Fidelity breached its duty by following directions that were

contrary to the Plan documents. As discussed in section III.A.1.b, a fact-finder could not

reasonably conclude that the decisions to increase the cash target to 20% in September 2005 and

to 50% in January 2006 were contrary to the Plan. Accordingly, there is no basis for holding

Fidelity liable for following such directions (except, as just discussed, to the extent that they were

unauthorized). A genuine question of fact exists, however, as to whether the decision to

---

[24] In Fidelity's February 24, 2006, notice informing participants that the liquidation had been "deferred," Fidelity recognized that it was the Benefits Committee that was responsible for setting the cash target—as Fidelity explained, "[t]he *Benefits Committee* may review this target cash balance in the future and adjust it as appropriate." (Supplemental Decl. of Richard E. Spoonemore in Supp. of Mot. for Class Certification (July 24, 2009) Ex. Q (emphasis added).)

reestablish the cash target at 50% in February 2006 was consistent with the terms of the Plan. But even if the fact-finder ultimately concluded that the decision to set the cash target at 50% was improper, that would not end the inquiry as to whether Fidelity breached its fiduciary duty by following the February 2006 direction. The letter of direction stated that "[t]he purpose of this target cash balance is to provide liquidity to satisfy daily participant requests." (Spoonemore Decl. Ex. T.) The question thus is whether Fidelity had any duty to look beyond the stated purpose in the letter of direction and determine whether the decision to set the cash target at 50% was consistent with the terms of the Plan.

The parties disagree as to the proper standard to be applied in such a situation. Citing a sentence in ERISA's legislative history, Fidelity contends that it is entitled to follow directions unless it is clear on the face of those directions that the directed actions would be contrary to the terms of the Plan or to ERISA. *See* H.R. Conf. Rep. No. 93-1280, at [page] (1973), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5079 ("If the plan so provides, the trustee who is directed by an investment committee is to follow that committee's directions unless it is clear on their face that the actions to be taken under those directions would be prohibited by the fiduciary responsibility rules of the bill or would be contrary to the terms of the plan or trust.").[25] Plaintiff, on the other hand, asserts that a directed trustee may not follow directions where it has reason to know that the directions are contrary to the Plan or ERISA. *See In re Enron Corp. Sec., Derivative & ERISA*

---

[25] The Trust Agreement used similar language: it provided that Fidelity would not be liable for following a direction of the named fiduciary if the direction was in a writing signed by an authorized signatory and if Fidelity reasonably believed the signature to be genuine, "unless it is clear on the direction's face that the actions to be taken under the direction would be prohibited under ERISA or would be contrary to the terms of this Agreement." (Trust Agreement § 7(c).)

*Litig.*, 284 F. Supp. 2d 511, 581–602 (S.D. Tex. 2003) (providing a detailed discussion regarding the standard to be applied under section 403(a) and concluding that a directed trustee has a fiduciary obligation "to question and investigate where he has some reason to know the directions he has been given may conflict with the plan . . . or the statute"); DOL Field Assistance Bulletin No. 2004-03 (Dec. 17, 2004), 2004 WL 2979777, at *2 ("[W]hen a directed trustee knows or should know that a direction from a named fiduciary is not made in accordance with the terms of the plan or is contrary to ERISA, the directed trustee may not, consistent with its fiduciary responsibilities, follow the direction."). But I need not resolve this issue now, since the existence of genuine questions of fact as to whether Fidelity breached its duty by following directions from a person other than the named fiduciary (the directions in the letter are clearly from Foamex, not the Benefits Committee), and whether such a breach caused the Plan's losses, precludes summary judgment in any event.

### c.        Did the Breach Cause the Plan's Losses?

Even if Fidelity did breach its fiduciary duty as a directed trustee, Fidelity may be held liable for that breach only to the extent that the breach caused the Plan's losses. And just as there is a question of fact as to whether the breach of duty by the Foamex defendants caused the Plan's losses, there is a question of fact as to whether the requisite causal link exists between Fidelity's alleged breach and the Plan's losses.

I will thus deny both plaintiff's and Fidelity's motions for summary judgment as to counts I and IV.

### B.      Count II: Breach of Duty to Monitor Benefits Committee

Plaintiff alleges, in count II, that Foamex breached its duty to monitor the Benefits

Committee. Plaintiff asserts that as a fiduciary of the Plan with respect to its appointment of

members of the Benefits Committee, Foamex had a duty, under section 404(a)(1)(B) of ERISA,

to monitor the performance of the Benefits Committee. And plaintiff claims that Foamex knew

or should have known that the members of the Benefits Committee were not properly performing

their duties between July 19, 2005, and January 30, 2006, because they permitted the liquidation

of the Foamex Stock Fund. Because the Foamex defendants have not addressed this claim in

their briefs, I will deny their motion for summary judgment as to this claim against Foamex.

### C.      Count III: *Respondeat Superior*

Plaintiff also seeks, in count III, to hold Foamex liable for the breaches of fiduciary duty

by the members of the Benefits Committee under the doctrine of *respondeat superior*. This claim

is derivative of the claim in count I, and insofar as this claim is based on alleged breaches of duty

by Ralph, Drap, or Karpinski, it cannot be sustained, since I am granting summary judgment in

favor of these three defendants as to the claims against them in count I. But because there are

questions of fact precluding summary judgment as to Christian's liability under count I, I must

similarly deny both plaintiff's and the Foamex defendants' motions for summary judgment as to

this claim insofar as it is based on Christian's alleged breach of duty. (I note as well that

summary judgment is inappropriate here given that neither party has addressed this claim in their

briefs.)

**D.      Count V: Breach of Duty to Monitor Fidelity**

Plaintiff claims, in count V, that Foamex breached its duty to monitor Fidelity. To the

extent that there is a genuine issue of fact as to whether Fidelity breached any of its duties,

summary judgment is not appropriate as to this count. (I also note that the Foamex defendants

have not addressed this count in their motion for summary judgment.)

**E.      Count VI: Cofiduciary Liability**

Finally, plaintiff claims that Benefits Committee members Ralph, Drap, and Karpinski, as

well as Fidelity, are liable as cofiduciaries under section 405 of ERISA.

An ERISA fiduciary may be held liable for breaches of fiduciary duty by another

fiduciary if

> (1) he participates knowingly in, or knowingly undertakes to conceal, an act or
> omission of such other fiduciary, knowing such act or omission is a breach;
> (2) if, by his failure to comply with [his fiduciary duties outlined in] section
> 404(a)(1) in the administration of his specific responsibilities which give rise to his
> status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes
> reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a).

**1.      The Committee Members: Ralph, Drap, and Karpinski**

Plaintiff seeks to hold Benefits Committee members Ralph, Drap, and Karpinski liable as

cofiduciaries under section 405(a)(3), asserting that they knew that the Foamex Stock Fund was

being liquidated in January 2006 and that they knew that the cash target had been reestablished at

50% in February 2006 but took no remedial steps. The Foamex defendants argue that plaintiff's

claim must fail because these three committee members had no role in the challenged

transactions.

Because I find that plaintiff has made a sufficient showing to establish genuine issues of material fact, I will deny the Foamex defendants' motion for summary judgment as to this claim.

As discussed above, plaintiff has established that Christian and Foamex breached their fiduciary duty to act in accordance with the Plan documents, although genuine issues of fact exist as to whether this breach caused the Plan's losses. Assuming that the fact-finder ultimately finds the requisite causal link, to hold the three committee members liable for this breach as cofiduciaries, plaintiff must demonstrate that they were aware of the breach and that they failed to make reasonable efforts to remedy the breach. *See* 29 U.S.C. § 1105(a)(3). In addition, although the Third Circuit has not yet addressed the question of which party bears the burden of proving causation, *see In re Unisys Sav. Plan Litig.*, 173 F.3d at 160, there must be a causal connection between the defendants' failure to make reasonable remedial efforts and the Plan's losses, *see Silverman*, 138 F.3d at 104 (2d Cir. 1998) (holding that section 409 requires a causal connection for liability under section 405(a)(3)).

### a.        Liquidation of the Fund

A genuine issue of fact exists as to whether the three committee members had knowledge of Foamex and Christian's breach of fiduciary duty with respect to the liquidation of the Foamex Stock Fund. Although, as discussed in connection with count I, there is no evidence that either Ralph, Drap, or Karpinski was involved in the decision to liquidate the Foamex Stock Fund, there is evidence that these three defendants became aware of the decision when they received the notice, dated January 27, 2006, informing participants of the liquidation. (*See* Karpinski Dep.

at 35:11–23 (testifying that he became aware of the liquidation when he received the notice sent

to participants); Drap Dep. at 9:8–23 (testifying that he was invested in the Foamex Stock Fund);

Ralph Dep. at 11:23–13:15 (same).) Moreover, although it is unclear whether they knew that the

decision to liquidate the fund was unauthorized, a fact-finder could reasonably find that the

defendants ultimately learned of the circumstances surrounding the decision to liquidate the fund.

Karpinski testified, for example, that after he received the notice regarding the liquidation of the

fund, he "stopped in to see Tom McGinley the next day and said, . . . why did this take place?"

although Karpinski also testified that he did not recall McGinley's answer. (Karpinski Dep. at

36:5–15.)

In addition, although there is no dispute that none of the three committee defendants took

steps to remedy the breach, a genuine issue of fact exists as to whether their failure to act caused

the Plan's losses. The liquidation of the Foamex Stock Fund began on January 23, 2006, but the

notice informing participants of the liquidation was dated January 27, 2006, and there is no

evidence as to the date on which the three committee defendants received that notice. Moreover,

it is not clear how much of the fund had been liquidated by the time they received this notice and

thus whether there was anything they could have done to prevent the liquidation.

### b.    Reestablishment of 50% Cash Target

Similarly, plaintiff has presented sufficient evidence to raise a genuine issue of fact as to

his claim that the three committee members were aware of the breach of duty with respect to the

"reversal" of the liquidation of the Foamex Stock Fund and the reestablishment of a 50% cash

target but took no steps to remedy the breach. Although it is undisputed that none of the three

committee defendants played any role in the decision to "reverse" the liquidation of the fund, a

fact-finder could reasonably find that these three defendants became aware of the decision when,

as participants, they received the February 24, 2006, notice informing participants of the decision

to defer the liquidation of the fund and to maintain a target cash balance of 50%. (*See, e.g.*,

Karpinski Dep. at 46:9–20.)[26] In addition, plaintiff has presented sufficient evidence to raise a

genuine issue of fact as to whether the defendants' failure to take reasonable remedial steps

caused the Plan's losses. Because the Plan provided that the Benefits Committee "shall act by the

majority of members then in office at all meetings" (Plan § 12.2), the three committee members,

acting together, could have directed that Fidelity reduce the cash target. Moreover, because the

price of Foamex International stock did not begin to increase significantly until mid-April 2006

(at the end of March 2006, the stock was trading at only $0.15 per share, but on April 27, 2006,

the stock closed at $2.37 per share (Spoonemore Decl. Ex. DD)), a fact-finder could reasonably

conclude that the three committee defendants could have prevented at least some of the Plan's

losses by reducing the cash target in March 2006.

     Given these genuine issues of fact, I must deny the Foamex defendants' motion for

summary judgment as to the claim in count VI that the three committee defendants are liable, as

co-fiduciaries, for the breaches of Foamex and Christian.

     I turn next to plaintiff's claim that Fidelity is also liable as a co-fiduciary.

---

[26] Although Fidelity had liquidated all the Foamex International stock holdings in the
fund between January 23, 2006, and January 30, 2006, and Fidelity had been directed, on
February 9, 2006, to repurchase shares of Foamex International stock to reestablish and maintain
a cash target of 50%, the notice stated only that "the automatic liquidation of remaining shares in
the Foamex Stock Fund has been deferred until further notice." (Supplemental Decl. of Richard
E. Spoonemore in Supp. of Mot. for Class Certification (July 24, 2009) Ex. Q.)

2. **Fidelity**

Plaintiff seeks to hold Fidelity liable as a cofiduciary under section 405(a)(2) and (3), asserting that Fidelity's own failure to act in accordance with the Plan documents enabled Foamex and Christian to breach their fiduciary duties, and asserting that Fidelity knew that the directions it followed were from Foamex, not the Benefits Committee,[27] and that Fidelity failed to notify the Benefits Committee of this unauthorized conduct. Plaintiff's claims against Fidelity under this count present a similar set of issues as those raised in connection with the breach-of-fiduciary-duty claims against Fidelity in count I (and count IV)—namely, whether Fidelity knew that the directions it received were unauthorized or otherwise improper and whether there is a causal connection between Fidelity's decision to follow such directions and the Plan's losses. And for the same reasons that I am denying Fidelity's and plaintiff's motions for summary judgment as to count I (and count IV), I will also deny Fidelity's motion for summary judgment as to this count (plaintiff has not moved for summary judgment as to this count).

IV. **CONCLUSION**

For the reasons set forth above, I will deny plaintiff's motion for summary judgment; I will grant the Foamex defendants' motion for summary judgment as to the claims in count I against Ralph, Drap, and Karpinski, but I will deny their motion as to all the remaining claims; and I will deny Fidelity's motion for summary judgment. I will also deny as moot Fidelity's motion to exclude the opinion of Dr. Dennis Logue on "authority" issues. An appropriate order accompanies this memorandum.

---

[27] Plaintiff also alleges that Fidelity knew that the adjustments to the cash target were not being made for liquidity purposes and thus knew that the directions were improper.